**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| POLICE & FIRE RETIREMENT SYSTEM CITY OF DETROIT and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARGO GROUP INTERNATIONAL HOLDINGS, LTD., SCOTT KIRK, KEVIN J. REHNBERG, MARK E. WATSON, III and JAY S. BULLOCK,<br><br>Defendants. | Civil Action No. 1:22-cv-08971 (LAK)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION**
**OF THE FEDERAL SECURITIES LAWS**

Table of Contents

I. NATURE OF THE ACTION ... 4
II. JURISDICTION AND VENUE ... 11
III. PARTIES ... 11
A. LEAD PLAINTIFF ... 11
B. DEFENDANTS ... 12
C. RELEVANT NON-PARTIES ... 14
D. CONFIDENTIAL WITNESSES ... 15
i. CW1 ... 15
ii. CW2 ... 17
iii. CW3 ... 18
iv. CW4 ... 20
IV. FACTS ... 24
A. BACKGROUND OF ARGO ... 24
B. ARGO'S CONSTRUCTION SEGMENT BECOMES ONE OF ARGO'S "SELECTED BUSINESS LINES" AND BREAKS OFF INTO A STAND-ALONE UNIT ... 26
C. ARGO CONSISTENTLY TOUTED ITS DISCIPLINED UNDERWRITING AND LONG-TERM FAVORABLE RESERVE DEVELOPMENT ... 29
V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 33
A. THE JUNE 11, 2018 PRESS RELEASE ... 34
B. 2019 ... 35
C. 2020 ... 36
D. 2021 ... 39
VI. THE TRUTH IS REVEALED ... 44
VII. SCIENTER ALLEGATIONS ... 49
A. ACTUAL KNOWLEDGE ... 49
B. IMPUTED KNOWLEDGE OF FACTS CRITICAL TO THE COMPANY'S U.S. OPERATIONS ... 54
C. MOTIVE AND OPPORTUNITY ... 55
i. Incentive Compensation ... 55
ii. Defendants Watson, Rehnberg, and Bullock Realized More Than $7.6 Million in Proceeds from Their Class Period Stock Sales ... 60
D. THE SEC INVESTIGATION INTO DEFENDANT WATSON'S UNDISCLOSED PERQUISITES ... 62
E. THROUGHOUT THE CLASS PERIOD ARGO EXPERIENCED SIGNIFICANT EXECUTIVE TURNOVER ... 64
VIII. CLASS ACTION ALLEGATIONS ... 65

IX. PRESUMPTION OF RELIANCE ........ 67
X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 68
XI. LOSS CAUSATION ........ 69
XII. PRAYER FOR RELIEF ........ 72
XIII. DEMAND FOR TRIAL BY JURY ........ 73

Lead Plaintiffs Police & Fire Retirement System City of Detroit ("Detroit PFRS") and Oklahoma Law Enforcement Retirement System ("OLERS," and together with Detroit PFRS "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned attorneys, alleges the following upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Argo Group International Holdings, Ltd. ("Argo" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Argo; (d) other public information regarding the Company; and (e) investigative interviews with former Argo employees having first-hand knowledge of the Company's business operations including its construction segment and the underwriting and claims adjustment processes thereunder.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of investors that purchased or otherwise acquired Argo common stock between June 11, 2018 and August 9, 2022 (the "Class Period"). Lead Plaintiff seeks to recover damages caused by Defendants' violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Based in Bermuda, Argo is a specialty insurance underwriter for insurance products in the property and casualty markets. Argo claims to target "niche" markets in order to develop a leadership position and generate underwriting profits. During the Class Period, Argo operated under two reporting segments, a U.S. segment and an international segment. Its U.S. segment was historically considered Argo's "crown jewel," whereas its international segment was sometimes referred to by analysts as "mediocre and dilutive."

3. Throughout the Class Period, investors and analysts were particularly focused on the health of the U.S. segment which grew exponentially as the Company shifted resources from its poorly performing international segment to the domestic market. In particular, the investing public was focused on Argo's gross written premiums ("GWP"), a metric representing the sum of direct premiums written and assumed premiums from reinsurance agreements, before deducting commissions. GWP is generally the principal source of an insurance company's revenues. In 2019, Argo's U.S. segment accounted for 58% of the Company's overall GWP. This percentage grew to 62% and 66% in 2020 and 2021, respectively. Conversely, Argo's international operations only accounted for 27%, 25%, and 30% of its total GWP for years 2019, 2020, and 2021, respectively.

4. Historically, the most important part of the Company's U.S. segment was its Excess and Surplus lines ("E&S"), which focused on risks that the standard market was unwilling or unable to underwrite. By fiscal year 2018, 24% of Argo's GWP mix was derived from its E&S lines. Argo touted how it was a "leader" in E&S in its Class Period SEC filings. For instance, on February 28, 2020, Argo filed its 10-K for fiscal year ended December 31, 2019, which stated: "This segment [U.S. Operations] is a leader in the U.S. Specialty Insurance market, specifically through its Excess and Surplus Lines ("E&S") businesses focusing on U.S.-based risks that the standard, admitted insurance market is unwilling or unable to underwrite, and through other specialized admitted and non-admitted business distributed through retail, wholesale and managing general brokers/agents in the Specialty Insurance market." Analysts too recognized Argo was a leader in E&S. For instance, on April 30, 2019, JMP Securities LLC stated: "We believe Argo has the right mix of business for the market at hand (predominantly specialty insurance), that ***its core E&S business is a valuable franchise***, and that ongoing investments in digital capabilities and emerging growth markets across the globe will pay dividends down the

road." Aware of the inherently risky nature of this line of business, Defendants repeatedly assured the investing public of the Company's prudent underwriting philosophies and its ability to properly reserve for losses for claims underwritten in that segment.

5. As demonstrated through statements made in Argo's SEC filings and as corroborated by several former employees, Defendants were particularly focused on Argo's construction segment which was historically part of Argo's E&S line. For years, Argo had underwritten insurance claims arising out of defects in construction, including design, workmanship, and materials, which the industry refers to as "construction defect claims." By 2018, Argo's construction portfolio was worth $150 million gross underwritten premiums in the U.S., or approximately 9% of its total U.S. business.

6. Defendants were determined to shift focus to Argo's U.S. business operations to offset the poor performance of its "mediocre" international segment. Recognizing the potential of the growing construction sector, Defendants decided to expand Argo's construction operations to seize a bigger piece of the construction industry's $1 trillion market share.

7. Thus, on June 11, 2018, Argo announced that it would break off its construction segment from its E&S line into a stand-alone underwriting business called "Argo Construction." In announcing the change, Defendant Watson observed that the construction industry was "projected to be among the fastest growing business sectors in the United States over the next five to seven years."

8. For years, Defendants touted the Company's burgeoning construction segment, its underwriting and reserving processes thereunder, and attributed much of the success of Argo's U.S. operations to the construction segment. For instance, during earnings calls and "investor days," Defendants assured the public that the Company's construction segment would "absorb"

the underperforming aspects of its business. Defendants repeatedly characterized the construction segment as one of Argo's "best performing" and "largest business units" that was "leading the way for us in the U.S." and claimed that the positive results therefrom allowed the company to "absorb the impact of the pandemic to report an excellent quarter." Defendants also consistently reported that the "strongest growth was in our professional liability and construction business units" and praised the construction segment for "exceed[ing] our expectations."

9. Analysts mirrored Defendants' statements about the success of Argo's construction business. For instance, on May 4, 2021, Boenning & Scattergood reported "GWP growth in the U.S. was driven by strategic focus businesses, including Argo Pro, Casualty, Construction, Environmental, Inland Marine and Surety." On November 3, 2021, Compass Point released a report discussing Argo's growing U.S. operations and how "growth primarily came from Argo Pro, Casualty, Construction, Environmental, Inland Marine, and Surety."

10. But things inside the Company were quite different. While touting the strength of Argo Construction, Defendants knew, but failed to disclose, that very business unit was plagued with underwriting issues, was over "exposed," and had claims written outside of its "core" construction business. Indeed, Defendants' belated disclosure on February 8, 2022, that Argo had formed a "Construction Defect Task Force" in 2017 to strengthen underwriting guidelines was itself an admission that they knew, as early as 2017, that: (1) Argo's construction portfolio was too exposed; (2) the underwriting guidelines thereunder were too lax; (3) the construction defect claims from 2011-2017 were improperly underwritten, and (4) because the construction defect claims booked from 2011-2017 were improperly underwritten, the Company would have to increase its reserves to cover claims against those policies.

11. Statements from four former employees who worked at Argo during the Class Period confirm that Defendants were aware of the problems within Argo's construction segment well before February of 2022. CW1 reported that Argo "did not understand how to deal with construction defect claims." CW2 reported that construction defect issues were an issue for Argo's middle market business and that there were internal discussions in 2020 about Argo's middle market construction defect group wanting to strengthen underwriting guidelines. CW3 reported that construction defects were not just a concern for leadership of the construction business, but that executives in other businesses were also "keeping an eye on" the construction defect losses. Further, CW3 stated that Defendant Rehnberg himself made statements in town hall meetings in or around March or April 2021 that construction defect "***was something that was a concern***." CW4 reported that: (1) Defendant Rehnberg stated that construction defect claims were a concern during more than two or three different quarterly town hall meetings; (2) Rehnberg "regularly" stated that "construction defect was a challenge" at those same townhall meetings (see paras. 61, 118, 142, below); (3) Argo had a culture of "reserves suppression" wherein certain executives, such as Chief Claims Officer, Mark Wade, yelled at or berated Argo employees who wanted to "put up reserves" during product line review meetings, which were attended by Defendants Watson, Rehnberg, Bullock, and Kirk; (4) management delayed approving reserve memos, and in particular, Leandra Ryan, Argo's former Vice President of Claims who was fired from the Company in June 2018, "knew people did not want to see development in the construction defect book, so she just would not approve reserves;" and (5) Defendants Watson, Rehnberg, Bullock, and Kirk attended quarterly construction product review meetings between July 2018 and August 2021 wherein the SVP of Construction, Jim Cornwell, presented data from Argo's CAPS

information system (which tracked and managed claims and featured estimated losses) via PowerPoint presentations.

12. Rather than disclose the problems pervading the construction segment and thereby risk having to report adverse reserve development (especially after more than fourteen years of touting favorable reserve development), and therefore incur a charge that would impact the Company's earnings, Defendants chose to conceal the truth about the problems with Argo's construction segment. Defendants took affirmative steps to mask the problems within the construction segment; cultivated the Company's culture of reserve suppression as evidenced by the fact that they witnessed executives and high-level managers yelling at lower level employees who sought to increase reserves; took home approximately $24 million worth of incentive compensation which was contingent on positive financial metrics like pre-tax operating income and growth in Book Value Per Share ("BVPS") targets (both of which would be negatively impacted by a reserve charge); and cashed out their stock while Argo's share price was artificially inflated.

13. On February 8, 2022, after years of proclaiming the success of its construction segment, Argo stunned analysts and investors when it announced adverse reserve development of *$130 to $140 million*, i.e., it had to increase its claims reserves – the majority of which pertained to its inadequate reserves for construction defect claims underwritten for years 2011-2017. Defendants for the first time disclosed that Argo's construction business, which they had previously touted as Argo's "leading business line," was suffering for *at least five years* from over exposure, improper and weak underwriting guidelines, and claims written in that book were outside of Argo's "core construction business." The investing public reacted not only to the negative business development but also to the disparity between what investors had been led to

believe and what appeared to be the truth known only to management. That same day, Compass Point released a news report with the headline "*Stunning Adverse Development*," and noted that the announced material adverse development "will *severely penalize 4Q21 EPS and decimate the CAGR of Tangible Book Value*" and reduced its price target for Argo *from $70 to just $47.50.*

14. A few weeks after the announcement, on February 23, 2022, an analyst from Raymond James referred to the reserve charge as a "*black hole*" and asked Defendant Rehnberg: "*how can we gain confidence*? … it feels like we might have to wait until the fourth quarter of 2022 before we – when you get through another annual reserve review before we have any visibility on whether things have stabilized or not." In response, Rehnberg disclosed that, with respect to construction defects claims, "we have been working on the underwriting side of this for the *past five years*." Rehnberg then attempted to reassure investors and analysts that the situation was now "normalized."

15. However, on August 9, 2022, Argo again shocked the market when it announced that it was disposing of its entire book of construction defect policies for accident years 2011-2019 to a third-party insurance company through a loss portfolio transfer and would incur an additional $100 million charge as a result. On that same day, Compass Point described Argo's fire sale of these policies as "*another body blow for Argo's shareholders*," reducing its price target from $45.50 to $35.

16. As a result of this series of announcements, Argo's share price declined precipitously, *losing more than 55% in value* in less than six months.

17. As a result of Defendants' wrongful acts, and the artificial inflation of Argo's shares that resulted, Lead Plaintiff, having purchased Argo shares during the Class Period at prices as high as over $67 per share, and the Class, have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)).

19. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the subject matter of this action.

20. Pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), venue is proper in the Judicial District. Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. LEAD PLAINTIFF

22. Lead Plaintiff Detroit PFRS provides retirement allowances and death benefits for Detroit Police and Detroit Firefighters and their beneficiaries though a Defined Benefit Plan and Defined Contribution Plan. As of fiscal year ended June 30, 2022, Detroit PFRS had $2.8 billion under management. PFRS acquired Argo common stock at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23. Lead Plaintiff OLERS is a defined benefit pension fund headquartered in Oklahoma City, Oklahoma, that administers retirement benefits on behalf of members of the law enforcement profession of the state of Oklahoma and their families. OLERS manages over $1 billion in assets. OLERS acquired Argo common stock at artificially inflated prices during the Class Period and

was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. DEFENDANTS

24. Defendant Argo is a Bermuda-based international underwriter of specialty insurance products in the property and casualty market. Argo's Class A common stock trades in an efficient market on the NYSE ("NYSE") under the trading symbol "ARGO". Argo is incorporated and has its principal place of business at Wellesley House, 90 Pitts Bay Road, Pembroke HM 08, Bermuda. Argo conducts its operations in the U.S. through its subsidiary "Argo Group U.S.," which is headquartered in San Antonio, Texas, and is the indirect and direct parent of the U.S. subsidiaries. Argo also has an office in New York located at 501 7th Avenue New York, NY 10018. Argo's fiscal year begins on January 1 and ends on December 31.

25. Defendant Mark E. Watson, III ("Watson") was Argo's Chief Executive Officer ("CEO") from 2000 until November 5, 2019. Watson retired from his position as Argo's Chief Executive Officer after Argo admitted that it had not properly disclosed perks totaling more than $3 million that had been given to Watson in violation of SEC rules. Watson resigned from Argo's Board of Directors effective December 30, 2019. In his position as CEO, Defendant Watson signed Argo's quarterly and other periodic filings with the SEC. During the Class Period, Watson made materially false and misleading statements and failed to disclose material facts to investors, as further alleged herein. Also during the Class Period, Watson engaged in insider trading and realized $2.9 million in proceeds from selling his stock at an artificially inflated average share price of $67.43.

26. Defendant Kevin J. Rehnberg ("Rehnberg") served as President of Argo Group U.S. beginning in March 2013. Rehnberg then became Argo's interim CEO effective November 4, 2019 (when Defendant Watson resigned as CEO). Rehnberg was appointed CEO on February 18, 2020 and served in that role until March 7, 2022, at which time he took a medical leave of

absence from the Company and Thomas Bradley replaced him as interim CEO. Rehnberg also served on Argo's Board of Directors from 2020 until June 23, 2022, at which point he completely resigned from the Company and the Board. In his position as CEO, Defendant Rehnberg signed Argo's quarterly and other periodic filings with the SEC, including Forms 8-K that appended Argo's quarterly earnings releases, and attended quarterly product line review meetings for Argo's construction segment as well as company-wide town hall meetings, during which he expressed concerns with Argo's construction line, as reported by CW3 and CW4. As a member of the Board of Directors, Defendant Rehnberg was responsible for: "monitor[ing] and provid[ing] oversight regarding the Company's adherence to the policies and procedural guidelines established for" various functions including "actuarial and underwriting." During the Class Period, Rehnberg made materially false and misleading statements and failed to disclose material facts to investors, as further alleged herein. Also during the Class Period, Defendant Rehnberg engaged in insider trading, realizing total proceeds of $2.6 million from selling his stock at an artificially inflated average share price of $58.22.

27. Defendant Jay S. Bullock ("Bullock") was Argo's Chief Financial Officer ("CFO") and Executive Vice President from May 5, 2008 until March 15, 2021. During the Class Period, Bullock made materially false and misleading statements and failed to disclose material facts to investors, as further alleged herein. In his position as CFO, Defendant Bullock signed Argo's quarterly and other periodic filings with the SEC. During the Class Period, Defendant Bullock engaged in insider trading, realizing total proceeds of $2.2 million from selling his stock at an artificially inflated average share price of $66.19.

28. Defendant Scott Kirk ("Kirk") has served as Argo's CFO since March 16, 2021. Prior to working at Argo, Defendant Kirk was the CFO at Aspen Insurance Holdings Limited from

2014 to April 2020. In his position as CFO, Defendant Kirk signed Argo's quarterly and other periodic filings with the SEC, including the Forms 8-K that appended quarterly earnings press releases. During the Class Period, Kirk made materially false and misleading statements and failed to disclose material facts to investors, as further alleged herein.

29. Defendants Watson, Rehnberg, Bullock, and Kirk are referred to herein as the "Individual Defendants."

30. Argo and the Individual Defendants are collectively referred to herein as "Defendants."

### C. Relevant Non-Parties

31. Mark Wade ("Wade") has served as Argo's Chief Claims Officer since December 2015. As further alleged herein, Wade perpetuated a culture of "reserves suppression" at Argo and commonly yelled at claims staff in meetings held during the Class Period.

32. Steve Laudermilch ("Laudermilch") was Argo's U.S. Chief Claims Officer from June 2020 until May 2022 and Argo's Vice President of Claims Strategy and Operations from June 2019 to June 2020. As further alleged herein, Laudermilch tried to "humiliate" claims managers so that they "were fearful to put up reserves" and also perpetuated a culture of "reserves suppression" at Argo.

33. Jim Cornwell ("Cornwell") was Argo's Senior Vice President of Construction from July 2018 until he left Argo in 2021 to work at K2 Construction. Before that, Cornwell served as Argo's Senior Vice President, Casualty Division Manager for Colony Specialty from September 2015 to July 2017 and as Argo's Vice President, Regional Casualty Manager from 2010 until May 2015. As further alleged herein, Cornwell commonly yelled at claims staff during meetings and tried to embarrass them so they would not post reserves.

34. Leandra Ryan ("Ryan") was the Vice President of Claims at Argo from November 2011 until June 2018 at which point she was terminated. According to Ryan's LinkedIn page, she "managed 4,000+ primary and excess casualty claims with heavy focus on construction defect," among other things. As further alleged herein, Ryan delayed approving construction defect reserve memos because she "knew people did not want to see development in the construction defect book."

35. Maryterese Ceko ("Ceko") has served as Argo's Vice President of Claims since October 2018. Prior to working as Argo's VP of Claims, Ceko served as Argo's Interim Head of Casualty Claims from June 2018 to October 2018.

36. Claussen & Miller is an insurance defense law firm with offices in Illinois, New York, California, New Jersey, Indiana, Wisconsin, Florida, Connecticut, and Texas. According to CW1 and CW4, Argo worked with Claussen & Miller throughout the Class Period to manage its construction defect claims.

### D. Confidential Witnesses

#### i. CW1

37. CW1 is a former employee of Argo who worked as a senior construction defect claims adjuster from August 2019 to December 2020. CW1 departed from Argo in 2020 because they felt overwhelmed by the amount of work they faced. CW1 reported having worked in the industry for 25 years at several different companies and is thus very familiar with construction defect claims. Many of the construction defect claims to which CW1 was assigned were for policies that had been written in 2012 or 2013.

38. CW1 reported to two construction defect claims managers during their employment at Argo: Kevin Caberto ("Caberto") and Walter Nelson ("Nelson"). Upon information and belief,

Caberto and Nelson reported to Mary Henderson, the Assistant Vice President of Construction at Argo.

39. CW1 reported that Argo was expanding its team of adjusters for its construction defect group. For context, CW1 reported that when they joined in 2019, they were one of six or seven construction claims adjusters at Argo. By the time CW1 left in December 2020, Argo had three teams of adjusters with four or five individuals on each team. In particular, Argo hired about 10 new adjusters between the time CW1 began working at Argo in August 2019 and when they left in December 2020.

40. CW1 reported that soon after joining Argo in 2019, they realized that Argo "did not understand how to deal with construction defect claims" and that the Company "did not know how many claims they actually had."

41. While employed at Argo, CW1 observed that construction defect adjusters were overloaded with work. CW1 reported feeling "so swamped with claims." CW1 explained that a manageable case load for an experienced claims adjuster is approximately 100 claims, however, CW1 and the other adjusters had caseloads of upwards of 175-180 claims.

42. As soon as claims were transferred to CW1 and other experienced claims adjusters, they realized they needed to resolve the claims as there were "exposures here." CW1 reported that by late 2019, there was an "influx of reserves set on claims" and that in late 2019 or early 2020, there was a "huge increase in reserves" assessed by the claims adjusters on both the claims that were previously handled by Claussen & Miller and the new claims filed with Argo.

43. CW1 also reported that there were tiers of authority assigned on the reserves the adjusters set. For instance, CW1 stated, "you could not just set a reserve for $1 million," rather, an

adjuster could set reserves up to a certain amount, but would then need approval from their manager for expected losses that exceeded their authority.

44. CW1 noted that Argo worked with the law firm, Claussen & Miller, to manage its construction defect claims. According to CW1, the law firm seemed to have been "sitting on the claims, just babysitting them," rather than actually investigating or resolving them. CW1 noted that Claussen & Miller was "just providing assistance" to Argo because Argo did not have a robust construction defect claims program in place that could handle the volume of claims the Company was experiencing.

**ii. CW2**

45. CW2 is a former employee of Argo who worked in various roles at the Company between July 2017 and June 2022. CW2 most recently worked as "Underwriter 2 – Argo Construction" for Argo's construction business in New York from April 2021 to June 2022. Prior to that, CW2 had worked as "Underwriter 1 – Argo Construction" from January 2019 through April 2021, and as an underwriting assistant from July 2017 to January 2019.

46. Beginning in 2019, CW2 began working under and directly reporting to Cornwell, the SVP of Construction. After Cornwell departed in 2021, CW2 began reporting to the Vice President of Underwriting, Justin Hobbs ("Hobbs").

47. CW2 reported that construction defect claims were an issue for Argo's "middle market" business. In particular, CW2 remembered discussions beginning in 2020 about Argo's middle market construction defect claims and in particular, how that group wanted "to strengthen underwriting guidelines" to mitigate the defect claim concerns. Specifically, CW2 reported that the middle market team was "adding on exclusion wording" to the policies to "cut back on potential

for certain business operations to be performed." CW2 stated that "one of the big things" the middle market team changed was limiting business with roofing contractors.

48. According to CW2, there was less due diligence conducted by the middle market underwriters than by the New York construction underwriters and the middle market team's underwriting was not as robust as CW2 was accustomed to in New York.

49. CW2 further reported that Argo historically held quarterly town hall meetings which were initially led by Defendant Watson until he resigned in November 2019 and later held by Defendant Rehnberg once he assumed the role as CEO. CW2 stated that Defendants Bullock and Kirk also attended the quarterly town hall meetings, and that these two Defendants were usually "involved in some degree" at the meetings, including presenting at some of them. These meetings became more frequent when employees began working remotely due to the COVID pandemic. CW2 reported that the town hall meetings were "extremely detailed," lasted about an hour, and were typically led by an executive, such as the CEO. Topics like "loss ratios" (which represents the ratio of losses to premiums earned) and "premiums written" were discussed during these meetings.

50. CW2 also reported that they attended quarterly construction meetings which typically lasted about 30 minutes. During these meetings, Cornwell provided business updates and Chief Underwriting Officer, Frank Mike-Mayer, and Vice President of Underwriting, Jordan Marks, presented.

51. CW2 noted that Argo tracked losses related to its construction line of business in a "loss portal" which CW2 believed was populated by the claims adjusters. CW2 noted that the loss portal was not always up to date.

**iii. CW3**

52. CW3 is a former employee of Argo who worked as a construction business development analyst from December 2020 to August 2021. CW3 was hired to help accelerate Argo's construction business. CW3 stated that Argo's construction unit was one of the "top five" businesses at Argo, which was expected to grow to over "$500 million in gross premium" within five to 10 years. CW3 further reported that the executives had "high hopes" for the construction business; however, the executives seemed less concerned with how this goal was achieved, and more focused on "having a plan to make it happen."

53. As a business development analyst, CW3 was responsible for analyzing the viability of new construction-based insurance products. In this capacity, CW3 worked with the leaders of Argo's construction business including: Jess Tanner ("Tanner"), the Head of Primary Casualty, and Cornwell, the SVP of Construction. According to CW3, Cornwell in turn reported to Julie Dunai ("Dunai"), the Casualty Underwriting Officer, and Dunai reported to Defendant Rehnberg.

54. According to CW3, Argo held town hall meetings remotely and PowerPoint slides were presented during the meetings.

55. CW3 noted that "construction defect was a concern for the leadership of the construction business" while they worked at Argo from December 2020 to August 2021. Even the executives outside the construction business unit were "keeping an eye on" the construction defect losses, according to CW3. In particular, CW3 reported that sometime during the middle of their employment – i.e., March-April 2021 – CEO Rehnberg stated in town hall meetings that construction defect "was something that was a concern."

56. CW3 observed that Tanner, Cornwell, and Marks all departed Argo at the same time in 2021 (public sources indicate that they left in April 2021) to work at K2 Construction. As a result, CW3 no longer felt stable in their position and resigned from Argo to seek other employment.

**iv. CW4**

57. CW4 is a former employee of Argo who worked in various claims-related roles from June 2003 to March 2022. Most recently, from June 2015 to March 2022, CW4 was the Assistant Vice President of Claims for Argo's environmental division. CW4 – along with all other claims personnel – reported to the same senior level management as did the personnel working on construction defect and attended construction defect meetings, and thus had insight into the construction defect claim issues Argo was experiencing. CW4 left in March 2022 because they did not like Argo's U.S. Chief Claims Officer, Steve Laudermilch, who, according to CW4, perpetuated a culture in which claims personnel were afraid to "put up reserves."

58. CW4 reported to Ryan, the Vice President of Claims, until 2018 at which time Ryan was terminated and replaced by Ceko. Both Ryan and Ceko reported to Wade, Argo's Chief Claims Officer ("CCO"), who joined Argo in December 2015 and is still in that role.

59. According to CW4, Argo had a culture of "reserves suppression." CW4 stated that Wade and Laudermilch perpetuated a culture in which claims personnel were afraid to "put up reserves" and were incentivized to keep construction defect claims reserves to a minimum. CW4 added that Ryan was "scared shitless" of Wade and that she would "not ask for help in terms" of the staff she needed to handle the claims volume.

60. CW4 also noted that the compensation at Argo was structured in such a way that not reporting adverse claims development benefited the CEO and CFO financially.

61. As further alleged herein, CW4 reported that the issue with construction defect claims "goes back a long time" and that in 2018 or just before then, "things started to get really screwed up, that is when all the crap started" with construction defect claims. CW4 stated that Defendant Rehnberg said that construction defect claims were a concern during more than two or three different quarterly town hall meetings. CW4 also reported that Defendant Rehnberg "regularly" stated that "construction defect was a challenge" at town hall meetings. CW4 stated that Defendants Bullock and Kirk also attended the town hall meetings.

62. According to CW4, there were two problems with construction defect claims: (1) a culture of reserves suppression; and (2) an overwhelming number of construction defect claims and ineffective management of the vast volume of claims.

63. With respect to the culture of reserves suppression, CW4 reported that: (a) management delayed approving reserve memos (written memos from claims adjusters addressed to management requesting approval to reserve for claims of certain amounts); and (b) claims staff were regularly "humiliated" and "yelled at" during meetings, so that many of the Argo claims personnel were afraid "to put up reserves."

64. CW4 reported that construction defect claims overwhelmed adjusters but all they could do was "triage" and "kick the can down the road." According to CW4, the construction defect claims adjusters "were getting crushed" with the claims volume. CW4 further reported that construction defect claims adjusters knew they would "get crapped on in a meeting" for reporting that they sought to put up significant reserves. CW4 stated that Wade, Laudermilch, and Cornwell commonly "yelled at" claims staff in meetings if they referred to significant reserves. Laudermilch

pressured CW4 and others to suppress reserves by yelling at the claims managers and the staff they managed in meetings. Laudermilch's "goal was to try to humiliate you" so that "you were fearful to put up reserves" and "Cornwell's thing was yelling at claims [staff] and trying to embarrass them and then they won't post reserves," according to CW4.

65. CW4 also discussed the reserve process at Argo, noting that Argo used a "CAPS information system" for tracking and managing claims. CW4 explained that putting up a reserve entailed extensive evaluation of a given claim to determine what the potential loss would be on a matter (i.e., through settlement or litigation), and then inputting the estimated loss into the CAPS information system. CW4 stated that reserves that were input into CAPS were reliably transferred to accounting reserves and that the accounting reserves were the aggregate of all the reserves the claims adjusters and managers across the various departments (including construction defect) entered into the CAPS system. Further, because of the reserves suppression, not all the reserves that needed to be recorded were entered into the CAPS system in a timely manner, according to CW4.

66. CW4 also added that claims adjusters only had "personal authority" to set certain reserve amounts – typically around a $100,000 limit – and that reserve authority increased with managerial rank. CW4 stated that $100,000 is not nearly enough to reserve for a construction defect claim. CW4 further stated that claims adjusters with a $100,00 authority that wanted to reserve for a claim that exceeded $100,000 would have to write a memo justifying the estimated reserve and submit it to the next line of management for approval. However, according to CW4, management delayed approving the reserve memos. For instance, CW4 reported: "During the Leandra [Ryan] era, she would sit on the" memos, and that Ryan "knew people did not want to see development in the construction defect book, so she just would not approve reserves."

67. CW4 reported that Argo held quarterly "product line review" meetings for each business line, including for its construction business during which the attendees reviewed and discussed "top- and bottom-line production at every level," as well as claims information, details concerning underwriting, and actuarial matters specific to the business. The actuaries discussed "what they were seeing in the data" during these meetings. According to CW4, the meetings typically included 15 attendees from four or five different conference rooms across the country, and were conducted virtually, even before the pandemic. CW4 attended a couple of the construction product line review meetings over the course of their employment and had first-hand knowledge from attending these meetings that the quarterly construction product line meetings were attended by senior executives including Defendants Watson, Rehnberg, Bullock, and Kirk, as well as Chief Claims Officers Wade and Laudermilch.

68. CW4 further stated that during the construction product line meetings they attended, Cornwell delivered PowerPoint presentations to the attendees and that at least some of the data included in the PowerPoint slides was derived from the CAPS information system. CW4 reported that the PowerPoint slides were emailed to all of the attendees ahead of the meetings (i.e., Defendants Watson, Rehnberg, Bullock, and Kirk would have received these slides containing data regarding the construction segment via email at least on a quarterly basis). CW4 added that Wade and Laudermilch "berated any claims staff who addressed" significant reserves during the meetings.

69. CW4 also discussed how Argo decided to move the management of its construction defect claims to the law firm Claussen & Miller. CW4 reported that this was Wade's decision. CW4 said that Claussen & Miller did not make any meaningful progress on the claims that were transferred. Ceko informed CW4 that the claims "sat" with the law firm and "it went south" and

that once Argo took the claims back from Claussen & Miller, the construction defect claims adjusters were overwhelmed with the number of claims.

70. Finally, CW4 stated that an exorbitant number of construction defect claims were "floating around," while Argo "would not commit the resources to do it right and wanted to do it on the cheap" with "it" being the effective management of the claims. According to CW4, Argo senior management "just rotated" the claims from the law firm Claussen Miller to Sedgwick Claims Management Services, and then "blamed people" when the issue was not satisfactorily resolved.

71. Finally, CW4 reported that Argo executives seemed to be most focused on top-line revenue, including gross premiums for each business line and that at Argo, "the pressure was on production and on the top line."

## IV. FACTS

### A. BACKGROUND OF ARGO

72. Argo Group underwrites specialty insurance products in the property and casualty market. Argo promotes itself as successful in insuring risks that are more complex or hard-to-price, offering life, marine and energy, professional liability, property, cyber, marine, construction and specialty insurance. During the Class Period, Argo operated primarily in four segments: E&S; Commercial Specialty; International Specialty; and Lloyd's Syndicate 1200 ("Syndicate 1200").

73. The Company has two reporting segments, a U.S. segment and an International segment. Argo's U.S. segment is referred to as Argo Group U.S., Inc., which is the direct and indirect parent of nine U.S. insurance subsidiaries through which Argo conducts its domestic operations.

74. Historically, Argo Group U.S., which is comprised primarily of liability products, was considered Argo's "crown jewel," in part, because Argo derives most of its GWP from its

domestic market. As Defendants made a concerted effort to focus on expanding the Company's U.S. operations, Argo's domestic GWP grew exponentially throughout the Class Period: In 2019, U.S. GWP was $1.8 billion, or 58% of Argo's total GWP compared to international GWP of just $834 million, or 27%.[2] In 2020, U.S. GWP was approximately $2 billion, or 62% of total GWP, whereas international GWP was just $826 million, or 25%. And in 2021, U.S. GWP was $2.07 billion, or 66% of Argo's total business operations (17% of which came from its construction line), whereas international GWP was just $1.1 billion, or 30% of Argo's total business.

75. Argo Group U.S. holds itself out as a leader in E&S, focusing on risks that the standard market is unwilling or unable to underwrite. Given the inherently risky nature of Argo's dealings with the specialty insurance business, especially within E&S, investors relied on the Company's assurances of industry expertise, management experience, prudent underwriting standards, ability to withstand market volatility, and ability to properly reserve for losses to account for perceived risk.

76. Argo sets reserves based upon its estimates of risk. Argo's loss reserves necessarily hinge on its underwriting policies. Without prudent underwriting standards, underwriters may incur more liabilities than a company has the bandwidth to handle in the hopes that some of the risks might not materialize. If those risks do materialize and a Company did not adequately reserve for those losses, then its loan loss reserves may end up being insufficient and the Company cannot properly pay out the claim.

77. Defendants, high-level executives of a publicly-traded insurance company, were intimately familiar with this delicate balance between proper underwriting methods and adequately

[2] The percentages of total GWP for Argo's International and U.S. segment do not add up to 100% of Argo's total GWP because the Company also reports GWP from its "exited business" lines. For instance, in 2019, 15% of Argo's GWP came from its exited business lines; 58% came from its U.S. business; and 27% came from its International segment.

setting loan loss reserves as evidenced by their references to a "systematic feedback loop between reserving, underwriting claims and reinsurance operations" on calls with investors and analysts. Defendants thus knew that if Argo's underwriting processes exposed Argo to too much risk, its loan loss reserves would not be sufficient.

78. Defendants also knew that investors and analysts found statements about Argo's underwriting discipline and loss reserves to be material and of critical importance in their investing decisions. Thus, during the Class Period, Defendants touted Argo's "favorable reserve development," or at least its "modest" reserve development. For instance, on February 13, 2019, Defendant Watson assured the public of Argo's consistent reserving process and unparalleled underwriting when he stated: "Our reserve development for the last 14 years has been positive" and "[w]e've established ourselves as a leader, particularly as an underwriting leader in many of the markets, if not most of the markets, where we operate." Argo also touted how its construction business had "favorable development" in its 10-Q filed on August 6, 2020, and how "judicious" and "robust" its reserving processes were for its construction business during its March 12, 2021 "Investor Update Special" call.

### B. ARGO'S CONSTRUCTION SEGMENT BECOMES ONE OF ARGO'S "SELECTED BUSINESS LINES" AND BREAKS OFF INTO A STAND-ALONE UNIT

79. For more than a decade, Argo has underwritten construction defect claims – that is, claims arising from insurance for commercial and residential contractors covering physical loss or damage due to defective components of a building, design, materials, or workmanship that requires repair or replacement.

80. Until 2018, Argo underwrote these claims as part of its E&S line. By 2018, its construction portfolio was, as Defendant Watson stated on June 11, 2018, "prosper[ing] as a strong, growing and profitable portfolio exceeding $150 million in premium." Argo thus began

shifting its focus "towards portfolios of risk with the best loss ratios" which included the construction segment, as well as other domestic business lines like professional and surety.

81. In 2018, Defendants realized that the construction industry was growing rapidly and as the industry expanded, the demand for construction defect insurance would likewise expand. Defendants wanted to tap into this burgeoning market and thus, on June 11, 2018, Argo broke out its construction unit, which it referred to as "Argo Construction," from its E&S line into a stand-alone business. In a June 11, 2018 press release that announced the break out of Argo Construction, Defendant Watson stated that the construction sector is "a $1-trillion industry that is growing rapidly and is projected to be among the fastest growing business sectors in the United States over the next five to seven years." In the same press release, Defendant Rehnberg touted the strength of Argo Construction's underwriting: "This change is the most recent example of a new and successful specialty underwriting practice launched from within our E&S organization. We have outstanding underwriting and claims expertise supported by a leading digital platform."

82. Argo classifies Argo Construction as "a casualty business unit that specializes in construction risks writing primary and supported excess coverage to the contractor segment." Argo Construction is further divided into four segments: New York Construction; Middle Market Construction; Owners Interest/Owners and Contractors Protective, Specialty Construction; and Specialty Construction Excess. According to its website, Argo's Middle Market Construction business – with which CW2 reported the Company had problems – covers "occurrence of claims-made policies for risks that are less than $25 million in sales/construction costs." Middle market claim coverage includes commercial and residential contractors (e.g., general contractors, masonry, plumbing, and electrical work) as well as industrial contractors (e.g., excavation, demolition, plumbing, painting, and welding).

83. Shortly after Argo established Argo Construction as a standalone unit, it began referring to its construction unit during investor presentations as one of its "Selected Business Lines" and as an "area[] with best potential." And when Argo, along with other insurance companies, felt the effects of COVID in early 2020, Defendant Rehnberg assured investors (on August 4, 2020, during Argo's second quarter earnings call for fiscal year 2020) that its construction segment was "absorb[ing] the impact of the pandemic to report an excellent quarter." Thus, Argo's construction segment quickly became its prized line and by March 12, 2021, Argo reported in an Investor Update Presentation that Argo Construction had more than $300 million in gross written premiums and was the second-best performing segment in the U.S., accounting for 17% of Argo's domestic gross written premiums.

84. By 2021, analysts began reporting on the growing business unit in their regular reports. For instance, on March 15, 2021, just days after Argo held its Investor Update on March 12, 2021, Boenning & Scattergood highlighted that construction was a focus area for Argo's U.S. operations. Then, on May 4, 2021, Boenning & Scattergood reported: "GPW growth in the U.S. was driven by strategic focus businesses, including Argo Pro, Casualty, Construction, Environmental, Inland Marine and Surety. Offsetting this growth was the impact of planned reductions in Property lines and other re-underwriting actions, including the exit of the grocery and restaurant business. Average rates in the U.S. were up in the high single digits." And again, on May 11, 2021, Boenning & Scattergood reported: "ARGO is focusing on six business units in the U.S.: Argo Pro, Casualty, Construction, Environmental, Inland Marine, and Surety. These businesses represented 60% of the company's U.S. premium in 1Q21 and grew by more than 15%. Each experienced positive rate increases and generated combined ratios under 90% with minimal catastrophe losses."

85. Several of Argo's former employees confirmed management's desire to expand Argo's construction line of business. For instance, according to CW3, Argo hired them in December 2020 to help accelerate Argo's construction business. CW3 observed that Argo's executives seemed less concerned with how this goal was achieved, and more focused on "having a plan to make it happen." And CW1 discussed how Argo had an influx of construction defect claims in late 2019, which suggests that the Company was making efforts to vamp up that segment of its business.

### C. ARGO CONSISTENTLY TOUTED ITS DISCIPLINED UNDERWRITING AND LONG-TERM FAVORABLE RESERVE DEVELOPMENT

86. Leading up to and throughout the Class Period, Defendants assured investors that Argo had disciplined underwriting operations and continuous long-term favorable (or at bottom, "modest") reserve development – i.e., that the claims that materialized and the Company had to pay for did not exceed the reserves previously set. For instance, just months before the Class Period, on February 14, 2018, during the Company's 4Q17 earnings conference call, Defendant Watson commented on Argo's long-term favorable reserve development, noting: "you can see that for the 13th year in a row we've had reserve redundancies on our balance sheet and I believe that this is also true for the last 14 out of 15 years." During the same call, Defendant Bullock echoed the sentiment that Argo had strong and positive reserve development when he stated: "we finished the year with positive prior-year development of $8.2 million, marking, as Mark said, the 13th straight year of overall positive development."

87. On May 3, 2018, Argo released its results for the first quarter of 2018 ("1Q18"). Defendant Watson was quoted in the earnings release claiming that Argo was able to weather the "increasingly volatile investment environment" because of Argo's "continuing strategy of disciplined, differentiated underwriting..." Net income reserve development was reported at $2

million, $1 million in the U.S. business, compared with a total adverse development of $6.8 million in the first quarter of 2017.

88. On August 7, 2018, Argo reported financial results for the three and six months ended June 30, 2018 on Form 10-Q. In a press release discussing the quarterly financial results, Argo expressly noted its "favorable prior year reserve developments."

89. A few months later, on November 5, 2018, Argo announced its results for the third quarter of 2018 ("3Q18"). Despite facing heavy catastrophe losses on a global basis, Argo again reported positive prior-year reserve developments in its U.S. operations. The day after, on November 6, 2018, Argo held an earnings call with investors and analysts during which Defendant Watson noted: "In the U.S., our operations continue to generate very strong underwriting results with double-digit growth in gross written premium and the top quartile loss ratios." During the question and answer segment of the 3Q18 earnings call, Marcos Holanda, an analyst with Raymond James, asked Defendant Watson: "You guys, I think posted the unfavorable development in the quarter and reserves have been developing favorable for over the past several quarters. So is there anything there that you guys would add to?" Defendant Watson continued to express his confidence in the Company's reserve development by replying that "[Argo's] reserves have been developing favorably for the last 13 years, and [that] there's always a bit of lumpiness from 1 quarter to another."

90. On February 11, 2019, Argo announced its financial results for the fourth quarter of 2018 ("4Q18"). Net favorable prior-year reserve development was $13.9 million for the fourth quarter, $6 million of which was generated by U.S. operations. While discussing the "good year" that Argo U.S. had experienced, Defendant Watson stated: "Since 2013 we've grown our U.S. top line premiums 11% a year on a compounded annual basis. In fact, growth would have been higher

had we not been shutting unprofitable business as we shifted the mix towards portfolios of risk with the best loss ratios, which include professional surety and construction."

91. During a Bank of America Merrill Lynch insurance conference held on February 13, 2019, Defendant Watson assured the public again of Argo's consistent reserving process and its unparalleled underwriting when he stated: "Our reserve development for the last 14 years has been positive." Defendant Watson then added: "We've established ourselves as a leader, particularly as an underwriting leader in many of the markets, if not most of the markets, where we operate. Our loss ratios really are best in class, and they've been consistent over a period of time now."

92. On April 15, 2019, Argo filed its proxy statement for fiscal year ended December 31, 2018, which stated: "Since 2013, our investments have paid off as we've grown our top line premiums 9.4% per year on a compounded annual basis. In fact, our current core businesses, including professional, surety and construction, have the most favorable loss ratios and have grown the fastest (+10%) in the portfolio." Here, Argo highlighted the strength of its construction business by touting its "favorable loss ratios."

93. On November 7, 2019, during an earnings call, acting CEO Defendant Rehnberg downplayed disappointing results while continuing to push the narrative of prudent underwriting and adequate reserves particularly in regards to the performance of its U.S. operations. Defendant Rehnberg distinguished the Company's U.S. Operations: "Across the company, we are growing in profitable areas, remediating challenged lines, and taking steps to control our loss and expense ratios" and touted that Argo's "US division is strong." Defendant Rehnberg also stated: "At our largest division, we have demonstrated the ability to grow profitable businesses and significantly improve service to brokers, customers using disciplined underwriting, effective capital

management, innovation and entrepreneurial spirit, which are a part of the DNA of this entire company." Defendant Rehnberg continued to tout how Argo's U.S. operation had posted its highest-ever gross premium figure noting: "These results reflect nearly 10 years of intense focus by the US team to refine underwriting, claims and operations. Given the consistently strong impact of these actions, we have started to implement similar best practices countrywide – companywide." Defendant Rehnberg ended his portion of the earnings call with the following encouragement: "So to summarize our Q3 performance, we have continued to show strength in many ways. Our US division is strong. Our international division is resilient and across the entirety of Argo, we are focusing on deliberate, strategic underwriting decisions and continuous improvements within operations."

94. During Argo's 4Q19 earnings conference call held on February 25, 2020, Defendants continued to mislead investors with statements regarding the strength of Argo's reserves. During the call, Defendant Rehnberg stated "[t]he pricing environment continues to strengthen, core product volumes are strong, and many business units have made a very positive turn into 2020. But at the same time, we had substantial reserve strengthening in the quarter and full year..." On the same call, Defendant Bullock stated "[w]e conduct reserve reviews of all ongoing businesses each quarter. Our reserving process has not changed and includes a feedback loop between reserving, underwriting, claims and reinsurance operations that enhances our ability to react quickly to the findings of the reserve reviews." Defendant Bullock then added: Argo "reported [its] 14th consecutive year of overall positive prior year development." In the question and answer session of the same 4Q19 conference call, Defendant Watson continued to stress Argo's positive reserve development stating that "if you look at our prior reserve development

over the last 14 years, it's been positive, and we're very proud of that. And we're very focused on making sure that continues."

95. Defendants emphasized Argo's disciplined underwriting and year-over-year favorable (or at least "modest") reserve development throughout the Class Period. However, Defendants knew that Argo could only maintain this string of favorable reserve development year after year by underreporting reserves for the Company's construction defect claims which had been improperly underwritten and over-exposed in years 2011-2017.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

96. Throughout the Class Period, Defendants consistently touted the strength of Argo's construction business. However, Defendants knew the following concerning Argo's legacy construction defect claims that had been underwritten from 2011-2017: (1) the underwriting guidelines used to write those legacy policies were deficient; (2) that book of business was too exposed; (3) those policies were written outside of Argo's "core construction business," and (4) because of these problems plaguing Argo's construction defect segment, the Company would inevitably have to incur a reserve charge. As evidenced by Defendants' decision to create the Construction Defect Task Force in 2017, and as corroborated by CW1, CW2, CW3, and CW4, Defendants knew, but failed to disclose, that the construction book of business underwritten from 2011-2017 was problematic and that these issues would eventually materialize in the form of significant adverse reserve development. As a result, Defendants' repeated statements concerning the profitability, growth, and financial results of Argo Construction were materially false and/or misleading.

### A. THE JUNE 11, 2018 PRESS RELEASE

97. The Class Period begins on June 11, 2018 when Argo announced in a press release that it was establishing Argo Construction as a standalone business in order to "enable it to evolve more quickly and grow at an accelerated pace." Defendant Watson, Argo's then CEO, made the following statement in that release: "Our construction business continues to prosper as a strong, growing and profitable portfolio exceeding $150 million in premium. This group has demonstrated success primarily in the northeast and is ready to expand across the United States." In the same press release, Defendant Rehnberg touted the strength of Argo Construction's underwriting when he stated: "This change is the most recent example of a ***new and successful*** specialty underwriting practice launched from within our E&S organization. ***We have outstanding underwriting and claims expertise supported by a leading digital platform***."

98. Defendant Watson's and Rehnberg's statements were materially false and misleading when made because at the time these statements were issued, Defendants knew that Argo's construction line was "too exposed" and there were problems with that segment's underwriting guidelines. By June 11, 2018, Argo had convened a Construction Defect Task Force – at the direction of management – to reduce the exposures, strengthen the underwriting guidelines, terms, and conditions, place significant restrictions on certain states and exposures, and eliminate claims from the construction line associated with contract binding and casualty that "were written outside of the core construction business." Therefore, the statement that Argo's construction portfolio continued to "prosper as a strong, growing and profitable" was materially misleading because Defendants Watson and Rehnberg knew, but failed to disclose, that Argo's construction portfolio underwritten in prior years was over-exposed as a result of deficient underwriting policies.

**B. 2019**

99. On February 11, 2019, Argo announced its financial results for the fourth quarter of 2018 ("4Q18"). While discussing the "good year" that Argo U.S. had experienced, Defendant Watson stated: "Since 2013 we've grown our U.S. top line premiums 11% a year on a compounded annual basis. In fact, growth would have been higher had we not been shutting unprofitable business as we shifted the mix ***towards portfolios of risk with the best loss ratios, which include professional surety and construction***."

100. On April 15, 2019, Argo filed its proxy statement for fiscal year ended December 31, 2018, which stated: "Since 2013, our investments have paid off as we've grown our top line premiums 9.4% per year on a compounded annual basis. In fact, our current core businesses, including professional, surety and construction, have the most favorable loss ratios and have grown the fastest (+10%) in the portfolio."

101. On August 5, 2019, Argo announced its financial results for the second quarter of 2019. During an earnings call on August 6, 2019, Defendant Watson discussed Argo's progress for the past quarter and stated: "as a part of our continuing strategy to focus resources on ***our best performing units***, we moved our construction business out of its former home and casualty this year, creating the Argo construction brand, which we've now launched.

102. On November 7, 2019 Argo held its earnings call for the third quarter of fiscal year 2019 ("3Q19"). During the call, acting CEO, Defendant Rehnberg, promoted the strength of Argo's U.S. division and in particular, its construction business, stating: "***Our construction business, no longer within casualty and operating as a business on its own, is also driving growth in an industry that continues to flourish in a robust economy***. Between rate increases and strong organic business growth, ***Argo construction continues to exceed our expectations***."

103. Defendants' statements made throughout fiscal year 2019 were materially false or misleading when made because while Defendants touted how successful its growing construction line was in SEC filings, earnings calls, and conferences, they knew, yet failed to disclose, the following facts about Argo's construction business: (1) the construction segment had deficient underwriting guidelines; (2) the construction book of business was over "exposed" for the years 2011-2017; (3) many of the legacy claims underwritten in Argo's construction portfolio between 2011 and 2017 "were written outside of the core construction business"; and (4) by virtue of these problems, the Company would have to increase its reserves in order to adequately cover claims that had been underwritten from 2011-2017 and therefore incur significant adverse reserve development. Defendants' knowledge of the falsity of the statements above is further demonstrated by the fact that CW4 reported that Defendants Watson and Rehnberg attended quarterly construction product line review meetings in 2019 wherein Cornwell presented PowerPoint slides featuring data from Argo's CAPS information system which tracked and managed claims and featured estimated losses. Further, during those same meetings attended by Watson and Rehnberg, Wade, Laudermilch, and Cornwell commonly "yelled at" staff if they referred to putting up significant reserves. By failing to disclose the issues within Argo Construction and instead touting Argo Construction's growth, Defendants Watson and Rehnberg misled investors about Argo Construction's business.

### C. 2020

104. On May 7, 2020, Argo announced financial results for the first quarter ended March 31, 2020 ("1Q20"). On May 8, 2020, Argo held its earnings call for 1Q20 during which Defendant Bullock stated: "The ***strongest growth was in*** our professional liability and ***construction business units***. Net written and earned premium growth during the quarter in the U.S. came in at 8.5% and 10.5%, respectively."

105. On August 3, 2020, Argo announced its results for the second quarter ended June 30, 2020 ("2Q20"). The next day, on August 4, 2020, Argo held an earnings call to discuss its 2Q20 results during which Defendant Rehnberg stated that Argo's construction line was one of the segments that "absorbed" the impacts the Company felt from COVID-19. In particular, Rehnberg stated:

> Looking through the volatility related to COVID-19 related catastrophe losses and reported alternative investment performance, I think there were a lot of positive signs that were evident in our results. We're able to achieve positive growth in the quarter, including almost 6% growth in the US and a flat top-line on International. This demonstrates not only the strong rate increases we achieved, but also our strong customer relationships and product innovation. In fact, some of our most economically sensitive businesses such as ***Construction*** and Surety ***continued to lead the way for us in the US and we're able to absorb the impact of the pandemic to report an excellent quarter***.

106. On August 6, 2020, Argo filed its 10-Q for the quarterly period ended June 30, 2020. In the 10-Q, Argo credited its favorable prior-year reserve development to its construction business: "Net favorable prior-year reserve development for the second quarter of 2020 was $0.6 million and ***primarily related to favorable development in specialty lines related to our surety and construction businesses***, partially offset by unfavorable development in liability and special property lines."

107. On September 10, 2020, Argo held an investor presentation. The PowerPoint that accompanied the investor presentation contained a slide (slide 10) with the title: "Investing in High Margin Specialty Businesses" which featured the note that "Argo is focused on deploying resources in niche products and business units with the highest returns on capital and sustainable growth prospects." Argo's Construction and Casualty unit was listed as a "***high margin specialty businesses***" on the same PowerPoint slide, and contained the following three bullet points: (1) "Gross Written Premiums: 2015-2019 CAGR of 12%;" (2) "Offers primary and excess casualty

coverage to contractors and a range of other industries;" and (3) "Created digital quoting platform to help increase submissions and drive operational efficiencies."

108. The above statements that Argo Construction was experiencing "growth," "high margins," and "favorable development" in 2020 were materially misleading, as was Defendant Rehnberg's statement that Argo Construction "continued to lead the way" for Argo U.S. At the time these statements were made, Defendants knew, but failed to disclose, the following facts about Argo's construction business: (1) Argo's construction unit had deficient underwriting guidelines; (2) its construction book of business was over "exposed" for the years 2011-2017; (3) many of the legacy claims underwritten in Argo's construction portfolio between 2011 and 2017 "were written outside of the core construction business"; and (4) by virtue of these problems, the Company would have to increase its reserves in order to adequately cover claims that had been underwritten from 2011-2017 and therefore incur significant adverse reserve development. Defendants' knowledge of the falsity of the statements above is further demonstrated by the fact that CW4 reported that Defendants Rehnberg and Bullock attended quarterly construction product line review meetings wherein Cornwell presented PowerPoint slides featuring data from Argo's CAPS information system which tracked and managed claims and featured estimated losses. Further, during those same meetings (which were attended by Rehnberg and Bullock), Wade, Laudermilch, and Cornwell commonly "yelled at" staff if they referred to putting up significant reserves. By failing to disclose the issues within Argo Construction and instead touting Argo Construction's growth, Defendants Watson and Rehnberg misled investors about the true nature of Argo Construction. That Defendants made specific positive statements regarding the strength of Argo Construction but omitted to disclose the problems that same segment was simultaneously experiencing – which would

substantially impact the Company's reserve development – renders these statements materially misleading.

**D. 2021**

109. On February 17, 2021, Argo filed a Form 8-K wherein it discussed the Company's results for the fourth quarter and year ended December 30, 2020 ("4Q20"). In the 8-K, Argo stated: "While heightened 2020 catastrophe and COVID-19 losses resulted in a disappointing financial outcome, ***we made significant progress on our strategic objectives and achieved meaningful growth in most of our top-performing businesses – including*** Argo Pro, ***Construction*** and Inland Marine."

110. The next day, on February 18, 2021, Argo held an earnings call for its 4Q20 financial results during which Defendant Rehnberg stated: "We also saw encouraging submission trends in some of our focused growth areas. For example, Casualty submissions were up 25% in the fourth quarter. And Inland Marine submissions were up more than 50%. ***Construction submission growth was also positive and had pockets of strength in the high-single-digits***. These trends give us confidence in our growth outlook for 2021."

111. On March 12, 2021, Argo held an "Investor Update Special Call." During the call, Defendant Rehnberg provided investors and analysts with an update on Argo's burgeoning construction business: "We'll go through the vision of our transformation. Has several key priorities that are expected to lead to better financial results. When we think about optimization, Argo has a collection of ***great specialty insurance businesses where we are a leader in multiple specialty lines, such as New York Construction***, Surety and Argo Pro." Defendant Rehnberg also added: "As I mentioned, ***our Construction group was part of Casualty and has been growing over the past decade into what has been a growth, profit and digital leader for the organization***."

112. A PowerPoint accompanying Argo's "Investor Special Update Call" held on March 12, 2021 also discussed Argo's growth and investment in its construction segment. In particular, the presentation featured a slide (slide 23) with the header: "Selected Business Lines[:] Growth and investment focused on areas with best potential" followed by a list of six business lines: Argo Pro, Casualty, ***Construction***, Environmental, Inland Marine, Surety." The slide also stated that each of these six areas of Argo's businesses had: (1) "Favorable rates and terms;" (2) "Disciplined growth opportunities;" (3) "Competitive advantages[:] Expertise, Relationships, Analytics, Digital capabilities;" (4) "Liability-focused risks;" and (5) "Businesses represent ~55% of U.S. gross written premiums (GWP)." Another slide (slide 27) in the same PowerPoint presentation provided a "Business Overview" of Argo's construction unit which stated that Argo Construction had "[p]rimary and excess coverage for areas of the construction market with a focus on interior renovation and service repair contractors" and that primary coverage had "~80% of GWP" and excess coverage had "~20% of GWP (no unsupported excess)." The "Business Overview" further stated that Argo Construction had "100% occurrence business." The presentation also stated that Argo Construction had "Favorable Rates and Terms" with "more than $300M of GWO;" "3 year GWP CAGR of ~7%;" "rates up +5% in 2020;" and that Argo Construction was "[g]rowing books judiciously and managing limits;" had "[c]ompetitive [a]dvantages;" and was a "[h]ighly efficient operation."

113. On March 15, 2021, Defendants filed Argo's Form 10-K for the year ended December 31, 2020 which stated: "Argo Construction's specialized underwriters understand the rates, pricing and coverages needed to meet contractors' insurance requirements, and help project owners succeed."

114. On May 3, 2021, Argo announced its financial results for the first fiscal quarter of 2021 ended March 31, 2021 ("1Q21"). In a press release accompanying its 1Q21 8-K filed with the SEC, Argo stated: "In our U.S. Operations, gross written premiums increased 2.7% compared to the 2020 first quarter due to growth in Professional and Specialty lines, while premiums in Property and Liability lines declined. ***Growth in the period was driven by strategic focus businesses that include*** Argo Pro, Casualty, ***Construction***, Environmental, Inland Marine and Surety. ***These businesses, which represent more than 60% of U.S. Operations gross written premiums, in total were up more than 15% during the quarter***." The next day, May 4, 2021, Defendant Rehnberg repeated this information on an earnings call and added: "***each of these six businesses experienced positive rate increases during the first quarter, which is a great sign as we already have a track record of underwriting profitability for the group***."

115. On August 2, 2021, Defendants issued a press release on Form 8-K regarding Argo's financial results for the second fiscal quarter of 2021 ended June 30, 2021 ("2Q21") which stated: "In our U.S. Operations, gross written premiums increased 6.8% compared to the 2020 second quarter due to growth in Liability and Professional lines, while premiums in Property lines declined. ***Growth in the period was driven by strategic focus businesses that*** include Argo Pro, Casualty, ***Construction***, Environmental, Inland Marine and Surety. ***These businesses, which represent more than 60% of U.S. Operations gross written premiums, in total were up approximately 25% during the quarter***." The next day, on August 3, 2021, Argo held an earnings call during which Defendant Rehnberg further emphasized the growth in Argo's construction segment: ***These businesses now represent almost two-thirds of our US premium base and, most importantly, remain highly profitable with combined ratio comfortably in the 80s with minimal catastrophe losses***."

116. On August 6, 2021, Argo filed its 10-Q for the quarter ended June 30, 2021, which stated: "Gross written premiums increased for the three and six months ended June 30, 2021 compared to the same periods in 2020 was driven by the general liability lines and environmental lines targeted for growth and investment. ***New business production was the primary driver behind growth in construction***, programs, garage and public entity classes. This was offset by planned reductions in contract binding, grocery and restaurant classes." The 10-Q further stated: "Net favorable prior-year reserve development for the second quarter of 2020 was $0.6 million and ***primarily related to favorable development in specialty lines related to*** our surety and ***construction businesses***, partially offset by unfavorable development in liability and special property lines."

117. On November 2, 2021, Argo issued a press release regarding its financial results for the third fiscal quarter of 2021 ended September 30, 2021, which stated: "In our U.S. Operations, gross written premiums increased 3.7% compared to the third quarter of 2020 due mainly to growth in Liability and Professional lines, while premiums in Property lines declined. ***Growth in the third quarter of 2021 was driven by strategic growth businesses that include*** Argo Pro, Casualty, ***Construction***, Environmental, Inland Marine and Surety. These businesses, which represent approximately 60% of U.S. Operations gross written premiums, in total, were up approximately 20% during the quarter." During an earnings call held the next day, on November 3, 2021, Defendant Rehnberg repeated this information and added: "***more importantly, these businesses remain highly profitable with the combined ratios in the 80s and minimal catastrophe losses***." Later in the earnings call, Defendant Kirk emphasized how Argo's U.S. segment was doing well in part because of its construction segment: "Turning now to our segment results, in U.S. gross written premiums were up 3.7%, comparable slow quarter 2020. ***The growth in the***

***period was driven by our grow and invest businesses*** [sic] that include Argo Pro, Casualty, ***Construction***, Environmental, Inland Marine and Surety."

118. Defendants' statements made in fiscal year 2021 regarding Argo Construction were materially false or misleading because while Defendants repeatedly touted the strength and growth of Argo Construction, they failed to disclose the following critical facts: (1) Argo's construction unit had deficient underwriting guidelines; (2) its construction book of business was over "exposed" for the years 2011-2017; (3) many of the legacy claims underwritten in Argo's construction portfolio between 2011 and 2017 "were written outside of the core construction business"; and (4) by virtue of these problems, the Company would have to increase its reserves in order to adequately cover claims that had been underwritten from 2011-2017 and therefore incur significant adverse reserve development. Further, Defendant Rehnberg's specific knowledge about these issues is evidenced by the fact that he stated that construction defect claims were "something that was a concern," in town hall meetings held in March or April 2021, according to CW3. Further, CW4 reported that Defendant Rehnberg also stated during more than two or three town hall meetings that construction defect was a concern and that he regularly stated that "construction defect was a challenge" in town hall meetings. Defendants' knowledge of the falsity of the statements above is further supported by the fact that CW4 reported that Defendants Rehnberg and Kirk attended quarterly construction product line review meetings wherein Cornwell presented PowerPoint slides featuring data from Argo's CAPS information system which tracked and managed claims and featured estimated losses. Moreover, during those same meetings (which were attended by Rehnberg and Kirk), Wade, Laudermilch, and Cornwell commonly "yelled at" staff if they referred to putting up significant reserves. By failing to disclose the issues within Argo Construction and instead touting Argo Construction's growth and contribution to the strength of

Argo, Defendants Rehnberg and Kirk misled investors about the Argo Construction segment. That Defendants made specific positive statements about the strength of Argo Construction but omitted to disclose the known problems that same segment was simultaneously experiencing – which they knew would necessarily and substantially impact the Company's reserve development – renders these statements materially misleading.

## VI. THE TRUTH IS REVEALED

119. Less than three months after assuring investors of "continued strong growth in the ongoing business," on February 8, 2022, after the close of the market, Argo issued a press release announcing that its fourth quarter results for 2021 ("4Q21") would be negatively impacted by ***$130 to $140 million*** worth of adverse prior year reserve development and non-operating charges. Specifically, the Company disclosed that:

> Argo expects net adverse prior year reserve development to be in the range of $130 million to $140 million for the 2021 fourth quarter. Prior year adverse development was the result of the recently concluded fourth quarter 2021 reserve review. The largest reserve increases were related to construction defect claims within Argo's U.S. Operations, in addition to reserve increases in the Run-off segment. The prior year reserve increase for construction defect primarily related to the 2017 and prior underwriting years in business lines that have either been significantly remediated or discontinued.

120. Analysts were completely stunned by the news. Compass Point released a report on February 8, 2022 with the headline: "Stunning Adverse Development & Other Charges; Downgrading to Neutral, Reducing Price Target to $47.50." Compass Point also commented on the stark difference between Defendants' prior assurances that the Company was prospering and the news, stating: "ARGO appeared to be on the Right Track, and Stuns with Major Adverse development, Other Charges. ARGO appeared to be nearing the end of a transitional phase to the US E&S focus, with a diminished focus on international markets. They had held an insightful investor/analyst day and presented the promise of a future of steady earnings, lower volatility of

earnings, and improving growth over time. ***This is what makes the current actions so surprising, especially after a year that had been going so well***." As a result of the February 8, 2022 news, Compass Point reduced its price target from $70 to just **$47.50.**

121. Boenning & Scattergood also reported on the news of the reserve charge on February 8, 2022, stating: "ARGO Preannounces Large 4Q21 Reserve Charge and Non-Operating Expenses" and "We expect the shares to trade down on the news tomorrow – *we would not be surprised if the shares dropped 10%+*."

122. On February 9, 2022, the next trading day, the price of the Company's common stock fell $7.11 per share, or 13.7%, to close at $44.76 per share. On February 10, 2022, the stock declined to $42.82 per share, for a two-day drop of $9.05 per share, or 17.5%, wiping out over $315 million in market capitalization.

123. On February 22, 2022, Argo issued a press release discussing its 4Q21 and fiscal year ended December 31, 2021 financial results. Argo reported a 4Q21 net loss attributable to common shareholders of $118.8 million or $3.41 per diluted common share. Net adverse prior year reserve development for the fourth quarter came in at $132.3 million. Argo noted that it had experienced net adverse prior year reserve development in both the U.S. Operations and Run-off Lines which was partially offset by favorable prior year reserve releases in International Operations.

124. The same day, Compass Point issued a report expressing its frustrations with Argo's lack of transparency: "What is probably most frustrating about this release is the lack of detail regarding the unfavorable reserve developments in the contract [construction] defect business." The report also stated: "Still a Lot of Explaining to Do. The earnings release has little in the way

of explanation for the construction defect adverse loss development, nor does it give any certainty that the issue has been put to bed."

125. The next day, February 23, 2022, Argo held an earnings conference call to discuss these results. After reviewing the Company's reserve process, Defendant Rehnberg stated that approximately $77 million of the adverse prior year development was driven by construction defect claims within Argo's U.S. operations, contradicting his prior statements that Argo's construction segment was "leading the way for us in U.S." and was one of Argo's "best performing" business units. Defendant Rehnberg disclosed to investors for the first time that most of the reserve increase was associated with policies written outside Argo's "core construction business" and that the Company had started strengthening underwriting guidelines in this area as early as the end of 2017, including restricting policies in certain states:

> A large portion of the reserve increase for a construction defect was associated with businesses that have either been discontinued, including contract binding in October of 2021, or have been significantly remediated. The remediated portion was previously underwritten by our casualty business. We established Argo Construction from the standalone business unit in June of 2018 to focus on the construction market with a greater depth of talent and knowledge. Most of the claims associated with contract binding and casualty were written outside of the core construction business. Over 95% of the construction defect prior year, adverse development in 2021, fourth quarter applied to 2017 and prior years.
>
> We started taking underwriting action on construction defects at the end of 2017, including strengthening underwriting guidelines and placing significant restrictions on certain states and exposures. Much of the adverse reserve development was a result of analyses performed in the fourth quarter, which included, among other things, new and/or updated information received relating to construction defect claims.

126. During the question and answer portion of the call, Greg Peters, an analyst with Raymond James, called out Defendant Rehnberg's attempt to downplay the reserve charge by highlighting improvements in Argo's International Operations:

> The progress that you've made in international ... is to be applauded [but] we can't really use that to sugar coat the surprise reserve charge ... in the U.S. business which had been thought of traditionally as one of the crown jewels of the Company.
>
> ***
>
> And then between November and then February this year, ***all of a sudden, you uncover this ... black hole of this reserve charge that you've announced***. I guess my question is, what happened? ... And then secondly, how can we gain confidence? That we -- it feels like we might have to wait until the fourth quarter of 2022 before we -- when you get through another annual reserve review before we have any visibility on whether things have stabilized or not.

127. In response to the analyst, Defendant Rehnberg stated:

> And we started some underwriting actions in the end of 2017 when a task force was convened on CD [construction defect], which had previously been underwritten in our liability area, and which includes construction and in our contract lending line of business. So we broke out construction as a separate business and started underwriting more specifically on this business and changed the underwriting guidelines around what had happened. So the book we have today is not as exposed. It's got different -- underwriting terms and conditions, different approaches to it. So while I understand there's a concern about it, we have been working on the underwriting side of this for the past five years. And we mentioned in the recent years, it has been performing according to expectations.

128. On February 23, 2022, Compass Point released another report which again stated, in bold: "**ARGO Appeared to be on the Right Track, and Stuns with Major Adverse Development, Other Charges**" and referred to the adverse development and other charges as a "setback." Compass Point then reduced Argo's price target even further to $43.50.

129. The next day, on February 24, 2022, William Blair released a report highlighting how unexpected the adverse development was for Argo's U.S. line of business, noting that: "significant underwriting challenges were evident in the core U.S. book in the quarter. This was historically the stable and better-performing part of the company" and further, that "While the U.S. book has historically been a bright spot, the company took significant adverse development charges in the quarter and is exiting several books."

130. On August 8, 2022, Argo filed an 8-K with the SEC announcing that it had entered into a Loss Portfolio Transfer ("LPT") agreement with a wholly owned subsidiary of Enstar covering a majority of the company's U.S. casualty insurance reserves. Enstar's subsidiary agreed to provide ground up cover of $746 million of reserves, and an additional $275 million of cover in excess of $821 million, up to a policy limit of $1.1 billion. Argo, however, would retain a loss corridor of $75 million up to $821 million. Furthermore, Argo announced that it anticipated recognizing an after-tax charge of approximately ***$100 million*** in connection with the transaction in the third quarter of 2022.

131. The next day, on August 9, 2022, Argo held a conference call for its second quarter 2022 earnings. During the call, CEO and Chairman of the Board of Directors, Thomas Bradley ("Bradley"), commented on the Enstar Transaction:

> We continue to explore a wide range of potential options to maximize shareholder value and take advantage of opportunities in the market. Consistent with that objective, we are entering into a loss portfolio transfer with Enstar, which covers the majority of our US casualty insurance reserves, including construction relating to accident years 2011 to 2019.

Bradley further disclosed that the LPT with Enstar was one of its strategic initiatives; in particular, in discussing Argo's ongoing strategic alternatives review process, Bradley stated; "We were able to execute on one of these opportunities with the announcement of the loss portfolio transfer."

132. The deal came as a shock to analysts and investors who were unaware that Argo had been seeking a risk transfer deal. For instance, on August 9, 2022, Compass Point described Argo's LPT agreement with Enstar as "***another body blow for ARGO shareholders***" and reduced its price target to $35 from $45.50. Compass Point also stated: "what concerned us about the potential transaction was that it could come with a meaningful one-time loss that would have a significant impact on our forward tangible book value calculation. Risk transfer deals (such as loss

portfolio transfers or LPT's) are capital market transactions, and by definition come at some discount."

133. Then, on August 10, 2022, an analyst at Raymond James downgraded Argo to Market Perform from Outperform. The analyst noted: "***there are now additional uncertainties associated with the $75M loss corridor retention which could act as overhang on the outlook for the next 12-24 months***."

134. On this news, the price of the Company's common stock declined $9.12 per share, or 28.3%, from an August 8, 2022 closing price of $32.22 to close at $23.10 per share on August 10, 2022. That drop caused the Company's market capitalization to fall another $320 million. As a result, Argo's stock price ***lost more than 55% in value in less than six months*** in 2022.

## VII. SCIENTER ALLEGATIONS

### A. ACTUAL KNOWLEDGE

135. All Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance of and/or control over Argo's and the Individual Defendants' materially false and misleading statements and omissions. Argo, through its management and other senior level employees, and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V, above, were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issue or dissemination of such statements as primary violators of the federal securities laws. In addition to the facts alleged herein regarding Argo's and the Individual Defendants' personal knowledge and/or reckless disregard of the materially false misrepresentations and omissions, Argo and the Individual Defendants' scienter is evidenced by the specific facts discussed below.

136. Defendants were directly involved and participated in both the management and day-to-day operations of Argo at its highest levels. Accordingly, Defendants each had access to

detailed information regarding Argo's construction business generally and specifically. In particular, Defendants had knowledge of the following:

137. Defendants knew – no later than 2017 – that Argo's legacy construction portfolio, in particular, the claims thereunder that had been written between 2011-2017, was a huge problem for the Company. Defendants' knowledge of the problems pervading that business unit is evidenced by their belated admission in February 2022 that Argo had created a Construction Defect Task Force in 2017 to "strengthen" that business line and the underwriting guidelines thereunder and to remove "exposures." It therefore follows that throughout the Class Period, Defendants knew of the falsity of their statements and that omitting to disclose material information rendered certain statements misleading. In particular, Defendants knew, but failed to disclose, the following information regarding Argo's legacy construction book of business for years 2011-2017 and therefore, that the Company would have to increase reserves for policies underwritten in those years accordingly: (1) the underwriting guidelines applied to construction defect claims within that time frame were improper; (2) that portfolio was over "exposed" and needed "restrictions;" and (3) the claims within that portfolio had been written outside of Argo's "core construction business." Despite the existence of material issues within the construction segment, about which Defendants knew by at least as early as 2017, none of this information was disclosed until February 2022.

138. Beyond Defendants' belated admissions regarding weaknesses in the construction business, several confidential witnesses confirmed that there were problems with Argo's construction segment throughout the Class Period. Both CW3 and CW4 confirmed that concerns regarding construction defect claims were being addressed at the highest levels of management in quarterly companywide town hall meetings. CW4 stated that the issue with construction defect

claims "goes back a long time" and that in 2018 or just before then, "things started to get really screwed up, that is when all the crap started" with construction defect claims. CW2 confirmed that Argo's middle market construction underwriters lacked necessary diligence in underwriting claims. Both CW1 and CW4 reported that Argo's construction defect claims adjusters were overwhelmed with work. In particular, CW1 stated that the department was understaffed and CW4 stated that the management of the vast volume of claims was ineffective. In fact, CW1 ended up resigning from the Company in December 2020 because they felt overwhelmed with the amount of work. CW4 also reported that construction defect claims adjusters were overwhelmed and noted that they would "get crapped on in a meeting" if they reported that they sought to put up significant reserves. CW1 stated that Argo's claims adjusters each had caseloads of upwards of 175 or even 180 claims whereas a manageable caseload for an experienced claims adjuster is typically just 100 claims. CW1 also noted that Argo could not handle the volume of construction defect claims it had in place so it retained a law firm that was "sitting on the claims, just babysitting them." CW2's statement that the "loss portal," which tracked Argo's losses related to its construction line and which CW2 believed was populated by the claims adjusters, was not always up-to-date corroborates CW1's statements about how overworked Argo's claims adjusters were.

139. Further, according to CW2 who worked in underwriting Argo's construction claims from July 2017 through June 2022, construction defect issues were a problem for Argo's "middle market" business and there were discussions within the Company as early as 2020 about the need "to strengthen underwriting guidelines." CW2 reported that Argo's middle market construction team was removing exposures by "adding on exclusion wording" to policies and limiting business with roofing contractors, which management did not reveal until 2022 and even then, did not expressly identify the nature of the "exposures" being reduced. Finally, CW2 discussed that Argo's

middle market construction underwriters had less due diligence and was less "robust" than another underwriting team.

140. CW4 also reported that Argo had a culture of "reserves suppression" wherein claims personnel were afraid to "put up reserves" because they were regularly "humiliated" and "yelled at" during meetings which were attended by Defendants Watson, Rehnberg, Bullock and Kirk. CW4 further stated that Defendants Watson, Rehnberg, Bullock, and Kirk, attended these quarterly construction product line meetings. Therefore, these Defendants would have witnessed Wade and Laudermilch "berat[ing] any claims staff who addressed" significant reserves during the meetings and been privy to the culture of reserve suppression.

141. Further, according to CW4, Defendants attended quarterly product line review meetings for Argo's construction segment wherein the SVP of Argo Construction, Cornwell, presented PowerPoint presentations with slides containing data from Argo's CAPS information system which tracked and managed claims and displayed the estimated losses for claims. CW4 stated that these PowerPoint slides were emailed to the meeting attendees ahead of time. Therefore, Defendants would have known that there were problems with the construction defect business by virtue of receiving via email the PowerPoint presentation data concerning construction defect claims and estimated losses therefrom. Defendants also would have known that there were issues with Argo's construction defect claims because they attended the meetings wherein this data was presented.

142. Defendants' knowledge of the falsity of the statements alleged herein is further demonstrated by the fact that "construction defect was a concern for the leadership of the construction business" and that even executives in other departments were also "keeping an eye on" the construction defect losses, as reported by CW3. CW3 specifically reported that Defendant

Rehnberg made statements in town hall meetings that took place in March or April 2021 that construction defect "was something that was a concern." And CW4 similarly reported that Rehnberg regularly stated that "construction defect was a challenge" at townhall meetings and, like CW3, heard Rehnberg state that construction defect claims were a concern at more than two or three quarterly town hall meetings before CW4 departed from Argo in March 2022.

143. Defendant Watson served as the President and CEO of Argo from January 2000 until November 2019. Watson was also a member of Argo's Board of Directors from 2000 until December 30, 2019. Between 1992 and 1997 Watson was a director and EVP, General Counsel and Secretary of Titan holdings, Inc., a publicly traded casualty and property insurance holding company. Defendant Watson was also a member of the board of governors of the Property Casualty Insurers Association of America as well as a member of the board of directors of the Association of Bermuda Insurers & Reinsurers. According to Argo's proxy statement for fiscal year 2019, Defendant Watson brought to the Board of Directors "a wealth of experience in the specialty property and casualty insurance sector and insight into the Company's investment strategies."

144. Defendant Rehnberg was the CEO of Argo effective February 18, 2020, and Interim CEO effective November 4, 2019. From March 2013 to November 2019, Defendant Rehnberg was the President of Argo's U.S. Operations, responsible for "overseeing all activities of Argo's U.S.-based business segments." Further, before Defendant Rehnberg joined Argo, he was the EVP at OneBeacon Insurance "where he oversaw specialty underwriting operations and acquired and built new lines of specialty business."

145. Defendant Kirk has been the CFO of Argo since March 16, 2021. Prior to working at Argo, Defendant Kirk worked at several other insurance and reinsurance companies and is thus intimately familiar with the financial accounting for insurance and loss reserves. The other

insurance and reinsurance companies that Kirk worked at include: Aspen Insurance Holdings Limited, a global property and casualty insurance and reinsurance company, where he was most recently Aspen's CFO from 2014 until April 2020; and Endurance Specialty Holdings Ltd., an underwriter of specialty lines of reinsurance and insurance, where he worked in several senior finance roles between 2002 and 2007. Defendant Kirk also worked in the finance and treasury departments at Trenwick International Ltd. and as an auditor at KPMG. As such, Defendant Kirk has decades of experience working in casualty and property insurance and reinsurance as well as finance.

146. Defendant Bullock was the CFO of Argo from May 2008 until March 15, 2021. Prior to joining Argo, Defendant Bullock worked at Bear Stearns & Co. Inc. where he worked as a Senior Managing Director and Head of Bear Sterns' Insurance Investment Banking Group. At Bear Sterns, Bullock worked primarily in the insurance sector wherein he served as an advisor to Argo Group on a few occasions.

### B. IMPUTED KNOWLEDGE OF FACTS CRITICAL TO THE COMPANY'S U.S. OPERATIONS

147. Defendants Watson, Rehnberg, Bullock, and Kirk were aware of and informed of matters relating to Argo's claims and reserves and in particular, its construction defect claims, which comprised the majority, if not all, of Argo Construction's premiums written, and were therefore critical to the continued viability of the Company's U.S. operations. Further, Defendants paid close attention to Argo's construction business as they consistently touted it as a growing business unit during the Class Period. Further, Argo's U.S. business was considered its "crown jewel" and its construction defect business in particular was a substantial segment of those operations. Moreover, Argo's underwriting philosophy and standards and its ability to prudently set reserves were integral to its success in the U.S. segment. Thus, Defendants can be presumed to

have had knowledge of the inadequacies of their disclosures in this regard. Further, Defendants' experience and responsibilities further supports a strong inference that they knew (or at least recklessly disregarded) that the statements at issue herein and made during the Class Period were materially false or misleading and contained material omissions.

148. Specifically, Kirk, Rehnberg, Watson, and Bullock were aware of and informed of matters pertaining to the Company's underwriting policies and reserve developments in general, and specifics regarding the construction defect business. Their experience and responsibilities further demonstrate a strong inference that they knew – or at least recklessly disregarded – that the statements alleged herein made during the Class Period were materially false and misleading and contained material omissions. The Individual Defendants each have significant experience in underwriting and reserve development.

### C. Motive and Opportunity

#### i. Incentive Compensation

149. The Individual Defendants were motivated to make false and misleading statements, and to conceal material information regarding adverse reserve developments in the construction defect business, throughout the Class Period, in order to give themselves the opportunity to capitalize on their incentive cash compensation and stock awards, both of which were linked to the Company's financial performance.

150. As set out in Argo's Proxy Statements on Schedule 14(a) issued in connection with the Notice of the Annual General Meeting of Shareholder for each year during the Class Period, (the "YYYY Proxy"), executive compensation at Argo was contingent to a large degree on performance metrics and targets that would have been adversely affected by any increase in

reserves or charges during the Class Period or by the announcement of an adverse reserve development.

151. For all relevant years, executive compensation at Argo had three components: base salaries, annual cash incentives and long-term incentives. In 2018 and 2019, the primary metrics on which incentive compensation were based were pre-tax operating income and year-over-year growth in BVPS targets. At Argo, BVPS was defined as a combination of underwriting income, total return on invested assets and capital management. Annual incentive compensation was determined in 2018 through 2020 using individual targets awards adjusted at year-end based on factors related to both the Company's financial performance and individual performance to determine the final amount of the award.

152. Specifically, annual incentive awards were calculated using pre-tax operating income target, with payout ranging from 0% to 200% of target opportunity, adjusted upwards or downwards by 30% based on individual performance. Payouts were capped at 200% of target opportunity regardless of individual performance. Long-term incentive compensation was based on achieving year-over-year BVPS growth for 50% of the award, with the full award adjusted upward by 25% for achievement of long-term individual performance objectives.

153. In the years 2018 through 2021, variable incentives accounted for a majority of total compensation of key executives. In 2018, for example, 73% of the total target compensation for Argo's CEO and 65% of the total target compensation for the average of all other Named Executive Officers ("NEOs") was linked to variable short-term and long-term performance-based incentives, excluding the value of the 2018 Performance Awards. In 2021, only 23% of pay of the CEO was fixed with 77% variable. For all other NEOs, fixed pay was 38%, with 62% variable.

154. In 2020, Argo made certain modifications to its executive compensation policies. Beginning in 2021, all long-term incentive grants were measured over a three-year performance period, rather than one year. Also beginning in 2020, Argo introduced a Return on Equity ("ROE") metric measured over a three-year performance period. The ROE metric was equally weighted with the BVPS growth metric under the long-term incentive plan. Argo also eliminated the individual performance modifier so that performance-based awards were tied to Company-wide goals only. Finally, Argo increased stock ownership guidelines for all NEOs.

155. In 2021, Argo made additional modifications to the annual incentive plan such that (1) "80% was based on achievement relative to pre-established underwriting income and normalized combined ratio results, as adjusted" and (2) "20% was based on individual performance with respect to pre-established, non-financial individual goals." 2022 Proxy.

156. Because Argo's cash incentive compensation plan was structured to link pay and performance, the Individual Defendants were motivated to hide issues that could negatively impact the metrics upon which their compensation was based, including operating income, BVPS and ROE. Specifically, any increase in reserves would necessarily offset premium receivables on Argo's balance sheet and thereby affect reported financials benchmarks, such as BVPS and underwriting income, on which variable compensation was based. Moreover, by systematically under-reserving, Defendants misrepresented the overall financial health of Argo in a manner that propped up Argo's stock price, allowing Defendants to achieve ROE and other targets that incorporated Argo's stock price.

157. The result of increasing reserves is best evidenced by the effect of the adverse prior year reserve development belatedly reported for the fourth quarter of 2021. Argo reported a net loss of $3.41 per share. The announcement of that loss, and the accompanying loss or reputational

capital, among other things, caused Argo's share price to tumble in a manner that would have hindered Defendants from achieving the targets necessary to receive incentive compensation.

### 1. Watson

158. According to Argo's Proxy Statement filed with the SEC on April 12, 2019, for the fiscal year ending December 31, 2018, Defendant Watson received a base salary of $1,200,000. In 2018, Defendant Watson received an incentive bonus of $1,020,521, accounting for ***46% of his total compensation package***. Further, for fiscal year ended 2018, Defendant Watson received $6,080,480 worth of stock awards and other forms of compensation totaling ***$8,162,328*** for fiscal year 2018.

159. Further, according to the SEC's investigation in connection with the $5 million in undisclosed perquisites received by Defendant Watson, it was also revealed that Watson ***received $10 million per year in stock and cash compensation over a five-year period***.

### 2. Bullock

160. According to Argo's 2019 Proxy Statement filed with the SEC on April 12, 2019, Defendant Bullock's base salary for 2018 was $525,000. For that same year, Defendant Bullock received an incentive award of $511,875. The fair value of all long-term equity incentive awards to Bullock in 2018 was $814,716.

161. According to the 2020 Proxy Statement, in 2019, Bullock's base salary increased from $525,000 to $600,000 effective May 26, 2019 for a total payment of $570,205. His stock awards for 2019 were valued at $419, 997. Bullock did not receive a cash incentive payout as the Company's pre-tax operating income goal was not met in 2019.

162. According to Argo's 2021 Proxy Statement filed with the SEC on March 25, 2021, for 2020, Defendant Bullock's base salary was $600,000 and his target annual incentive

compensation was $700,000, or 116.7% of his base salary, of which he received $210,000. In 2020, Bullock received stock awards valued at $599,991.

163. According to Argo's 2022 Proxy Statement, for 2021, Bullock's base salary was to be $600,000. Upon leaving the Company, Bullock was not eligible to participate in the 2021 annual incentive plan or long-term incentive plan. He did however receive significant separation payments including $758,333 in cash severance and a $700,000 "incentive payment."

**3. Rehnberg**

164. According to Argo's 2019 Proxy Statement filed with the SEC on April 12, 2019, Defendant Rehnberg's base salary in 2018 was $650,000. For that same year, Defendant Rehnberg received an incentive award of $688,500. The fair value of all long-term equity incentive awards to Rehnberg in 2018 was $1,634,291.

165. According to Argo's 2020 Proxy Statement filed with the SEC on March 16, 2020, Defendant Rehnberg's base salary in 2019 was increased to $975,000 from $700,00 effective November 5, 2019 in connection with his appointment as Interim President and Chief Executive Officer. He received an incentive bonus of $283,815 and stock awards valued at $999,951 in 2019. Combined with all other compensation, Defendant Rehnberg was paid over $2.1 million in 2019.

166. According to Argo's 2021 Proxy Statement filed with the SEC on March 25, 2021, Defendant Rehnberg's base salary was $975,000 for 2020. He received non-equity incentive compensation of $365,625 and stock awards valued at $2,499.980, for total compensation of $3,927,090.

167. According to Argo's 2022 Proxy Statement filed with the SEC on October 31, 2022, for fiscal year 2021, Defendant Rehnberg's base salary was $975,000 for 2021. For that year, Defendant Rehnberg's target annual incentive was 125% of his base salary or $1,218,750, of which

he earned $1,007,906. For 2021, Rehnberg's target award value for long-term incentive awards was $2 million, of which he received 1,999,945. Defendant Rehnberg's compensation for 2021 thus totaled over $4 million.

#### 4. Kirk

168. According to Argo's 2022 Proxy Statement, for 2021, Defendant Kirk's base salary was $561,423, or $630,087 on an annualized basis. Defendant Kirk joined Argo on February 8, 2021 and succeeded Mr. Bullock on March 16, 2021. For 2021, Defendant Kirk's target annual incentive compensation was $630,087, of which he earned $521,082. He also received stock awards valued at $1,407,177. His total compensation for less than one year of employment was $2,831,014.

169. Defendant Kirk was also paid a one-time cash sign-on bonus of $300,000 in 2021. In December 2021, Defendant Kirk received a one-time retention award with a grant date fair value equal to $500,000 in the form of restricted stock that would vest ratably over three-years.

170. On April 26, 2022, the Board granted Kirk yet another retention bonus in cash in an amount equal to two times his base salary (then $700,00 x 2) vesting in 25% increments.

### ii. Defendants Watson, Rehnberg, and Bullock Realized More Than $7.6 Million in Proceeds from Their Class Period Stock Sales

171. Throughout the Class Period, the Individual Defendants were motivated to issue false statements and omit material information from statements thereby rendering them misleading in order to give themselves the opportunity to sell their common stock at artificially inflated prices.

172. While Defendants repeatedly misled the investing public about how prosperous and successful Argo's construction segment was, and how it was leading the way for its U.S. operations, Individual Defendants Watson, Rehnberg, and Bullock, along with several other Company insiders, sold substantial amounts of Argo shares at artificially inflated prices.

173. In total, Defendants Watson, Rehnberg, and Bullock unloaded more than 130,000 shares of Argo common stock during the Class Period for combined proceeds of $7.67 million.

### 1. Watson

174. During the Class Period, Defendant Watson sold 42,876 shares of Argo common stock at an average share price of $67.43. Defendant Watson realized a total of **$2,852,666** in proceeds over the course of just *three months* from selling his stock at artificially inflated prices.

| Date | No. of shares | Price per share | Proceeds |
|---|---|---|---|
| 8/22/2018 | 15,000 | $63.19 | $947,787.00 |
| 11/9/2018 | 272 | $68.72 | $18,691.84 |
| 11/9/2018 | 2,051 | $68.00 | $139,468.00 |
| 11/9/2018 | 6,987 | $66.82 | $466,871.34 |
| 11/29/2018 | 9,274 | $68.92 | $639,164.08 |
| 11/30/2018 | 9,292 | $68.95 | $640,683.40 |
| | **Total: 42,876** | **Avg. price: $67.43** | **Total: $2,852,666** |

### 2. Rehnberg

175. Defendant Rehnberg sold 54,139 shares of Argo common stock during the Class Period at an average share price of $58.22. As a result of his stock sales, Defendant Rehnberg realized $2,604,725.47 in proceeds during the Class Period.

| Date | No. of shares | Price per share | Proceeds |
|---|---|---|---|
| 8/10/2018 | 6,000 | $61.07 | $366,424.20 |
| 8/10/2018 | 6,000 | $61.22 | $367,290.60 |
| 8/10/2018 | 4,850 | $61.63 | $298,905.50 |
| 5/28/2019 | 6,442 | $71.08 | $457,911.53 |

| | | | |
|---|---|---|---|
| 8/13/2020 | 30,847 | $36.12 | $1,114,193.64 |
| | **Total: 54,139** | **Avg. price: $58.22** | **Total: $2,604,725.47** |

### 3. Bullock

176. Defendant Bullock sold 33,153 shares of Argo common stock during the Class Period, at an average share price of $66.19. During the Class Period, Defendant Bullock realized $2,215,303 in proceeds.

| Date | No. of shares | Price per share | Proceeds |
|---|---|---|---|
| 9/5/2018 | 5,486 | $63.52 | $348,470.72 |
| 9/6/2018 | 2,066 | $63.51 | $131,211.66 |
| 9/7/2018 | 4,771 | $63.28 | $301,908.88 |
| 12/11/2018 | 6,207 | $69.09 | $428,841.63 |
| 8/13/2019 | 11,854 | $68.62 | $813,421.48 |
| 8/13/2019 | 2,769 | $69.14 | $191,448.66 |
| | **Total: 33,153** | **Avg. price: $66.19** | **Total: $2,215,303** |

## D. THE SEC INVESTIGATION INTO DEFENDANT WATSON'S UNDISCLOSED PERQUISITES

177. Throughout the Class Period, Defendant Watson was further motivated to issue false and misleading statements regarding Argo's construction segment and Argo's financial wellbeing overall to conceal his abuse of and failure to disclose the receipt of Company perquisites. On October 8, 2018, Bloomberg released an article reporting that Argo had received a subpoena from the SEC regarding certain perquisites Defendant and former CEO Watson had received.

178. In particular, between 2014 through 2018, Defendant Watson had received a number of perquisites which were improperly reported and not disclosed by the Company.

According to the SEC, these perquisites included "expenses associated with personal use of corporate aircraft, rent and other housing costs, personal use of corporate automobiles, helicopter trips, other personal travel costs, use of a car service by family members, club and concierge service memberships, tickets and transportation to sporting, fashion or other entertainment events, personal services provided by Argo employees, and watercraft-related costs."

179. Throughout 2019, Argo responded to the comments of Voce Capital, one of its largest stakeholders, regarding excessive spending, including personal use of a corporate jet and other extravagant spending by corporate executives, including Defendant Watson. In particular, on February 25, 2019, Voce wrote a letter to shareholders noting its concerns about "shockingly inappropriate" corporate expenses which included: "gross misallocations of capital on wasteful items and frivolous sponsorships, and an overall spendthrift culture that misdirects [Argo] assets to support the lifestyle and hobbies of [Watson] at the expense of shareholders." The letter further stated: "His [Watson's] tastes in art, architecture, racing, yachting and luxury travel, among other things, are well documented, and he appears to be quite the *bon vivant* . . . But we're deeply concerned that Mr. Watson's hobbies, pet projects and the cult of personality he apparently wishes to create for himself have commandeered and corrupted Argo's priorities. We believe that Argo's corporate assets – including Mr. Watson's professional time, the Company's focus and its capital – are being grossly misspent and misdirected, in furtherance of Mr. Watson's personal agenda at shareholders' expense." Nevertheless, Argo consistently characterized these assertions as "falsehoods," and retorted that Voce was "fabricating a narrative of excess," including in investor presentations and press releases at various points during the year.

180. On October 8, 2019, Argo announced that its independent directors would be conducting a review of compensation and other matters after having received a subpoena from the

SEC seeking documents regarding Company perquisites. This investigation ultimately led to the resignation of Defendant Watson and the payment of significant sums to the SEC from both Defendant Watson and Argo itself.

181. On November 2, 2019, Argo issued a press release announcing the "retirement" of Defendant Watson, effective immediately. Defendant Rehnberg was named as Interim Chief Executive Officer. The Argo Board thanked Watson for his 20 years of service and leadership, despite the fact that his "retirement" was precipitated by the SEC investigation into Argo's pay practices and the findings of its own internal investigation that Argo had failed to disclose over $5 million in perks to Defendant Watson, including using the company card to purchase tickets to the Met Gala in 2018 and 2019 for $60,000 and $70,000, respectively. The SEC ultimately announced that its own investigation had shown more that $5 million in perks to Defendant Watson over a 5-year period, on top of over $10 million per year in cash and stock compensation.

182. On December 12, 2019, Argo provided an update to shareholders regarding its "Board refreshment process." Argo announced that five Board members would retire and that the Board would be revising its executive compensation program in the wake of Defendant Watson's departure. Less than one month later, Argo announced a cooperation agreement with Voce Capital whose criticisms Argo had previously discounted and denied.

### E. THROUGHOUT THE CLASS PERIOD ARGO EXPERIENCED SIGNIFICANT EXECUTIVE TURNOVER

183. The termination and resignations of high-ranking executives throughout the Class Period, including Defendants Watson, Bullock, and Rehnberg are further indicia of scienter.

184. In November 2019, Watson retired from his position as Argo's CEO after the Company admitted it had failed to disclose over $3 million in perks given to Watson.

185. In June 2020, Argo's Chief Underwriting Officer ("CUO"), Axel Schmidt, stepped down from his role as CUO but remained as an advisor to Defendant Rehnberg through the end of 2020. Schmidt was replaced by Tim Carter, who then departed in August 2021. Matt Harris, the head of International Operations, also departed from Argo in August 2021.

186. In March 2021, Defendant Bullock suddenly resigned as Argo's CFO after working at the Company for more than 12 years. Argo did not provide an explanation for his departure and merely announced that the Company was in "search for Jay Bullock's successor as CFO at Argo."

187. In 2021, several senior leaders from Argo's construction division departed from Argo. In particular, in 2021, Jess Tanner, the Head of Primary Casualty, Jim Cornwell, the Senior Vice President of Construction, and Jordan Marks, the Vice President of Underwriting, senior leaders of Argo's construction business, all departed Argo to begin working for K2 Construction.

## VIII. CLASS ACTION ALLEGATIONS

188. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Argo common stock during the Class Period from June 11, 2018 through August 9, 2022 and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

189. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Argo common stock actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Argo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

190. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Argo;

(c) whether the Individual Defendants caused Argo to make false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether Defendants' conduct complained of herein artificially inflated the prices of Argo securities during the Class Period; and

(f) to what extent the members of the Class have sustained damages and what is the proper measure of damages.

191. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

192. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

193. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE

194. At all relevant times, the market for Argo's common stock was open, well-developed, and efficient, for the following reasons, among others:

(a) Argo's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Argo filed periodic public reports with the SEC and the NYSE;

(c) Argo regularly and publicly communicated with investors via established market communication channels, including through the regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or:

(d) Argo was followed by analysts employed by brokerage firms who issued reports about the Company and these reports were distributes to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

195. As a result of Defendants' materially false and misleading statements, Argo's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Argo's common stock and market information relating to Argo, and have been damaged thereby.

196. As a result of the foregoing, the market for Argo's common stock promptly digested current information regarding Argo from all publicly available sources and reflected such information in Argo's share price. Under these circumstances, all purchasers of Argo's common stock during the Class Period suffered similar injury through their purchase of Argo's common stock at artificially inflated prices and a presumption of reliance applies.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

197. The statutory safe harbor provided for forward-looking statements under certain circumstances is inapplicable to the false statements alleged in this Amended Complaint. The statements alleged to be false herein all related to then-existing facts and conditions. Further, to the extent that certain of the statements alleged to be false may be characterized as forward looking, they were not characterized as "forward-looking statements" when made and there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false, and/or the forward-looking statement was authorized or approved by an executive officer of Argo who knew that the statement was false when made.

## XI. LOSS CAUSATION

198. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

199. During the Class Period, Lead Plaintiff and the Class purchased Argo common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## COUNT I
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants**

200. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

201. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other Class members to purchase Argo securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

202. Defendants (i) knowingly or recklessly engaged in acts transactions, practices and courses of business in order to defraud Lead Plaintiff and the Class members; (ii) made various untrue statements of material facts; and (iii) engaged in devices, schemes and artifices to defraud in connection with the purchase and sale of securities. All Defendants named are sued either as primary participants in the illegal conduct charged herein or as controlling persons as alleged below.

203. During the Class Period, Defendants made false statements which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically:

i. Watson: Defendant Watson made, or caused Argo to make the false statements specified in Paragraphs 97, 99, 101, above.

ii. Rehnberg: Defendant Rehnberg made, or caused Argo to make the false statements specified in Paragraphs 97, 102, 105, 110, 111, 114, 115, 117, above.

iii. Kirk: Defendant Kirk made, or caused Argo to make the false statements specified in Paragraph 117, above.

iv. Bullock: Defendant Bullock made, or caused Argo to make the false statements specified in Paragraph 104, above.

v. Argo: Defendant Argo is responsible for all of the false statements specified in Sections V, above.

204. Each of the Defendants engaged and participated in the continuous conduct to conceal material information about Argo's ability to properly reserve for losses as specified herein. Defendants directly or indirectly issued quarterly and annual reports, SEC filings, press releases and other statements and documents, including statements made to securities analysts and the media that influenced the market for Argo's securities. Such statements were materially false and misleading in that they concealed the truth about Argo's finances and business prospects.

205. Defendants had actual knowledge of the materially false and misleading statements or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such

facts, even though such facts were available to them. Defendants committed said acts willfully or with reckless disregard for the truth. Additionally, each Defendant knew or recklessly disregarded the truth that material facts were being misrepresented as detailed above.

206. Evidence that Defendants acted knowingly or with reckless disregard for the truth lies within Defendants' knowledge and control. As the senior managers and/or directors of Argo, each of the Defendants (i) had control over the Company's public statements and filings; (ii) were privy to the creation and reporting of the Company's public filings; and (iii) had knowledge of the Company's dissemination of false information to investors, which they knew and/or recklessly disregarded was materially false.

207. The Individual Defendants are both directly and indirectly liable for the wrongs complained of herein. As a result of the dissemination of the false and misleading reports, filings, and releases, the market price of Argo securities was artificially inflated during the Class Period. Unbeknownst to them, Lead Plaintiff and other members of the Class purchased or acquired securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

208. During the Class Period, Lead Plaintiff and other members of the Class were ignorant of the falsity of Argo's misrepresentations. Had they known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflate prices that were paid.

209. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act.

210. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Watson and Rehnberg**

211. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212. Defendants Watson and Rehnberg were controlling persons of Argo within the meaning of Section 20(a) of the Exchange Act as alleged herein. Due to their senior positions, each of the Defendants knew the adverse non-public information about Argo's misstatements about its reserves and false financial statements.

213. As officers and/or directors or a publicly owned company, Defendants Watson and Rehnberg had a duty to disseminate accurate and truthful information with respect to Argo's financial condition and results or operations. Defendants Watson and Rehnberg also had a duty to correct any materially false or misleading public statements issued by Argo.

214. During the Class Period, Defendants Watson and Rehnberg exercised their power and authority to cause Argo to engage in the wrongful acts complained of herein. In this capacity, they participated in unlawful conduct alleged which artificially inflated the market price of Argo securities.

215. By reason of the above conduct, Defendants Watson and Rehnberg are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Argo.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

(a) Determining that this action is proper under Rule 23 of the Federal Rules of Civil Procedure;

(b) Requiring Defendants to pay compensatory damages to Lead Plaintiff and the Class for all damages caused by Defendants' wrongdoing;

(c) Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d) Such other and further relief as the Court may deem proper.

## XIII. DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: March 28, 2023

Respectfully submitted,

*/s/ Daniel L. Berger*

Daniel L. Berger
Karin E. Fisch
Mica A. Cocco
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: kfisch@gelaw.com
Email: mcocco@gelaw.com

*Counsel for Lead Plaintiff Police & Fire Retirement System City of Detroit and Oklahoma Law Enforcement Retirement System and the proposed Class*