UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| THE POLICE & FIRE RETIREMENT SYSTEM CITY OF DETROIT, Individually and On Behalf of All Others Similarly Situated, | : : : : : |
| Plaintiff, | : : |
| v. | : : : |
| ARGO GROUP INTERNATIONAL HOLDINGS, LTD., SCOTT KIRK, KEVIN J. REHNBERG, MARK E. WATSON, III, and JAY S. BULLOCK, | : : : : : |
| Defendants. | : : |

22-cv-08971 (LAK)

**ECF Case**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Jay B. Kasner
Alexander C. Drylewski
Tansy Woan
Sarah E. Adams
One Manhattan West
New York, NY 10001-8603
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
alexander.drylewski@skadden.com
tansy.woan@skadden.com
sarah.adams@skadden.com

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 5

    A.    The Company and Individual Defendants ................................................. 5

    B.    Argo Construction and Construction Defect Claims ................................ 6

    C.    Argo Repeatedly Warned Investors That Its Loss Reserve Estimates Are Inherently Uncertain and Subject to Change ........................................... 7

    D.    Argo's Loss Reserve Estimates Are Reviewed by Independent Parties ................. 9

    E.    Argo Announces an Increase in Its Reserves Based on New Information ............. 9

    F.    Argo Announces the Enstar Transaction in August 2022 ...................... 11

    G.    Plaintiffs File This Action Asserting Fraud ........................................... 11

ARGUMENT .......................................................................................................................... 12

I.    THE AC SHOULD BE DISMISSED WITH PREJUDICE ........................................... 12

    A.    Plaintiffs Fail to Plead Any Material Misstatement or Omission ......................... 12

        1.    Plaintiffs Have Not Alleged That Argo's Reserving-Related Statements Were False or Misleading ......................................... 12

            (a)    Two Independent Third Parties Reviewed the Estimated Reserves ................................................................... 16

            (b)    Plaintiffs' CW Allegations Fail ...................................... 17

            (c)    Argo Adequately Disclosed the Very Risks That Ultimately Materialized ....................................................... 21

        2.    Plaintiffs Fail to Allege That Any of the Remaining Challenged Statements Are False or Misleading ......................................... 22

            (a)    Accurate Statements of Financial Performance ............................. 22

            (b)    Statements of General Corporate Optimism and Puffery ............. 24

B.      Plaintiffs Fail to Plead Scheme Liability ................................................26

C.      Plaintiffs Fail to Plead a Strong Inference of Scienter.............................26

        1.      Plaintiffs Fail to Plead a Cognizable Motive to Commit Fraud................26

                (a)     Plaintiffs' Stock Sale Allegations Are Insufficient......................27

                (b)     Incentive Compensation Allegations .............................................29

        2.      Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness .............30

        3.      Non-culpable Inferences Are Far More Compelling ................................34

II.     Plaintiffs Fail to State a Claim For Control Person Liability..............................35

CONCLUSION .................................................................................................................35

# **TABLE OF AUTHORITIES**

Page(s)

## CASES

*Abely v. Aeterna Zentaris Inc.*,
    2013 WL 2399869 (S.D.N.Y. May 29, 2013) ................................................................27

*Abramson v. NewLink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)..........................................................................................24

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995)........................................................................................28, 30

*Africa v. Jianpu Technology Inc.*,
    2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)...........................................................22, 23

*In re Aratana Therapeutics Inc. Securities Litigation*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)...........................................................................28

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ..............................................................................12, 26, 30

*Arthur Properties, S.A. v. ABA Gallery, Inc.*,
    2012 WL 2886685 (S.D.N.Y. July 16, 2012) ................................................................32

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................................5

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020).............2, 14

*In re Banco Bradesco S.A. Securities Litigation*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017).............................................................................25

*In re Bristol-Myers Squibb Co. CVR Securities Litigation*,
    2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) ................................................................30

*In re Bristol-Myers Squibb Securities Litigation*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................................................................28

*Campo v. Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 71 F. App'x 212 (2d Cir. 2010).................16

*Chapman v. Mueller Water Products, Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)............................................................5, 14, 29, 34

*In re CIT Group, Inc. Securities Litigation*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)........................................................21

*City of Monroe Employees' Retirement System v. Hartford Financial Services Group,*
    *Inc.*, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011).......................................26

*City of North Miami Beach Police Officers' & Firefighters' Retirement Plan v. National*
    *General Holdings Corp.*, 2021 WL 212337 (S.D.N.Y. Jan. 21), *aff'd sub nom.*
    *Town of Davie Police Officers Retirement System v. City of North Miami Beach*
    *Police Officers'& Firefighters'Retirement Plan*, 2021 WL 5142702 (2d Cir. Nov.
    5, 2021) .........................................................................................28

*City of Taylor General Employees Retirement System v. Magna International Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013)........................................................29

*City of Westland Police & Fire Retirement System v. MetLife, Inc.*,
    129 F. Supp. 3d 48 (S.D.N.Y. 2015)..............................................13, 14, 15

*In re CRM Holdings, Ltd. Securities Litigation*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...........................................13, 32

*Deluca v. GPB Automotive Portfolio, LP*,
    2020 WL 7343788 (S.D.N.Y. Dec. 14, 2020) ...........................................25, 26

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................25, 26, 29, 30, 34

*In re eSpeed, Inc. Securities Litigation*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................................27

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)................................................................2, 12

*In re Ferrellgas Partners, L.P., Securities Litigation*,
    2018 WL 2081859 (S.D.N.Y. 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).................33

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020).......................................................31

*In re Garret Motion Inc. Securities Litigation*,
    2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) .................................................35

*In re GeoPharma, Inc. Securities Litigation*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005).......................................................35

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................28

*Gillis v. QRX Pharma Ltd.*,
 197 F. Supp. 3d 557 (S.D.N.Y. 2016)................................................................35

*Glaser v. The9, Ltd.*,
 772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................27, 28, 31, 32

*Gregory v. ProNAi Therapeutics Inc.*,
 297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)..........25

*In re Hertz Global Holdings Inc.*,
 905 F.3d 106 (3d Cir. 2018)..............................................................................33

*Hinerfeld v. United Auto Group*,
 1998 WL 397852 (S.D.N.Y. July 15, 1998) .....................................................20

*Holbrook v. Trivago N.V.*,
 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago
 N.V.*, 796 F. App'x 31 (2d Cir. 2019) ...............................................................32

*Hou Liu v. Intercept Pharmaceuticals, Inc.*,
 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ............................................27, 33

*In re Iconix Brand Group, Inc.*,
 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..............................................16, 34

*Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc.*,
 2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .....................................................25

*Jackson v. Abernathy*,
 960 F.3d 94 (2d Cir. 2020)................................................................................34

*Janus Capital Group, Inc. v. First Derivative Traders*,
 564 U.S. 135 (2011)...........................................................................................25

*KBC Asset Management NV v. MetLife, Inc.*,
 2022 WL 480213 (2d Cir. Feb. 17, 2022)..........................................................31

*Kleinman v. Elan Corp., plc*,
 706 F.3d 145 (2d Cir. 2013)..............................................................................24

*Lachman v. Revlon, Inc.*,
 487 F. Supp. 3d 111 (E.D.N.Y. 2020) ...............................................................34

*Lehmann v. Ohr Pharmaceutical, Inc.*,
 830 F. App'x 349 (2d Cir. 2020) .......................................................................31

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005)...............................................................................26

*In re Magnum Hunter Resources Corp. Securities Litigation*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).................16

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)..........16, 18

*Nandkumar v. AstraZeneca PLC*,
    2023 WL 3477164 (2d Cir. May 16, 2023) ........................................................23

*NECA-IBEW Pension Trust Fund v. Bank of America Corp.*
    2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012)........................................14, 20, 21

*North Collier Fire Control & Rescue District Firefighter Pension Plan & Plymouth
    County Retirement Association v. MDC Partn*ers*, Inc.*, 2016 WL 5794774
    (S.D.N.Y. Sept. 30, 2016) .............................................................................16, 17

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013).........................................................14, 21

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v.
    Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)...................................................25

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)...............................................................................2, 13, 14

*In re Optionable Securities Litigation*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008).............................................................21

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ....................................................19

*Plymouth County Retirement System Association & Carpenters Pension Trust Fund v.
    Array Technologies, Inc.*, 2023 WL 3569068 (S.D.N.Y. May 19, 2023)...................18, 23

*In re PXRE Group, Ltd., Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F.
    App'x 393 (2d Cir. 2009)...........................................................................19, 20

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) .......................................29, 30, 32

*In re Renewable Energy Group Securities Litigation*,
    2022 WL 14206678 (2d Cir. Oct. 25, 2022).............................................32, 35

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)...........................................................................27

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................34

*Saraf v. Ebix, Inc.*,
    2022 WL 4622676 (S.D.N.Y. Sept. 30, 2022) ...........................................17, 33

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ...............................................................................26

*Shields* v. *Citytrust Bankcorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ............................................................................34

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ............................................................................26

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) ..............................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................................5, 26, 34

*In re Tempur Sealy International., Inc. Securities Litigation*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .................................................12

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ............................................................................20

*In re Turquoise Hill Resource Ltd. Securities Litigation*,
    2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .................................................34

*In re UBS AG Securities Litigation*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). ....................................................................................................16, 22

*In re Veon Ltd. Securities Litigation*,
    2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) .................................................35

*In re Wachovia Equity Securities Litig*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...............................15, 16, 17, 18, 19, 32

*Waterford Township Police & Fire Retirement System v. Regional Management Corp.*,
    2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) .......................................15, 16, 32

*In re Weight Watchers International, Inc. Securities Litigation*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) .................................................20

*Wilson v. Merrill Lynch & Co.*,
     671 F.3d 120 (2d Cir. 2011)..............................................................................35

*Woolgar v. Kingstone Cos.*,
     477 F. Supp. 3d 193 (S.D.N.Y. 2020)...........................................14, 17, 18, 20

## STATUTES

15 U.S.C. § 78u-4(b)(1) ....................................................................................12

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................26

## RULES

Fed. R. Civ. P. 9(b) ..........................................................................................12

Defendants Argo Group International Holdings, Ltd. ("Argo" or the "Company"), Scott Kirk, Kevin J. Rehnberg, Mark E. Watson, III, and Jay S. Bullock (the "Individual Defendants," and together with Argo, "Defendants"), respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Class Action Complaint (the "AC") (ECF No. 29)[1] with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Argo is an international underwriter of specialty insurance that focuses on niche businesses requiring specialized or hard-to-place coverage. As Argo repeatedly told investors, its insurance loss reserve process was inherently uncertain and subject to volatility, its reserves represented management's "best estimates," and due to the significant uncertainties and related judgments involved, there could be "no assurance" that those estimates would not be adjusted upward in the future. Given these uncertainties, Argo would regularly review its reserving judgments, and also submitted them to third-party actuaries for their independent review and assessment. In February 2022, Argo announced that it was increasing its aggregate loss reserves based on information obtained during a "recently concluded fourth quarter 2021 reserve review." The Company stated that the increases were driven primarily by "construction defect claims within Argo's U.S. Operations, in addition to reserve increases in the Run-off segment . . . primarily related to the 2017 and prior underwriting years."

Through this putative class action, Plaintiffs attempt to seize upon the Company's increase in reserves and subsequent decrease in stock price to assert that Defendants engaged in securities

---

[1] The AC is attached as Exhibit A to the accompanying Declaration of Tansy Woan, dated May 26, 2023, exhibits to which are indicated as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All citations and quotation marks are omitted, and all emphases are added, unless otherwise indicated.

fraud. The linchpin of their theory is that because Argo increased its loss reserves in 2022, Defendants knew as early as 2017 that the Company's construction defect claims reserves for the 2011-2017 time period were insufficient. From this untenable premise, Plaintiffs challenge a hodge-podge of statements made by Argo and a variety of individuals over a four-year period, the vast majority of which had nothing to do with construction defect claims reserves or underwriting, while others merely accurately reported the Company's financial performance or were general optimistic statements upon which no reasonable investor would rely.

As the Second Circuit and this Court have recognized, Plaintiffs cannot simply point to an adverse reserve development as evidence that Defendants knew past reserving decisions were wrong or that statements about those reserves were false and misleading. To the contrary, given the significant judgment involved, the law is settled that reserves are matters of opinion subject to the heightened pleadings standards of *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 135 S. Ct. 1318 (2015). *See Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011); *see also Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020). These standards are even more stringent than the already-demanding standards governing securities fraud actions. Plaintiffs' claims—which amount to nothing more than a hindsight-based disagreement with Argo's reserving opinions—fall far short and should be dismissed in their entirety for the following separate and independent reasons.

***Plaintiffs fail to allege an actionable misstatement or omission (infra § I.A.)***: First, Plaintiffs fail to allege that Argo's statements about its reserves were objectively false or not honestly believed when made. Rather, Plaintiffs' allegations amount to nothing more than a fraud-by-hindsight theory that because the reserves were later increased, Defendants must have known earlier that they were inadequate. But Plaintiffs allege no particularized facts to support such a

claim. They seek to rely upon allegations by four confidential witnesses ("CWs"), all low- to mid-level former employees who do not allege any direct interaction with any Defendant and never actually dispute the adequacy of the reserves in question. At the same time, Plaintiffs ignore that Argo hired an independent, third-party actuary to review its loss reserves on two separate occasions during the Class Period, and that the reserves were also reviewed by its outside auditor. Neither the independent actuary nor the auditor identified any material inaccuracies, severely undermining any assertion that Defendants did not honestly believe Argo's reserve estimates were adequate. (*See infra* §§ D; I.A.1a.)

Similarly, Plaintiffs allege in wholly conclusory fashion that the Company's construction defect underwriting guidelines from 2011-2017 were "deficient." But Plaintiffs do not challenge any statements involving underwriting guidelines, and fail to allege any facts—particularized or otherwise—that Argo's underwriting guidelines were deficient or not followed. Rather, Plaintiffs merely point to the fact that Argo convened a "CD Task Force" in 2017 to review and strengthen the Company's underwriting guidelines and ask this Court to infer that it must mean Defendants "knew" that previous reserves and guidelines were insufficient. Courts have concluded, however, that strengthening policies on a going-forward basis does not support an inference of inadequacy or fraud, but in fact does just the opposite by highlighting a defendant's ongoing efforts to constantly improve as new information becomes available. (*Infra* §§ I.A.1., I.C.2.)

Plaintiffs also ignore Argo's robust risk disclosures made throughout the Class Period, which explained that its reserving process was inherently uncertain and subject to volatility, and that "there can be no assurance that the future loss development, favorable or unfavorable, will not occur." (*Infra* § I.A.1.c.) These warnings belie any suggestion that investors were misled.

Further, while Plaintiffs challenge several statements regarding the financial performance of Argo's Construction business unit ("Argo Construction"), which was formed *after* the 2011-2017 time period in question, they fail to plead particularized facts showing that any of those statements were false. Indeed, the Company's financial results—which were never restated—were independently vetted by the Company's outside auditor and cannot form the basis of a securities fraud claim. Plaintiffs also challenge numerous vague and generalized statements made about Argo being a "leader in multiple specialty lines" and having "competitive advantages," but courts consistently find such statements to be inactionable puffery.

***Plaintiffs fail to plead a strong inference of scienter (infra § I.C.)***: Second, Plaintiffs fail to allege particularized facts evincing a "strong inference" of scienter that is "cogent and at least as compelling" as any non-fraudulent inference. Far from cogent, Plaintiffs' theory is incoherent. According to the AC, multiple Argo executives acting at different times and in varying circumstances spanning a four-year period all knowingly conspired to conceal a major problem with Argo's reserves that, even under Plaintiffs' allegations, would have been readily observable by independent auditors and third-party actuaries that the Company hired throughout the Class Period. Plaintiffs' proffered motive for this scheme was so that some (but not all) Defendants could profit by selling small percentages of personal Argo stock holdings, even while some of those Defendants' stock holdings actually *increased* over that same time.

Instead, the simplest inference is also the most compelling: Argo faced inherent risks and uncertainties involving its insurance loss reserves, increased its reserves to account for new information as it was obtained through its regular reserve review processes and acted promptly to notify the market as adverse developments became known, all while warning investors of these risks and uncertainties. The AC and disclosures upon which the Court may take judicial notice

paint the picture of a Company and management that acted responsibly, not with fraudulent intent.

## STATEMENT OF FACTS[2]

### A.   The Company and Individual Defendants

Argo is an "underwriter of specialty insurance products in the property and casualty market[,]" with a "focus on discrete niche products or businesses that require specialized or hard-to-place coverage." (Ex. B, FY20 10-K at 3.) It has two primary reporting segments, U.S. and International Operations. (*Id.* at 4.) Argo's U.S. Operations "is a leader in the U.S. specialty insurance market, specifically through its Excess and Surplus Lines ("E&S") business," which focuses on "risks that the standard, admitted insurance markets are unwilling or unable to underwrite." (*Id.*) Prior to 2018, construction defect claims were written within this riskier E&S business. (Ex. C, 4Q21 Tr. at 6, 10.) Argo's U.S. Operations has several other business units, including Casualty, Transportation, Property, Contract and Environmental. (Ex. B, FY20 10-K at 4.)

The Individual Defendants are current and former officers of the Company. (*See* AC ¶¶ 25-28.) Mark Watson was Argo's Chief Executive Officer ("CEO") from 2000 until November 5, 2019. (*Id.* ¶ 25.) Kevin J. Rehnberg served as President of Argo Group U.S. beginning in March 2013, and then became interim CEO and then appointed CEO, a role he served until March 7, 2022. (*Id.* ¶ 26.) Jay Bullock was Argo's Chief Financial Officer ("CFO") from May 5, 2008 until March 15, 2021. (*Id.* ¶ 27.) Scott Kirk has served as Argo's CFO since March 16, 2021.

---

[2] The facts are drawn from the AC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007). The Court may consider any "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Courts will consider well-pled factual allegations as true, but will not accept legal conclusions or a formalistic citation of the elements. *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 395 (S.D.N.Y. 2020).

B.       **Argo Construction and Construction Defect Claims**

On June 11, 2018—the start of the putative Class Period[3]—Argo announced that it was "establishing Argo Construction as a stand-alone underwriting business to pursue the growing construction sector," which was "launched from within [Argo's] E&S organization." (Ex. D, June 11, 2018 Press Release at 1.) This move was intended to capitalize on the expected growth of the construction sector which, at the time, was a "$1-trillion industry" and "projected to be among the fastest growing business sectors in the United States over the next five to seven years." (*Id.*) As explained by Rehnberg during an investor presentation in March 2021, Argo Construction "has been growing over the past decade into what has been a growth, profit and digital leader for the organization." (Ex. E, Mar. 2021 Tr. at 11.)

Unlike Argo Construction, which began to underwrite construction-specific policies in June 2018, the construction defect ***claims*** underwritten from 2011-2017, about which Plaintiffs complain, were underwritten across several different lines of business, including contract binding and casualty. (Ex. C, 4Q21 Tr. at 6.) These businesses—not Argo Construction—were either discontinued or remediated. (*Id.*) As Argo disclosed, "claims alleging construction defect[] are characterized by extreme time lags for both reporting and payment of claims." (Ex. F, FY21 10-K at 81; *see also* Ex. G, FY18 10-K at 69.) These claims are also "subject to greater inherent variability than is typical of the remainder of the Company's reserves, and are highly dependent upon court settlements, economic conditions, and the predictability of those results inherently have a larger range of potential outcomes." (Ex. F, FY21 10-K at 28.)

---

[3] Plaintiffs have defined the purported Class Period as June 11, 2018 through August 9, 2022 ("Class Period"). (AC ¶ 1.)

**C.      Argo Repeatedly Warned Investors That Its
          Loss Reserve Estimates Are Inherently Uncertain and Subject to Change**

During the Class Period, Argo provided detailed disclosures about its loss reserve estimates
and how they were set. Specifically, Argo explained that its aggregate reserves consist of reserves
for specific claims incurred and reported, and claims incurred but not reported ("IBNR"). For
reported claims, estimates "are established judgmentally on an individual basis" (Ex. B, FY20 10-
K at 21), and the claims department is tasked with setting reserves on individual, reported claims
(AC ¶¶ 42-43, 65). For IBNR claims, reserves "are based on the estimated ultimate cost of settling
claims," and calculated by actuaries who "use a variety of statistical and actuarial techniques to
analyze current claims costs, including frequency and severity data and prevailing economic,
social and legal factors." (Ex. B, FY20 10-K at 21.)

In each of its quarterly and annual reports filed during the Class Period, Argo warned that
its loss reserves were not precise measures of liability, but merely estimates of what management
expected based on a variety of quantifiable and unquantifiable inputs:

> Reserves **do not represent an exact calculation of liability**, but instead represent
> management's best **estimates**, which take into account various statistical and actuarial
> projection techniques as well as other influencing factors. These reserve estimates
> **represent management's expectations** of what the ultimate settlement and administration
> of claims will cost based on an assessment of known facts and circumstances, review of
> historical settlement patterns, estimates of trends in claims severity and frequency,
> changing legal theories of liability and other factors. Variables in the reserve estimation
> process can be affected by both internal and external events, such as changes in claims
> handling procedures, economic inflation, legal precedent and legislative changes. **Many of
> these items are not directly quantifiable, particularly on a prospective basis**. Additionally,
> there may be significant reporting lags between the occurrence of an insured event and the
> time it is actually reported to the insurer.

(Ex. G, FY18 10-K at 21; *see also* Ex. H, 2Q20 10-Q at 22 ("our *reserves represent the best
estimate of our ultimate liabilities*, based on currently known facts. . . and reasonable assumptions
where facts are not known. Due to the significant uncertainties and related management judgments,

there can be *no assurance* that future favorable or unfavorable loss development, which may be material, will not occur.").)

Throughout the Class Period, Argo repeatedly warned that its process for estimating reserves "is inherently uncertain,"[4] and thus:

- "existing reserves *may be insufficient or redundant* and estimates of ultimate losses . . . may increase or decrease over time." (Ex. G, FY18 10-K at 21.)

- "Due to the *significant uncertainties inherent in the estimation of loss reserves*, there can be *no assurance that the future loss development, favorable or unfavorable, will not occur*." (*Id.* at 50.)

- "*estimates may be more or less than the amounts ultimately paid* when the claims are settled." (*Id.* at F-9.)

- "We may incur income statement charges if the reserves for losses . . . are insufficient. Such income statement charges *could be material*, individually or in the aggregate, to our financial condition and operating results in future periods." (*Id.* at 21.)

Finally, Argo emphasized that reserves could be volatile, and that it continually reevaluated and readjusted its estimates as new information became available:

- "*Reserves* established in prior years *are adjusted as loss experience develops and new information becomes available*." (Ex. B, FY20 10-K at 21.)

- "Reserve estimates are *continually reevaluated in a regular ongoing process* as historical loss experience develops and additional claims are reported and settled, and consequently, management's estimates may change from time to time." (Ex. G, FY18 10-K at 21.)

- "*We're always going to have a mix of positive and negative movements in our reserves*." (*See* Ex. I, 1Q20 Tr. at 5; *see also* Ex. J, 2Q21 Tr. at 9 ("*[T]here are always going to be ups and downs* across various lines and across various years.").)

- The Company "*conduct[s] reserve reviews of all ongoing businesses each quarter*. Our process includes a *systematic feedback loop* between reserving underwriting claims and reinsurance that enhances our ability to react quickly to the findings of the reserve reviews." (Ex. K, 3Q19 Tr. at 8.)

---

[4] As reflected in Argo's annual reports, its independent auditor, Ernst & Young LLP ("E&Y"), similarly cautioned that the "factors and assumptions" used in estimating IBNR reserves "involve significant uncertainties and management judgments." (Ex. B, FY20 10-K at F-3.) E&Y specifically noted that auditing Argo's best estimate of reserves "was complex and involved the use of our actuarial specialists due to the *significant measurement of uncertainty* associated with the estimation and *high degree of subjectivity* in evaluating management's methods and assumptions." (*Id.*)

In its FY 2020 10-K, Argo specifically disclosed that its general liability estimated net reserves—which encompasses construction defect claims—"*could change by $150.0 million, in either direction*." (Ex. B, FY20 10-K at 75; *see also* Ex. L, FY19 10-K at 76; Ex. G, FY18 10-K at 72.) The Company attributed this volatility to the fact that "reported loss development patterns are a key assumption for this line of business," and "[h]istorically, assumptions on reported loss development patterns have been impacted by, among other things, emergence of new types of claims (e.g., construction defect claims)." (Ex. B, FY20 10-K at 75 (explaining that the Company has seen loss development patterns change by as much as 15%).)

## D.    Argo's Loss Reserve Estimates Are Reviewed by Independent Parties

As part of its comprehensive process for setting reserves, Argo's reserve estimates were reviewed by both its independent actuary and an independent auditor throughout the Class Period. As Rehnberg disclosed during the Company's 1Q20 earnings call, Argo "employed an internationally recognized third-party actuarial firm to perform an in-depth review of our reserves across the company as of year-end 2019." (Ex. I, 1Q20 Tr. at 5.) He explained that "their central estimate was in line with our carried reserve total at December 31, 2019," stating that "[t]his is not an indication of any future performance, but it does give me more confidence." (*Id.*) The independent actuarial review was conducted for a second time during 4Q21. (*See* Ex. F, FY21 10-K at 63.) Again, the review's result "was consistent with [Argo's] internal analysis." (*Id.*) Finally, the Company's outside auditor, E&Y, similarly reviewed Argo's reserves throughout the Class Period and did not raise any deficiencies. (*See* Ex. I, 1Q20 Tr. at 6; Ex. B, FY20 10-K at F-3.) Plaintiffs do not challenge these independent, third-party reserve reviews.

## E.    Argo Announces an Increase in Its Reserves Based on New Information

In a February 8, 2022 press release, Argo announced that it was anticipating an increase in its aggregate insurance loss reserves by $130 to $140 million. (AC ¶ 119; Ex. M, Feb. 8, 2022 8-

K at 1.) It explained that "[t]he largest reserve increases were related to construction defect claims within Argo's U.S. Operations, in addition to reserve increases in the Run-off segment." (Ex. M, Feb. 8, 2022 8-K at 1.) It further disclosed that the "prior year reserve increase for construction defect primarily related to the 2017 and prior underwriting years in business lines that have either been significantly remediated or discontinued." (*Id.*).

On February 22, 2022, Argo reported that the "[n]et adverse prior year reserve development . . . was $132.3 million." (Ex. N, 4Q21 8-K at 2; AC ¶ 123.) On an earnings call the next day, Argo stated that "[a]pproximately [$77] million of the adverse prior year development was driven by construction defect claims within Argo's U.S. Operations." (Ex. C, 4Q21 Tr. at 6.) During that call, Rehnberg explained that "[a] large portion of the reserve increase[] for construction defect was associated with businesses that have either been discontinued, including contract binding . . . or have been significantly remediated. The remediated portion was previously underwritten by our casualty business"—i.e., not Argo Construction. (*Id.* ("Most of the [construction defect] claims associated with contract binding and casualty were written outside of the core construction business.").) Rehnberg reminded investors that Argo had "broke[n] out construction as a separate business [in 2018] and started underwriting more specifically on this business and changed the underwriting guidelines" at that time. (*Id.* at 10.) He also referenced the 2017 CD Task Force, which had been created to examine those guidelines. (*Id.*)

Argo also explained that the increase in reserves was based on new information received from a "recently concluded fourth quarter 2021 reserve review." (Ex. M, Feb. 8, 2022 8-K at 1; *see also* Ex. F, FY21 10-K at 63 (the reserve "development was largely due to movements in the fourth quarter 2021"); Ex. C, 4Q21 Tr. at 6 ("Much of the adverse development was a result of analyses performed in the fourth quarter, which included among other things, *new and/or updated*

*information* received relating to construction defect claims.").) Specifically, "[t]he internal analysis of liability lines completed during the fourth quarter of 2021 saw an increase in the difference between the *actual* incurred loss movements versus the *expected* movements in business units with significant exposure to claims alleging construction defect, driven by accident years 2017 and prior." (Ex. F, FY21 10-K at 63.) In other words, the increase stemmed from construction defect IBNR reserves where, in light of new information, the losses associated with those claims was higher than previously expected. (*Id.* at F-35 (noting that construction defect IBNR reserves "can be complex and challenging"); *id.* at 81 (explaining these claims have "extreme time lags").)

## F.   Argo Announces the Enstar Transaction in August 2022

On August 8, 2022, Argo announced it was entering into a Loss Portfolio Transfer ("LPT") agreement with a wholly owned subsidiary of Enstar Group Limited ("Enstar"), which transferred the liability from a majority of Argo's "U.S. casualty insurance reserves, including construction, for accident years 2011 to 2019" to Enstar. (AC ¶ 130; Ex. O, Aug. 8, 2022 8-K at 6.) The press release announcing the LPT contains a single reference to "construction" and otherwise does not mention construction defect reserves or underwriting guidelines. (*Id.*) The next day, Argo explained during its earnings call that the LPT "provides increased certainty in our reserve position in addition to providing us with further capital flexibility." (Ex. P, 2Q22 Tr. at 7.)[5]

## G.   Plaintiffs File This Action Asserting Fraud

Two months later, The Police & Fire Retirement System City of Detroit (P&FRSCD) initiated this action, asserting securities fraud claims against Argo, Bradley and the Individual Defendants under section 10(b) and 20(a) of the Securities Exchange Act of 1934. (ECF No. 1.) On January 18, 2023, this Court granted P&FRSCD and the Oklahoma Law Enforcement

---

[5] There is no allegation in the AC explaining how or why the announcement of the Enstar transaction rendered any of the challenged statements false or misleading, as the only reference to Enstar is in paragraphs 130-33 of the AC.

Retirement System's unopposed motion for appointment as co-lead plaintiffs. (ECF No. 22.) Together, they filed the AC on March 28, 2023 (ECF No. 29), removing Bradley as a defendant.

The AC alleges that throughout the purported Class Period, Defendants made misleading statements based on their supposed knowledge, as early as 2017, that Argo's construction defect reserves and underwriting guidelines were deficient. (AC ¶ 10.) Plaintiffs challenge three categories of statements: (1) those relating to Argo's reserves (*id.* ¶¶ 106, 116); (2) those relating to Argo's past financial performance (*id.* ¶¶ 97, 99-100, 104-07, 109-12, 114-17); and (3) general statements of corporate optimism (*id.* ¶¶ 97, 101-02, 105, 107, 109, 111-14).

## ARGUMENT

## I.   THE AC SHOULD BE DISMISSED WITH PREJUDICE

The elements of a section 10(b) claim are well settled. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022). "A complaint that pleads securities fraud must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA." *In re Tempur Sealy Int'l., Inc. Sec. Litig.*, 2019 WL 1368787, at *5 (S.D.N.Y. Mar. 26, 2019); *see also* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1).

## A.   Plaintiffs Fail to Plead Any Material Misstatement or Omission

### 1.   Plaintiffs Have Not Alleged That Argo's Reserving-Related Statements Were False or Misleading

Plaintiffs' claims are grounded in the unsupported theory that Defendants knew, as early as 2017, that Argo's loss reserves relating to construction defect claims were deficient. (AC ¶ 10.) Numerous courts—including the Second Circuit and this Court—have held that loss reserves are a matter of opinion. *See, e.g.*, *Fait*, 655 F.3d at 113 ("[D]etermining the adequacy of loan loss reserves is not a matter of objective fact" because "loan loss reserves reflect management's opinion or judgment," are "inherently subjective," and "will vary depending on a variety of predictable

and unpredictable circumstances"); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015) ("'While [reserve] estimates involve some factual inputs, they necessarily require judgment' and thus are statements of opinion or belief, not of fact."). Under the Supreme Court's decision in *Omnicare*, opinion statements are actionable only if "the speaker did not hold the belief she professed," "the supporting fact[s] [the speaker] supplied were untrue," or the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning [the opinion], and . . . those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc.*, 575 U.S. at 186, 189, 135 S. Ct. at 1327, 1329; *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) ("Reserves are opinions, and the Complaint must allege facts showing that defendants did not truly hold those opinions [either knowingly or recklessly] at the time they were made public."). Satisfying the *Omnicare* standard "is no small task for an investor." 575 U.S. at 194, 135 S. Ct. at 1332.

The AC's allegations fall far short. Plaintiffs challenge only two statements that arguably even reference Argo's reserves, but both statements simply reported the Company's 2Q20 "[n]et favorable prior-year reserve development" of "$0.6 million," which Argo stated "primarily related to favorable development in specialty lines related to our surety and construction businesses." (AC ¶¶ 106, 116; Ex. H, 2Q20 10-Q at 50.) Plaintiffs theorize that these statements were false and misleading because Argo knew that it "would have to increase its reserves to cover claims against those policies" but did not do so until 4Q21. (AC ¶ 10.) This theory fails for several reasons.

*First*, the AC does not offer any particularized facts showing that "the speaker did not hold the belief she professed," "the supporting fact[s] [the speaker] supplied were untrue," or the statements "omit[] material facts about the [speaker's] inquiry into or knowledge concerning [the opinion]" that "conflict with what a reasonable investor would take from the statement itself."

*Omnicare*, 575. U.S. at 186, 189, 135 S. Ct. at 1327, 1329; *Axar Master Fund, Ltd.*, 308 F. Supp. 3d at 754. Taken together, Plaintiffs' allegations amount to an unsupported assertion that Argo should have increased its construction defect reserves earlier than 4Q21. "But such an argument 'mimics the typical type of fraud by hindsight theory that courts have been unwilling to entertain.'" *Chapman*, 466 F. Supp. 3d at 399; *see also Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 226 (S.D.N.Y. 2020); *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013).

For example, in *Mueller Water Products*, Judge Liman dismissed the complaint where, like here, plaintiffs pointed to two reserve charges to argue, in essence, that the defendant "should have taken the charge earlier." 466 F. Supp. 3d at 404. The court rejected this hindsight-based pleading tactic as unsupported, emphasizing instead the "equally compelling conclusion" that the defendant "appropriately made the adjustments [to reserves] based on *new information* it acquired." *Id.* Similarly, in *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, Magistrate Judge Pitman concluded, in a Report and Recommendation adopted by this Court, that the fact "that defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think [the] reserves were adequate at the time the registration statement and prospectus became effective." 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012), *adopted*, 10-Civ.-440 (Mar. 16, 2012) at ECF No. 65 (Kaplan, J.).

The same reasoning applies here. Plaintiffs cannot contest that Argo disclosed that "[m]uch of the [4Q21] adverse reserve development was a result of analyses performed in the fourth quarter, which included among other things, new and/or updated information received relating to construction defect claims." (*Supra* § E.) This defeats Plaintiffs' "fraud by hindsight" gambit as a matter of law. *See City of Westland*, 129 F. Supp. 3d at 73; *Waterford Twp. Police & Fire Ret. Sys.*

14

*v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016).

This conclusion is underscored by the fact that the adverse development involved IBNR reserves for construction defect claims that originated in Argo's E&S business, which "focused on U.S.-based risks that the standard, admitted insurance markets [we]re unwilling or unable to underwrite." (*Supra* § A.) This Court has emphasized the "extremely conjectural" nature of IBNR reserves because they are "set aside to cover losses for which claims have not been reported but must be estimated" and "may need adjustment as time passes and their accuracy can be tested in retrospect." *See City of Westland*, 129 F. Supp. 3d at 56-57. Notably, construction defect claims are "characterized by extreme time lags for both reporting and payment of claims" (Ex. F, FY21 10-K at 81), further highlighting that the adequacy of their reserves can only be tested in hindsight.

*Second*, in an attempt to remedy their fatal flaws, Plaintiffs twist the disclosure of Argo's 2017 CD Task Force as "an admission that [Defendants] knew" about purported problems with construction defect reserves as early as 2017. (AC ¶ 10.) As the AC itself recognizes, however, the Task Force was formed "to strengthen underwriting guidelines" on a going-forward basis (*id.*)— not to analyze, much less adjust, previous construction defect *reserves*. Critically, there are no allegations that the Task Force ever concluded that construction defect reserves should have been increased based on then-known information. *City of Westland*, 129 F. Supp. 3d at 74 ("There is no indication . . . that [defendants' actions and discoveries years prior to the reserve increase] had any impact whatsoever, positive or negative, on MetLife's IBNR reserves or on its financial statements."). Indeed, as described *infra* § I.A.1.b., Plaintiffs do not allege that Argo was "experiencing or internally predicting losses exceeding their set reserves." *In re Wachovia Equity Sec. Litig*, 753 F. Supp. 2d 326, 361-62 (S.D.N.Y. 2011) (disclosure "of a 'massive increase' to

15

loan loss reserves 'is not, in itself, an indicator that the previous reserve levels were inadequate'").[6]

(a)   Two Independent Third Parties Reviewed the Estimated Reserves

Defendants' honest belief in the accuracy of Argo's reserve estimates is confirmed by the fact that Argo's reserves and financial statements were reviewed by both an independent actuary and outside auditor. (*See* Ex. G, FY18 10-K at F-2; Ex. I, 1Q20 Tr. at 5; Ex. C, 4Q21 Tr. at 7.)[7] Plaintiffs do not allege that either third party  disagreed with the Company's reserves or that there was ever any adjustment to or restatement of those figures. *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007) (dismissing loss reserves claims where there was "no allegation . . . there has been any restatement of any financial statement or that any auditor or actuary has qualified or withdrawn its opinion"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). This defeats Plaintiffs' claim that Defendants did not believe the reserving estimates at issue here. *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("[T]he fact that UBS's outside independent auditor . . . did not require a restatement of [its] financials significantly undercuts Plaintiffs' allegations. . . ."), *aff'd*, 752 F.3d 173 (2d Cir. 2014); *see also In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017).

---

[6] Similarly, Plaintiffs cannot contort the creation of the 2017 CD Task Force into an admission that Argo's 2011-2017 construction defect underwriting guidelines were "deficient." (AC ¶¶ 10, 96.) First, Plaintiffs do not challenge any statements concerning the adequacy (or inadequacy) of Argo's underwriting guidelines. (*See infra* § I.A.2.) Second, Plaintiffs fail to allege any facts explaining how the strengthening of guidelines on a going-forward basis renders the previous guidelines insufficient. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *17 (S.D.N.Y. Sept. 30, 2016) (company taking "steps to improve and strengthen its internal controls" did not support an inference that controls were inadequate); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 294-95 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015). Just as importantly, like reserves, "alleged misstatements as to [Argo's] underwriting were statements in the nature of belief or opinion," and Plaintiffs have not pled facts demonstrating that for the 2011-2017 construction defect claims, Defendants "knowingly failed to follow the underwriting practices that it actually disclosed, or that those practices were objectively unsound." *Waterford Twp. Police & Fire Ret. Sys.*, 2016 WL 1261135, at *10.

[7] The Court can consider these documents on a motion to dismiss as they are relied upon in the AC and filed with the SEC. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328-29 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

(b)  <u>Plaintiffs' CW Allegations Fail</u>

Plaintiffs rely on a handful of statements from anonymous CWs but none of these allegations, alone or in tandem, show that Defendants did not honestly believe Argo's reserving estimates at the time. As an initial matter, *none* of the CWs are alleged to have had direct contact with any Individual Defendant, and *none* claim that the purported need to increase reserves was ever determined by, let alone reported to, any Individual Defendant. *In re Wachovia*, 753 F. Supp. 2d at 352 ("there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period."); *see also Saraf v. Ebix, Inc.*, 2022 WL 4622676, at *5 (S.D.N.Y. Sept. 30, 2022). Indeed, as alleged, all four CWs were lower level employees who did not report to any Individual Defendant.[8] *See N. Collier Fire Control*, 2016 WL 5794774, at *11.

Moreover, three of the four CWs are not pled to have had any direct experience with construction defect reserves. CW2 and CW3—who worked in underwriting and business development, respectively—are not alleged to have any connection to Argo's reserving processes, *see Woolgar*, 477 F. Supp. 3d at 219 (discounting CW that worked in the underwriting department in insurance reserves case), and CW4 allegedly worked in claims "for Argo's environmental division"—not construction defect, *see id.* (CW not in position "in which they had particular knowledge about the Company's commercial liability lines—i.e., the lines from which the increased reserves were ultimately taken"). (*See* AC ¶¶ 45, 53, 57.)[9]

---

[8] CW1 reported to "construction defect claims managers" (AC ¶ 38), CW2 reported to the "SVP of Construction" and later "the Vice President of Underwriting" (*Id.* ¶ 46), CW3 "worked with the leaders of Argo's construction business" (*Id.* ¶ 53), and CW4 reported to the Vice President of Claims who reported to the Chief Claims Officer (*Id.* ¶ 58).

[9] Plaintiffs' conclusory assertion that because CW4 "reported to the same senior level management as did the personnel working on construction defect," CW4 therefore "had insight into the construction defect claim issues" (AC ¶ 57), fails to solve for this glaring deficiency. *See Saraf*, 2022 WL 4622676, at *4-5.

Even CW1, who "worked as a senior construction defect claims adjuster" (AC ¶ 37), is not alleged to have any "knowledge of how [Argo] calculated reserve levels" as a whole. *In re Wachovia*, 753 F. Supp. 2d at 362. Accordingly, "none of the CWs are alleged to have specific experience with or knowledge of the Company's claims reserving practices or its loss reserve estimates," thus dooming Plaintiffs' ability to manufacture a securities fraud claim. *Woolgar*, 477 F. Supp. 3d at 219; *see also Malin*, 499 F. Supp. 2d at 141 ("Also problematic is the fact that none of the CWs are alleged to have been involved in or have any familiarity with the process of setting or estimating loss reserves.").

Regardless, CW1 alleges merely that "construction defect adjusters were overloaded with work[,]" that "by late 2019, there was an 'influx of reserves set on claims' and that in late 2019 or early 2020, there was a 'huge increase in reserves' assessed by the claims adjusters[.]" (AC ¶¶ 41-42.) These allegations do not provide any insight into, or in fact say anything about, Argo's aggregate construction defect reserves—either those set by the claims department or the IBNR reserves projected by the Company's actuaries.

The remaining CW allegations, even if credited, fare no better, as none of them show how or why Defendants' statements concerning reserves were false or misleading when made, and are "not corroborated by independent adequately pled facts." *Plymouth Cnty. Ret. Sys. Ass'n & Carpenters Pension Tr. Fund v. Array Techs., Inc.*, 2023 WL 3569068, at *15 (S.D.N.Y. May 19, 2023) (holding that "[t]he CW's uncorroborated and, apparently, subjective views should be accorded little weight"). *First*, no CW supports an assertion that Defendants had access to contradictory information concerning the reserves at any point during the Class Period. *In re Wachovia*, 753 F. Supp. 2d at 362 ("Plaintiffs do not 'identify any contemporaneous internal document showing that the loan loss reserves were improperly calculated.'"). Through CW4,

Plaintiffs suggest that the Individual Defendants attended "quarterly 'product line review' meetings" where PowerPoint presentations were emailed to attendees, which purportedly contained information from a "CAPS" system where the "estimated loss" for a given claim was entered. (AC ¶¶ 65-68.) But the AC fails to allege that CW4 attended any of these meetings with any Individual Defendant. Instead, it summarily concludes that CW4 "had first-hand knowledge" that the Individual Defendants attended these meetings simply because CW4 "attended a couple of [these] meetings over the course of their employment," which spanned from June 2003 to March 2022. (AC ¶¶ 57, 67.) These vague allegations do not specify at what specific meeting any Individual Defendant may have received information concerning construction defect reserves, what that information was, or how it rendered any of the challenged statements false or misleading when made. *In re Wachovia*, 753 F. Supp. 2d at 352 ("the CW allegations are either undated or pegged to an indefinite time period" which "renders the task of matching CW allegations to contrary public statements all but impossible").[10]

*Second*, the CW allegations concerning statements at town hall meetings (AC ¶¶ 49, 55, 61) are wholly conclusory and do not show that any Individual Defendant (much less all of them) had access to specific information contradicting Argo's construction defect reserving estimates. CW3 and CW4 claim that at a few of these meetings, Rehnberg stated that construction defect claims were "something that was a concern." (AC ¶¶ 55, 61). But vague comments about "concerns" are a far cry from showing that Defendants had access to specific, contradictory information indicating that construction defect reserve estimates were inadequate. *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 539 (S.D.N.Y.) (dismissing allegations involving

---

[10] *See also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *9 (S.D.N.Y. Oct. 5, 2016) (dismissing allegedly understated warranty reserves claims where reports relied on by plaintiffs "did not directly 'contradict' [defendant's] estimates" and "were not 'internal analyses' of what [defendant's] estimates should really have been").

"alleged 'concerns'" of a "general nature"), *aff'd*, 357 F. App'x 393 (2d Cir. 2009).

*Third*, any CW criticisms of Argo's purported mismanagement of construction claims (*see* AC ¶¶ 40, 43-44, 51, 62, 64-66, 69-70) or that "Argo had a culture of reserves suppression"[11] (AC ¶¶ 59, 63) are simply "a characterization or opinion of the witness, not an objectively testable statement of fact." *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6-7 (S.D.N.Y. May 11, 2016); *see also Woolgar*, 477 F. Supp. 3d at 222 (dismissing "culture" assertions where plaintiff did not "provide particularized allegations from which it could be inferred that such a culture was anything more than the CW's own individual, subjective opinions, or that the Individual Defendants were aware of any of these general concerns"). At most, these allegations amount to some vague, unparticularized criticism of corporate mismanagement or reflect internal disagreements about the appropriate level of reserving—not that anybody (much less Defendants) did not honestly believe the reserves that were ultimately set.[12] *See, e.g.*, *NECA-IBEW Pension Tr. Fund*, 2012 WL 3191860, at *15 ("[P]laintiffs' allegations with respect to BAC's loss reserves merely show that the company may have made bad predictions as to its reserves."); *Hinerfeld v. United Auto Grp.*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998).

Finally, to the extent Plaintiffs are making some omissions-based claims, they are required to show that the challenged opinion statements did not "rest on some meaningful inquiry" or "fairly align[] with the information in the [defendant's] possession at [the] time." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).[13] Plaintiffs' CW allegations fail to make this showing.

---

[11] CW4 is the only witness describing such a "culture," and Plaintiffs fail to allege that CW4 attended any particular meeting where any Individual Defendant was present when people were supposedly "yelled at." (AC ¶ 118.)

[12] The CWs similarly fail to allege that the 2011-2017 construction defect underwriting guidelines were "deficient." (AC ¶ 96.) Indeed, CW2—the only CW that speaks to underwriting—claims only that Argo sought to strengthen guidelines in 2020. (*Id.* ¶ 47.) Again, there are no allegations that the 2011-2017 underwriting guidelines were "objectively unsound" or that the Company failed to follow its own guidelines for those years. *See supra* § I.A.1.

[13] Moreover, Plaintiffs have not alleged that Argo had "a duty to disclose" the purported (and nonexistent) "problems"

(c) Argo Adequately Disclosed the
Very Risks That Ultimately Materialized

Finally, Argo disclosed the very risks associated with an increase in reserves, and thus the challenged statements concerning reserve estimates cannot be false or misleading. As described *supra* § C, Argo made robust risk disclosures emphasizing that "the calculation and setting of the reserves for losses . . . is an inherently uncertain process dependent on estimates," and thus "our existing reserves may be insufficient or redundant and estimates of ultimate losses . . . may increase or decrease over time." (Ex. G, FY18 10-K at 21.) The Company also explained that "[r]eserves do not represent an exact calculation of liability, but instead represent management's best estimates, which take into account various statistical and actuarial projection techniques as well as other influencing factors." (*Id.*) As disclosed, reserve estimates are based on many factors and inputs, many of which "are not directly quantifiable." (*Id.*; Ex. F, FY21 10-K at F-35 (construction defect IBNR reserves "can be complex and challenging").) In fact, in its FY 2020 10-K, Argo specifically disclosed that its general liability estimated net reserves (which includes construction defect) "*could change by $150.0 million, in either direction*." (Ex. B, FY20 10-K at 75; *supra* § C.)

A reasonable investor therefore would have viewed Argo's reserves for what they were— uncertain estimates that could be adjusted in the future to the Company's detriment. *See Student Loan Corp.*, 951 F. Supp. 2d at 497 (dismissing complaint where "each of [the disclosures] clearly stated that its loss reserves were estimated figures subject to market conditions and were by no means guarantees of the loss amounts likely to be incurred").[14] Moreover, at no point during the

---

with construction defect reserving or underwriting. (AC ¶ 96; *see also id.* ¶¶ 98, 103, 108, 118.) *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008); *see also NECA-IBEW Pension Tr. Fund*, 2012 WL 3191860, at *22 (non-disclosure of purported "lax underwriting standards" failed to state facially plausible claim).

[14] *See also In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004); *NECA-IBEW Pension Tr. Fund*, 2012 WL 3191860, at *11-12 (language in Form 10-Q adequately warned investors that there is "imprecision inherent in the forecasting methodologies" and that the reserves process "requires difficult, subjective and complex judgments" and that "there is always the risk that [BAC] will fail to accurately estimate the impact of factors that it identifies").

Class Period did Defendants assure investors of the adequacy of its reserves. *In re UBS AG*, 2012 WL 4471265, at \*36. Rather, Argo repeatedly noted that it "conduct[s] reserve reviews of all ongoing businesses each quarter." (Ex. K, 3Q19 Tr. at 8.)

### 2. Plaintiffs Fail to Allege That Any of the Remaining Challenged Statements Are False or Misleading

Plaintiffs' remaining claims challenge (1) accurately reported statements about Argo Construction's financial performance or (2) general statements of corporate optimism (neither of which reference construction defect reserves or underwriting guidelines). These claims are similarly deficient and should be dismissed.

### (a) Accurate Statements of Financial Performance

First, Plaintiffs challenge several statements about Argo Construction's performance and continued growth (*see* AC ¶¶ 97, 102, 110-11; *see also id.* at ¶¶ 104, 109, 114, 117), including:

- "Our construction business continues to prosper as a strong, growing and profitable portfolio exceeding $150 million in premium." (Ex. D, June 11, 2018 Press Release at 1.)
- Construction was "driving growth" and "continues to exceed our expectations." (Ex. K, 3Q19 Tr. at 5.)
- "Construction submission growth was also positive[.]" (Ex. Q, 4Q20 Tr. at 5.)
- Argo Construction "has been growing over the past decade into what has been a growth, profit and digital leader for the organization." (Ex. E, Mar. 2021 Tr. at 11.)

Plaintiffs also challenge statements about Argo Construction's "favorable loss ratios," its gross written premiums, and that it was a "high margin specialty business[]" that "remain[ed] highly profitable" and "continued to lead the way for us in the US." (AC ¶¶ 100, 104-05, 107, 114-15, 117; *see also* Ex. R, 2019 Proxy Statement at 4; Ex. S, Sept. 10, 2020 8-K at 10; Ex. J, 2Q21 Tr. at 5; Ex. T, 3Q21 Tr. at 5; Ex. U, 2Q20 Tr. at 4). Yet Plaintiffs do not allege any facts demonstrating how any of these statements were false. Indeed, Defendants never corrected or restated these statements of financial performance. *See Africa v. Jianpu Tech. Inc.*, 2022 WL 4537973, at \*7

(S.D.N.Y. Sept. 28, 2022) (plaintiff "cannot base a claim for securities fraud on historically accurate statements, such as the Company's statements regarding . . . revenues and growth").

Instead, Plaintiffs base their claims on the theory that Defendants somehow knew Argo would "inevitably have to incur a reserve charge" because of "problems plaguing Argo's construction defect segment," including that (1) the construction defect underwriting guidelines were allegedly "deficient," (2) "that book of business was too exposed," and (3) "those policies were written outside of Argo's 'core construction business.'" (AC ¶ 96.) As an initial matter, Plaintiffs impermissibly use the same form paragraph in explaining why each challenged statement is purportedly false or misleading. *See, e.g.*, *Array Techs., Inc.*, 2023 WL 3569068, at *8 n.9, *9 (dismissing 10(b) claims where plaintiffs repeated "the same formulaic response as to why the statements [were] false" thereby "leav[ing] the Court mired in having to ascertain exactly which statements Plaintiffs allege to be false or misleading—and how they are so"); *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023) ("boilerplate paragraph after each alleged misstatement" leaves court to "'determine on its own initiative how and why the statements were false' and, thus, 'does not comport with our exhortation that plaintiffs'" plead alleged securities fraud with specificity). Moreover, Plaintiffs do not plead any particularized facts supporting these claims, and instead rest solely on their mischaracterization of Argo's February 2022 disclosures.

Indeed, Plaintiffs allege that Defendants failed to disclose that Argo would have to incur a reserve charge based on problems "plaguing Argo's construction defect segment" (AC ¶ 96), but no such segment even exists. Plaintiffs conflate the Argo Construction *unit*—spun out from the E&S line in June 2018—with construction defect *claims*. (*Supra* § B.) As disclosed in 2018, the Company created Argo Construction to "enable it to evolve more quickly and grow at an

accelerated pace" (Ex. D, June 11, 2018 Press Release at 1), and "started underwriting more specifically on this business" at that time (Ex. C, 4Q21 Tr. at 10-11). When announcing the increased reserve, Argo explained that "[t]he largest reserve increases were related to construction defect claims within Argo's *U.S. Operations*" and that it "primarily related to . . . business *lines* that have either been significantly remediated or discontinued." (Ex. M, Feb. 8, 2022 8-K at 1.) And on the earnings call, Rehnberg reiterated that Argo "mentioned in [] recent years that [Argo Construction] has been performing according to expectations" and did not correct those prior statements. (Ex. C, 4Q21 Tr. at 10-11.) Thus, the "problem" Plaintiffs cite with writing policies outside of its "core construction business" was not a "problem plaguing" Argo Construction, but is simply a reference to the fact that "[m]ost of the [construction defect] *claims* associated with contract binding and casualty were written outside of the core construction *business*" because they were written before 2018. (*Id.* at 6; AC ¶ 96.) *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) (dismissing claims based on plaintiffs' characterization that was "not alleged to be a mischaracterization corrected by the [corrective disclosure]" and had not disclosed anything contrary to defendants' purportedly false statements).

Moreover, the purported corrective disclosures that referenced "strengthening underwriting guidelines" (*e.g.*, AC ¶ 125; Ex. C, 4Q21 Tr. at 6), did not reveal that construction defect underwriting guidelines were "deficient" or that construction defect was "over exposed" (AC ¶ 96). As explained *supra* §§ I.A.1., I.C.2, strengthening underwriting guidelines on a going-forward basis is a prudent course of action and does not support an inference of fraud.

       (b)    <u>Statements of General Corporate Optimism and Puffery</u>

Many of the challenged statements focus on Argo Construction (*not* pre-2018 construction defect claims), and in any event, are merely "[g]eneric, indefinite statements of corporate optimism" that "typically are not actionable." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165,

173 (2d Cir. 2020). These expressions of belief are inherently vague and subjective, and thus "too general to cause a reasonable investor to rely upon them." *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *12 (S.D.N.Y. Mar. 15, 2022).

For example, Plaintiffs challenge Defendants' statements that "we are a leader in multiple specialty lines, such as New York Construction" (AC ¶ 111, Ex. E, Mar. 2021 Tr. at 8) and that "Argo Construction . . . had 'competitive advantages;' and was a 'highly efficient operation'" (AC ¶ 112, Ex. V, Mar. 2021 Presentation at 27). Courts have consistently held that such statements are inactionable. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (dismissing as puffery statements about the company's "competitive advantage"), *aff'd*, 771 F. App'x 51 (2d Cir. 2019); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y.) (dismissing statements touting company's "knowledge, experience" and "competitive advantage"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). The same is true for the challenged statements about Argo Construction being a "new and successful specialty underwriting practice" (AC ¶ 97, Ex. D, June 11, 2018 Press Release at 1), that it has "outstanding underwriting and claims expertise" (*id.*), and that its "specialized underwriters understand the rates, pricing and coverages needed to meet contractors' insurance requirements" (*id.* ¶ 113, Ex. B, FY20 10-K at 4). Such statements are "no more than 'puffery' which does not give rise to securities violations" because they are "too general to cause a reasonable investor to rely upon them."[15] *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (dismissing "generalizations regarding JPMC's business practices" as puffery);

---

[15] The Individual Defendants may not be held liable for statements they did not make. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S. Ct. 2296, 2302 (2011) (a party is deemed to have "made" a particular statement only where it has "ultimate authority over the statement, including its content and whether and how to communicate it"). As the AC acknowledges (*see* AC ¶ 203), only some Individual Defendants "made" certain challenged statements, and none was an officer during the entire Class Period. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 641 (S.D.N.Y. 2017).

*Deluca v. GPB Auto. Portfolio, LP*, 2020 WL 7343788, at *19 (S.D.N.Y. Dec. 14, 2020) (dismissing as puffery statement that company "had expertise in the automotive retail industry").

**B.**     **Plaintiffs Fail to Plead Scheme Liability**

Although the AC references the language of Rule 10b5(a) and (c) (*see* AC ¶ 201), it does not actually allege any separate "scheme" liability under those subsections. Regardless, alleged misrepresentations or omissions are insufficient to plead scheme liability. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). Notably, this is the only paragraph that references a "scheme," and nowhere else does the AC otherwise allege what this purported scheme is. This is insufficient as a matter of law. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

**C.**     **Plaintiffs Fail to Plead a Strong Inference of Scienter**

Plaintiffs also fail to plead scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S. Ct. 2499, 2507 (2007). Plaintiffs must make this showing "with respect to *each* defendant." *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011). This is a high bar: the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). Plaintiffs must allege particularized facts "showing '(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. Neither showing is met here.

**1.**     **Plaintiffs Fail to Plead a Cognizable Motive to Commit Fraud**

To plead a cognizable motive, Plaintiffs must allege that Defendants "benefitted in some

concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. Here, Plaintiffs attempt to plead motive by alleging (1) certain stock sales by Defendants Watson, Rehnberg and Bullock (AC ¶¶ 171-76), and (2) that all Individual Defendants received incentive compensation.

(a) <u>Plaintiffs' Stock Sale Allegations Are Insufficient</u>

Stock sales alone cannot satisfy the PSLRA's stringent pleading requirement unless the plaintiffs plead particularized facts to show that the trades were "unusual or suspicious." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); *see also Hou Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020) (similar). Courts look to several factors when analyzing stock sales, including (1) "the amount of net profits realized;" (2) "the percentages of holdings sold;" (3) "the change in volume of insider defendant's sales;" (4) "the number of insider defendants selling;" and (5) "whether sales occurred shortly before corrective disclosures." *Glaser*, 772 F. Supp. 2d at 587. These factors weigh in favor of dismissal.

*First*, the AC does not contain any allegations that Defendant Kirk sold shares during the Class Period. Courts have discredited stock sales allegations where not all defendants sold shares during the class period. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996). Moreover, Bradley, who served as CEO during part of the Class Period and who Plaintiffs previously named as a defendant (*supra* § G), only *purchased* shares throughout the Class Period (Ex. W, Bradley Forms 4),[16] further undermining Plaintiffs' theory of fraud. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289-92 (S.D.N.Y. 2006) ("dispositive factor is that other insiders . . . did not sell during the putative class period").

*Second*, Plaintiffs fail to make any allegations with respect to the net profits—rather than *total proceeds*—realized by those individual Defendants who traded. (AC ¶¶ 173-76); *Glaser*, 772

---

[16] This Court may take "judicial notice of Form 4 filings at the motion to dismiss stage, and consider them for the truth of their contents." *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013).

27

F. Supp. 2d at 587 ("Plaintiffs must allege . . . defendants' *net profits* as opposed to *gross proceeds*."); *see also City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l. Gen. Holdings Corp.,* 2021 WL 212337, at *8 (S.D.N.Y. Jan. 21, 2021) ("proceeds alone say nothing about a seller's motive"), *aff'd,* 2021 WL 5142702 (2d Cir. Nov. 5, 2021).

*Third*, Plaintiffs also fail to allege the "overall percentage changes in defendant's holdings." *Glaser*, 772 F. Supp. 2d at 587. A "decisive [factor] in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("Such a number appropriately captures not only the fact of sales, but also the extent to which the insider availed himself or herself of, or forwent, the opportunity to turn a profit before disclosure of concealed bad news."). Here, Watson's sales only represented 6.7% of his total holdings. (Ex. X, Watson Forms 4.) *See Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 54 (2d Cir. 1995) (sales of less than 11% of defendant's holdings not "unusual"); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (rejecting allegations where "stock sales amounted to only 22.5% and 4.9%" of defendants' holdings). Even more, both Bullock's and Rehnberg's holdings *increased* during the Class Period by 8.0% and 36.8%, respectively.[17] (*See* Ex. Y, Bullock Forms 4; Ex. Z, Rehnberg Forms 4.) This eviscerates any inference of scienter. *See Glaser*, 772 F. Supp. 2d at 592 (allegations insufficient where defendant's holdings "actually *increased* during that period"); *In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

*Fourth*, the timing of the alleged stock sales belies any suggestion of fraud. To be relevant

---

[17] Moreover, when Rehnberg sold 30,847 shares on August 13, 2020, his spouse repurchased 32,000 shares the very next day. (*See* Ex. Z, Rehnberg Forms 4 at 16.)

to a scienter analysis, the sales must have occurred shortly before an alleged corrective disclosure. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d at 271 (sales allegations insufficient where they occurred "many months before the release of any negative information"). Here, all of the stock sales are alleged to have occurred prior to August 13, 2020—a *year and a half* before the purported corrective disclosure in February 2022. (AC ¶¶ 174-76.) They thus fail to evince motive. *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) ("None of the defendants sold any stock in the final 100 days of the class period— the exact timing 'when insiders would have rushed to cash out.'").

*Finally*, all three individuals sold shares often right after public filings, including the 2Q18, 3Q18, 2Q19 and 2Q20 earnings announcements. (*Compare* Ex. AA, 2Q18 Tr.; Ex. BB, 3Q18 Tr.; Ex. CC, 2Q19 Tr.; Ex. U, 2Q20 Tr., *with* Ex. Y, Bullock Forms 4 at 11; Ex. Z, Rehnberg Forms 4 at 1, 16; Ex. X, Watson Forms 4 at 3, 5-6.)[18] Such "trading after the release of financial information has been held to be appropriate and common place," not evidence of fraudulent intent. *Chapman*, 466 F. Supp. 3d at 412. Accordingly, Plaintiffs' stock sales allegations are insufficient.

        (b)   <u>Incentive Compensation Allegations</u>

Plaintiffs' incentive compensation allegations also fail. (AC ¶¶ 149-70.) As the Second Circuit has made clear, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *ECA*, 553 F.3d at 201. "Motives that are common to most corporate officers, such as the desire . . . to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* at 198. Indeed, "if scienter could be pleaded

---

[18] Further, Bullocks's sales in September and December 2018, Watson's sales in November 2018, and Rehnberg's sales in May 2019, all corresponded with stock appreciation rights that vested on that same day. (*See* Ex. Y, Bullock Forms 4 at 1-3; Ex. X, Watson Forms 4 at 7-8; Ex. Z, Rehnberg Forms 4 at 8.)

on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54.

Plaintiffs do not even attempt to tie the incentive awards to the alleged fraud itself. Indeed, the AC also does not contain any allegation that but-for the purported reserve suppression, any Individual Defendant would not have received his compensation. Rather, the AC paints the opposite picture (*see, e.g.*, AC ¶¶ 170 (Kirk granted "yet another retention bonus" two months after 4Q21 *increase* in reserves); 161 (Bullock "did not receive a cash incentive payout as the Company's pre-tax operating income goal was not met in 2019").) Courts have found insufficient even more particularized allegations than those found here. *See, e.g.*, *Reilly*, 2018 WL 3559089, at *12 (bonuses allegedly higher than but for the fraud "comprise[d] general performance-based compensation that cannot form the basis for motive to commit securities fraud").

### 2. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness

Because Plaintiffs fail to plead a cognizable motive, their allegations of conscious misbehavior or recklessness "must be correspondingly greater." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. They are not. "Recklessness" means "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Plaintiffs must "show, 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" *ECA*, 553 F.3d at 202-03. This standard creates a high bar that demands particularized facts, not the speculation and rote conclusions offered in the AC.

*First*, as detailed *supra* § I.A.1.b, Plaintiffs' allegations from the four insufficiently pled CWs do not support a strong inference of scienter. Again, no CW is alleged to have reported to or even directly communicated with any Individual Defendant. (*See* AC ¶¶ 38, 46, 53, 57.) *See In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 2023 WL 2308151, at *6 (S.D.N.Y. Mar. 1, 2023) (no

CWs "alleged to have ever interacted with any Executive Defendant regarding [disputed drug]"). Two CWs are not alleged to have had any role in the reserving process. (AC ¶¶ 45, 52); *see Glaser*, 772 F. Supp. 2d at 596. And of the two CWs in Argo's claims department, one did not touch construction defect claims and the other merely alleges an influx of claims in 2019-2020 and that adjusters were "overloaded with work." (AC ¶¶ 41-42, 57.) These allegations, even if credited, do not give rise to a cogent and compelling inference of fraud.

*Second*, Plaintiffs' vague references to "PowerPoint presentations" (AC ¶¶ 68, 103, 108, 141) similarly fail. Where "plaintiffs assert that defendants had access to contrary facts, the complaint must '*specifically* identify the reports or statements containing this information.'" *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020). Here, Plaintiffs only vaguely allege that the "slides contain[ed] data from Argo's CAPS information system which tracked and managed claims and displayed the estimated losses for claims." (AC ¶ 141.) There are no allegations that these presentations included aggregate construction defect reserve development from the Company's actuaries or that Defendants were shown that such reserves had grown but ignored that information. Similarly, there are no allegations that the presentations included details about purportedly deficient underwriting guidelines or that such guidelines led to a need for increased reserves. *See Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020).

*Third*, equally unavailing is Plaintiffs' allegation that Defendants "knew" Argo would have to increase reserves for 2011-2017 construction defect policies due to their "belated admission" that "Argo had created a Construction Defect Task Force in 2017." (AC ¶ 137.) Strengthening underwriting guidelines on new policies is not an admission that the previous underwriting guidelines were knowingly deficient. *See KBC Asset Mgmt. NV v. MetLife, Inc.*, 2022 WL 480213, at *2 (2d Cir. Feb. 17, 2022) (launch of internal pilot program supported nonfraudulent inference

that MetLife undertook program to determine whether the disputed practice could be causing an overstatement of profits and if so, how to improve the process). Nor does it say anything about the *future* loss reserves estimated to accrue on previously written policies. *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016).

*Fourth*, allegations concerning executive turnover (AC ¶¶ 183-87), "without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter." *Glaser*, 772 F. Supp. 2d at 598. Plaintiffs have alleged no "unusual or suspicious circumstances" to even suggest the reasons for the "turnover" related to a purported fraudulent scheme. *See, e.g.*, *In re Wachovia*, 753 F. Supp. 2d at 366 (resignations alone insufficient "without factual allegations linking the resignations to the alleged fraud").[19] Moreover, resignations of non-defendants (AC ¶¶ 185, 187) "create[] no inference of scienter on the part of any of the named defendants." *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012).

*Fifth*, Plaintiffs' apparent fallback on the "core operations" doctrine is a red herring. (*See* AC ¶¶ 147-48.) "The Second Circuit has not decided whether the 'core operations' doctrine remains valid as a theory of scienter following the PSLRA," and it, at most, may only "constitute supplementary, but not an independent, means to plead scienter." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F. App'x 31 (2d Cir. 2019); *see also In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3, n.4 (2d Cir. Oct. 25, 2022). Regardless, Argo is an international underwriter that reported $3.2 billion in gross written premiums in FY 2020. (Ex. B, FY20 10-K at 49.) Far from "constitut[ing] nearly all of [Argo's]

---

[19] Moreover, Plaintiffs' "conclusory allegations of [the Individual Defendants'] skill [and] experience do not satisfy the particularity requirements of Rule 9(b)." *Arthur Props., S.A. v. ABA Gallery, Inc.*, 2012 WL 2886685, at *2 (S.D.N.Y. July 16, 2012); AC ¶¶ 143-48.

business" *Reilly*, 2018 WL 3559089, at *18, in comparison, Argo Construction reported gross written premiums of only about $300 million. (*See* Ex. B, FY20 10-K at 49; AC ¶ 83); *see also In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. 2018) (dismissing core operations theory where at-issue segment comprised about 30% of company's business), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).

*Sixth*, Plaintiffs attempt to create a smokescreen by detailing a prior SEC investigation into Watson's undisclosed perquisites. (AC ¶¶ 177-82.) But they do not even attempt to connect that matter to reserving, underwriting guidelines, construction defect claims, or any other allegation in the AC. *See Hou Liu*, 2020 WL 1489831, at *14 (unrelated settlement did not support "inference that defendants acted recklessly in the present matter"); *Saraf*, 2022 WL 4622676, at *7.

*Seventh*, Plaintiffs' blanket allegation that "Argo had a culture of 'reserves suppression' wherein claims personnel were . . . 'yelled at'" and "afraid to 'put up reserves'" (AC ¶ 140), fails to specify that this behavior was actually witnessed by the Individual Defendants, much less that it originated from any of the Individual Defendants or caused them to know that their challenged statements were misleading. Vague allegations about "culture" fall short of pleading an inference of scienter. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) (creating "an environment in which improper accounting practices flourished" insufficient to allege scienter).

*Finally*, Plaintiffs' scienter allegations fail because they impermissibly lump all Individual Defendants together rather than alleging specific facts with respect to each (as they must). *See Hou Liu*, 2020 WL 1489831, at *15. Here, Plaintiffs generally allege that Defendants acted with scienter because they "participated in both the management and day-to-day operations of Argo," "had access to detailed information regarding Argo's construction business," and were "privy to the culture of reserve suppression." (AC ¶¶ 136-42.) This group pleading fails as a matter of law

and also boils down to an allegation that Defendants should be charged with scienter based on their positions within Argo—a tactic courts regularly reject. *See Chapman*, 466 F. Supp. 3d at 401.[20]

### 3.    Non-culpable Inferences Are Far More Compelling

Under *Tellabs*, a court must take into account "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." 551 U.S. at 314, 127 S. Ct. at 2504. Plaintiffs' allegations here are not only implausible, but far less compelling than inferences of nonfraudulent intent. Plaintiffs' theory is incoherent. If Defendants were seeking to conceal their purported reserve deficiencies, then it makes no sense for them to hire an independent third-party actuary to review Argo's reserves. *See ECA*, 553 F.3d at 203 (affirming dismissal where scienter allegations "suffer[ed] from a basic problem concerning plausibility"). Indeed, since Argo had "committed the resources necessary to undertake an internal [review]," there is no credible basis to suggest it would then ignore the results and simultaneously disclose that its reserves were in line. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (no inference of scienter where complaint lacked allegations that company's auditors disagreed with challenged accounting); *In re Iconix*, 2017 WL 4898228, at *19.

It bears emphasis that loss reserves are merely predictions about future payment obligations—obligations that will inevitably be owed for the amount of the loss, regardless of the amount reserved. Thus, "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning." *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.

---

[20] These defects also doom any effort to plead corporate scienter. Indeed, "a strong inference of corporate scienter" is reserved for statements "so dramatic . . . that they would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 139 (E.D.N.Y. 2020). Such an "exceedingly rare instance[]" of fraud is not pled here. *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020).

1994). There is no alleged basis to conclude that the Individual Defendants—whose service spanned multiple years and leadership changes—would all secretly conspire to conceal from investors that reserves were inadequate, knowing that one day the truth would emerge yet reaping no cognizable benefits in the interim. Courts do not hesitate to reject theories of fraud that, like this one, make no sense. *In re Garret Motion Inc. Sec. Litig.*, 2022 WL 976269 at *13 (S.D.N.Y. Mar. 31, 2022) (noting "motive problem" with plaintiffs' scienter theory); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) (plaintiffs' alleged "scheme . . . lacks a coherent rational objective"); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449 (S.D.N.Y. 2005) (rejecting scienter allegations where "the alleged scheme could not possibly have succeeded").

The far more compelling inference is that Argo reviewed and adjusted its reserves on a quarterly basis, honestly believed those estimates, increased them on its own initiative when it received new information, and promptly disclosed the adjustments to the market. *See Renewable Energy Grp.*, 2022 WL 14206678, at *2 (more plausible that company discovered issue in fourth quarter and "divulged the problem" pre-earnings).

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

Plaintiffs' section 20(a) claim should be dismissed because they fail to allege (1) a primary violation and (2) that the Individual Defendants were in some meaningful sense "culpable participant[s]" in the primary violation. *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *22 (S.D.N.Y. Aug. 30, 2018); *see also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Indeed, each Individual Defendant was an officer of Argo at different times, and thus each could not have been "culpable participants" throughout the Class Period. *See supra* § A.

## CONCLUSION

For these reasons, Defendants respectfully request that the AC be dismissed with prejudice.

Dated: New York, New York
May 26, 2023

/s/ *Jay B. Kasner*

Jay B. Kasner
Alexander C. Drylewski
Tansy Woan
Sarah E. Adams
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
alexander.drylewski@skadden.com
tansy.woan@skadden.com
sarah.adams@skadden.com

*Attorneys for Defendants*