## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

POLICE & FIRE RETIREMENT SYSTEM
CITY OF DETROIT and OKLAHOMA
LAW ENFORCEMENT RETIREMENT
SYSTEM, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiffs,

     v.

ARGO GROUP INTERNATIONAL
HOLDINGS, LTD., SCOTT KIRK, KEVIN
J. REHNBERG, MARK E. WATSON, III,
and JAY S. BULLOCK,

                Defendants.

Civil Action No. 1:22-cv-08971 (LAK)

The Honorable Lewis A. Kaplan

**Oral Argument Requested**

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

I.    PRELIMINARY STATEMENT .................................................................................. 1

II.   SUMMARY OF FACTS ............................................................................................. 4

    A.    BACKGROUND ................................................................................................ 4

    B.    ARGO'S CONSTRUCTION BUSINESS ............................................................ 5

    C.    THE TRUTH BEHIND ARGO'S CONSTRUCTION BUSINESS ........................... 6

    D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................... 9

    E.    THE TRUTH IS REVEALED ........................................................................... 10

III.   STANDARD OF REVIEW ...................................................................................... 13

IV.   ARGUMENT ............................................................................................................ 13

    A.    PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT ...................................................... 14

        1.    Defendants' Omissions of Material Fact About Argo's Construction Business Rendered Their Statements Misleading ........................................................................................ 15

        2.    Defendants' Statements About Reserves Are Actionable Statements of Opinion ......................................................................... 18

        3.    Defendants' Risk Disclosures Do Not Shield Them from Liability ............................................................................................. 21

    B.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER ........................................ 22

        1.    Defendants Had Actual Knowledge that their Statements about Argo's Construction Business were False ...................... 24

        2.    Defendants' Incentive Compensation Plan and Insider Trading Demonstrate Motive and Opportunity .......................... 31

    C.    PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY ...................................................................................................... 35

V.   CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abessinio v. Beer*,
No. 06 CIV 2777 (LTS) (FM), 2008 WL 11515514, (S.D.N.Y. May 9, 2008) ...................35

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d. Cir. 1995)...................................................................................................34

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021).................................................................................35

*Africa v. Jianpu Tech. Inc.*,
No. 21-CV-1419 (JMF), 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) .............................16

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..................................................................................................16

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ................................................................................................13

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...........................................................................15, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................13

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002).................................................................................................14

*Chapman v. Mueller Water Prod., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)..................................................................................21

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)...............................................................................13, 19

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)..................................................................................34

*In re Converium Holding AG Sec. Litig.*,
No. 04 CIV. 7897 DLC, 2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006) ...............................30

*In re Credit Suisse–AOL Sec. Litig.*,
465 F. Supp. 2d 34 (D.Mass.2006) ......................................................................................22

*Dobina v. Weatherford Int'l Ltd.*,
　909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................29, 30

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
　794 F.3d 297 (2d Cir. 2015).............................................................................23, 26

*In re: eSpeed, Inc. Sec. Litig.*,
　457 F. Supp. 2d 266 (S.D.N.Y. 2006) ....................................................................35

*In re: EZCorp, Inc. Sec. Litigations*,
　181 F. Supp. 3d 197 (S.D.N.Y. 2016).....................................................................28

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
　104 F. Supp. 3d 441 (S.D.N.Y. 2015), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed.*
　*Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017) ........................19

*Freudenberg v. E\*Trade Fin. Corp.*,
　712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................20, 21, 22

*Ganino v. Citizens Utilities Co.*,
　228 F.3d 154 (2d Cir. 2000)...........................................................................16, 21

*In re Gen. Elec. Co. Sec. Litig.*,
　857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................17

*In re Gen. Elec. Sec. Litig.*,
　844 F. App'x 385 (2d Cir. 2021) .......................................................................14, 15

*In re Gentiva Sec. Litig.*,
　932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................................27

*KBC Asset Mgmt. NV v. MetLife, Inc.*,
　No. 21-291-CV, 2022 WL 480213 (2d Cir. Feb. 17, 2022) .............................................25, 26

*Lapin v. Goldman Sachs Group*,
　506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................22

*Long Miao v. Fanhua, Inc.*,
　442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................................26

*McMahan & Co. v. WherehouseEntm't*,
　900 F.2d 576 (2d Cir. 1990)...........................................................................15, 16

*Meyer v. JinkoSolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014)...............................................................................14

*Moshell v. Sasol Ltd.*,
　481 F. Supp. 3d 280 (S.D.N.Y. 2020)...................................................................25, 26

*NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*,
    No. 10 CIV. 440 LAK HBP, 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) ...........................21

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013) .....................................................................................30

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...............................................................................18, 26, 31

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ...............................................................................................18, 19

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) .....................................................................................29

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) .....................................................................................33

*In re Salix Pharms., Ltd.*,
    No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..............................31

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .............................................................................................34, 35

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) .....................................................................................................35

*Setzer v. Omega Healthcare Investors, Inc.*,
    968 F.3d 204 (2d Cir. 2020) .................................................................................................14

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...................... *passim*

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .................................................................................................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...............................................................................................23, 31

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .................................................................................................19

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    No. 14-CV-1997 (LAK), 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ........................28, 30

*In re Winstar Commc'ns*,
    No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............................................30

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)......................................................................................29

**Statutes**

15 U.S.C. § 78u–4(b)(2) ...........................................................................................................22

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................................................13

Lead Plaintiffs Police & Fire Retirement System City of Detroit ("Detroit PFRS") and Oklahoma Law Enforcement Retirement System ("OLERS," and together with Detroit PFRS "Plaintiffs"), on behalf of all others similarly situated, submit this memorandum of law in opposition to the motion to dismiss filed by Argo Group International Holdings, LTD. ("Argo" or "Company"), Scott Kirk ("Kirk"), Kevin J. Rehnberg ("Rehnberg"), Mark E. Watson, III ("Watson") and Jay S. Bullock ("Bullock") (collectively, "Defendants") (ECF Nos. 30, 31). For the following reasons, Defendants' motion to dismiss should be denied.

## I.    PRELIMINARY STATEMENT

On February 8, 2022, Argo, a specialty insurance underwriter, announced an astonishing adverse reserve charge of $130 to $140 million. ¶ 119.[1] That is to say, Argo had not set aside sufficient reserves to satisfy claims. Specifically, Argo revealed that the largest reserve increases stemmed from construction defect claims, primarily related to years prior to 2017. ¶ 125. The market's reaction to this unexpected increase in loss reserves was severe. Analysts characterized the announcement as "stunning" and called the reserve charge a "black hole," not simply because the news was so negative, but also because the announcement stood in stark contrast to what Defendants had represented to the investing public about that specific line of business. ¶¶ 120, 127-28. From June 11, 2018 to August 9, 2022 (the "Class Period"), Defendants had proclaimed the success of Argo's newly-formed standalone construction segment, but never disclosed known facts about the exposure of claims written in years prior to 2017. ¶¶ 96-118. By August 2022, Argo was forced to sell off its entire book of construction defect policies for accident years 2011 to 2017. ¶¶ 130-31. One analyst described the unexpected sale of these assets as "another body blow

---

[1] Citations to "¶ __" or the "Complaint" are to the Amended Class Action Complaint (ECF No. 29); and to "Def. Br. at __" are to Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF No. 31).

for Argo's shareholders." ¶ 132. As a result of the announcement of the significant adverse development and the subsequent announcement of the sale of the entire construction portfolio, Argo's share price declined by 55% over the course of six months. ¶ 134.

Plaintiffs challenge Defendants' admitted failure to disclose facts, known no later than 2017, regarding Argo's legacy construction portfolio, in particular, claims written between 2011 and 2017. ¶ 96. These facts include that underwriting guidelines applied to construction defect claims had been improper, that the portfolio had been overexposed and needed to be restricted, and that claims had been written outside of Argo's core construction business. *Id*. Defendants therefore knew that Argo's prior year claims were at risk, yet continued to assure investors that its underwriting guidelines were prudent and to tout Argo's long-term year-over-year favorable reserve development. ¶¶ 86-96.

Defendants' attempt to label Plaintiffs' claims as "fraud by hindsight" fails in light of Defendant Rehnberg's own words on February 23, 2022 explaining the reasons for the adverse reserve development: "We started taking underwriting action on construction defects at the end of 2017, including strengthening underwriting guidelines and placing significant restrictions on certain states and exposures." ¶ 125. In response to a question from an analyst, Defendant Rehnberg continued:

> And we started some underwriting actions in the end of 2017 when a task force was convened on CD [construction defect], which had previously been underwritten in our liability area, and which includes construction and in our contract lending line of business. So we broke out construction as a separate business and started underwriting more specifically on this business and changed the underwriting guidelines around what had happened. So the book we have today is not as exposed. It's got different -- underwriting terms and conditions, different approaches to it. So while I understand there's a concern about it, we have been working on the underwriting side of this for the past five years. And we mentioned in the recent years, it has been performing according to expectations. ¶ 127.

2

In disclosing the creation of that task force ("Construction Defect Task Force" or "Task Force") and the changes being effectuated, Argo, intentionally or not, admitted that Defendants knew, as early as 2017, that (1) Argo's construction portfolio was too exposed in prior years; (2) the underwriting guidelines being utilized in its construction line were too lax; (3) construction defect claims from 2011 to 2017 had been improperly written, (4) Argo had in fact changed its underwriting policies and standards going forward; and (5) the Company would have to increase reserves for past years. ¶ 10. Rehnberg further admitted that, in 2017, specific changes had been made to underwriting terms and conditions within the construction line and that Defendants had been "*working on the underwriting side of this for the past five years.*" ¶ 127.  However, at no point from 2018 to 2022 did any Defendant so much as suggest that the construction line of business was being studied, that underwriting guidelines were being strengthened or even changed, or that exposures in the construction line were being restricted in any way.

These admissions, followed by the sale of the entire portfolio months later, at the very least create a plausible inference that Defendants knew as early as 2017 that policies written prior to 2017 presented increased risk, exposed Argo to significantly higher losses, and therefore that reserves for years 2011 to 2017 were insufficient. That inference is at least as plausible as Defendants' unsupported factual assertion that the Construction Defect Task Force was created solely to strengthen underwriting guidelines on a going-forward basis. Def. Br. at 3. Defendants' argument begs the question as to why the underwriting guidelines needed to be strengthened and why restrictions needed to be implemented if not because Argo management knew that past years had been deficient. Moreover, Defendants' failure to disclose the creation of the task force, the reasons therefore, and the changes being made to underwriting guidelines within the construction

line rendered Defendants' affirmative statements regarding the profitability, strength and growth of the construction business false and misleading throughout the Class Period.

## II.    SUMMARY OF FACTS

### A.    BACKGROUND

Argo is a specialty insurance underwriter that promotes itself as targeting "niche" markets. ¶ 2. Specifically, Argo underwrites risks arising from the property and casualty markets. *Id.* Argo consists of two operating segments, its international segment, which was considered "mediocre and dilutive," and its U.S. segment. *Id.* Argo's U.S. segment was consistently lauded as its "crown jewel." ¶¶ 2, 74. In 2019, Argo's U.S. segment accounted for $1.8 billion, or 58%, of the Company's gross written premiums ("GWP"), which is the sum of direct premiums written and assumed premiums from reinsurance agreements before deducting commissions. ¶¶ 3, 74. Argo's GWP for its U.S. segment increased to approximately $2 billion, or 62%, in 2020 and $2.07 billion, or 66%, in 2021. *Id.* As Argo invested more time and resources on its U.S. segment, investors and analysts became particularly focused on the health of this segment. *Id.*

For years, the key part of Argo's U.S. segment was its Excess and Surplus lines ("E&S"). In Argo's 10-K filed on February 28, 2020 for the fiscal year ended December 31, 2019, the Company stated "[t]his segment [U.S. Operations] is a leader in the U.S. Specialty Insurance market, specifically through its Excess and Surplus Lines ("E&S") businesses focusing on U.S.-based risks that the standard, admitted insurance market is unwilling or unable to underwrite, and through other specialized admitted and non-admitted business distributed through retail, wholesale and managing general brokers/agents in the Specialty Insurance market." ¶ 4. Because of the inherently risky nature of Argo's underwriting of specialty insurance, investors paid close attention to Argo's assurances of its industry expertise, management experience, prudent underwriting

standards, ability to withstand market volatility, and ability to properly reserve for losses. ¶ 75. Knowing this, Argo labeled itself as an "underwriting leader" with "favorable reserve development" for 14 years. ¶ 78. Argo also touted how its construction business had "judicious" and "robust" reserving processes. *Id*.

### B.    ARGO'S CONSTRUCTION BUSINESS

Argo has underwritten construction defect claims for more than a decade. ¶ 79. Construction defect claims are "claims arising from insurance for commercial and residential contractors covering physical loss or damage due to defective components of a building, design, materials, or workmanship that requires repair or replacement." *Id*. Defendants attributed much of the success of Argo's U.S. operations to its construction segment. ¶ 8. During earnings calls and "investor days," Defendants told analysts and investors that its construction segment would "absorb" the underperforming parts of Argo's business. *Id*. Defendants described Argo's construction business as one of the "best performing" and "largest business units" that was "leading the way" for the Company in the U.S. *Id*. Defendants attributed the Company's "strongest growth" to its construction business. *Id*.

Argo's construction business operated under its E&S line until 2018. ¶ 80. In 2018, in order to capitalize on an expanding market, Argo broke out its construction business as a stand-alone business. ¶ 81. It referred to this new business as "Argo Construction." *Id*.  On June 11, 2018, Defendants issued a press release in which Defendant Watson stated that the construction sector is "a $1-trillion industry that is growing rapidly and is projected to be among the fastest growing business sectors in the United States over the next five to seven years." *Id*. In this same press release, Defendant Rehnberg highlighted that, "[t]his change is the most recent example of a new

and successful specialty underwriting practice launched from within our E&S organization. We have outstanding underwriting and claims expertise supported by a leading digital platform." *Id*.

### C.    THE TRUTH BEHIND ARGO'S CONSTRUCTION BUSINESS

Defendants knew that Argo's construction business was riddled with problems. Several confidential witnesses ("CWs") corroborated management's reluctance to increase reserves and that the construction unit was a matter of concern within Argo. After CW1 joined Argo as a senior construction defect claims adjuster in August 2019, they realized that Argo "did not understand how to deal with construction defect claims" and that management "did not know how many claims they actually had." ¶¶ 37, 39. CW2, an underwriter in Argo Construction, reported that construction defect claims were an issue specifically for Argo's "middle market" business. ¶¶ 45, 47. According to CW2, the middle market underwriters exercised less due diligence and their underwriting was not robust. ¶ 48. In early 2020, management discussed how to "strengthen underwriting guidelines" for the middle market construction defect claims. ¶ 47. According to CW4, the issue with construction defect claims "goes back a long time" and in or just prior to 2018, "things started to get really screwed up, that is when all the crap started" with construction defect claims. ¶ 61.

Argo had more construction defect claims than it knew how to handle. CW1 reported feeling overwhelmed by the number of claims received and, as a result, left Argo in December 2020. ¶¶ 37, 41. Other construction defect adjusters felt overloaded with work. ¶ 41. According to CW1, a manageable case load for an experienced claims adjuster is approximately 100 claims. *Id*. However, Argo's claims adjusters had caseloads of around 175-180 claims each. *Id*. CW4 also reported an overwhelming number of construction defect claims and ineffective management of those claims. ¶ 62. CW4 stated that construction defect claims adjusters "were getting crushed"

with claims and all they could do was "triage" and "kick the can down the road." ¶ 64. While a significant number of claims were "floating around," the Company still "would not commit the resources" to effectively manage the claims and "wanted to do it on the cheap." ¶ 70.

According to CW1 and CW4, Argo hired a law firm, Claussen & Miller, to help address the overload of construction defect claims. ¶¶ 44, 69. Argo needed the help of Claussen & Miller because Argo Construction lacked a robust program that could handle the amount of construction claims it received. ¶ 44. Rather than addressing these claims, CW1 reported that the law firm was "sitting on the claims, just babysitting them." *Id*. CW4 similarly reported that Claussen & Miller did not make any meaningful progress towards resolving the claims and the claims just "sat" with the law firm. ¶ 69. According to CW4, Argo's Vice President of Claims stated that things "went south" once Argo reclaimed its construction defect claims from Claussen & Miller because Argo's adjusters were overwhelmed with the number of claims that they needed to address. *Id*.

Argo also cultivated a culture of "reserve suppression," according to CW4. ¶ 59. Mark Wade ("Wade"), Argo's Chief Claims Officer, and Steven Laudermilch ("Laudermilch"), Argo's U.S. Chief Claims Officer, created an environment where claims personnel were afraid to "put up reserves" and were pressured to keep construction defect claims reserves to a minimum. ¶¶ 31, 57, 59. This culture was so pervasive that even Argo's former Vice President of Claims was "scared shitless" of Wade and would not ask for help to handle the claims volumes. ¶¶ 34, 59. CW4 reported that the Vice President of Claims would not approve construction defect claims because she "knew people did not want to see development in the construction defect book." ¶ 66.

Wade, Laudermilch, and Jim Cornwell ("Cornwell"), Argo's Senior Vice President of Construction, frequently "yelled at" and embarrassed claims personnel in an effort to prevent them from posting reserves. ¶¶ 33, 64. Laudermilch's "goal was to try to humiliate you" so that "you

7

were fearful to put up reserves" and "Cornwell's thing was yelling at claims [staff] and trying to embarrass them and then they won't post reserves," as reported by CW4. ¶ 64. Moreover, during the quarterly "product line review" meetings for Argo Construction, Wade and Laudermilch "berated any claims staff who addressed" reserves. ¶ 68. According to CW4, Defendants Watson, Rehnberg, Bullock and Kirk attended these meetings and all attendees received PowerPoint slides showing data from the construction segment beforehand. ¶¶ 67-68.

Moreover, Argo created policies that obstructed claims personnel's ability to establish needed reserves. ¶¶ 43, 66. Specifically, as reported by CW1 and CW4, Argo limited the ability of personnel to authorize setting reserves above a certain amount. *Id*. For instance, according to CW1, "you could not just set a reserve for $1 million." ¶ 43. Claims adjusters typically could only set reserves up to a limit of $100,000. ¶ 66. CW4 reported that $100,000 is not nearly enough to reserve for a construction defect claim. *Id*. If an adjuster wanted to set a reserve over that limit, that adjuster would have to write a memo justifying the reserve and submit it for approval from management. ¶¶ 43, 66. Management would then delay approving these reserve memos in an effort to suppress reserves. ¶¶ 63, 66.

Defendants were aware of the issues plaguing Argo Construction. Argo held quarterly town hall meetings, attended by CW2 and CW4. ¶¶ 49, 61. These meetings were initially led by then-CEO Defendant Watson until he resigned in November 2019. ¶ 49. Defendant Rehnberg then led these meetings once he assumed the role of CEO. *Id*. Defendants Bullock and Kirk also attended and participated in these meetings. *Id*. These meetings were "extremely detailed" and participants specifically discussed "loss ratios" (which represents the ratio of losses to premiums earned) and "premiums written." *Id*. Argo also held quarterly construction meetings. ¶ 50.

CW3 explained that, during their employment from December 2020 to August 2021, "construction defect was a concern for the leadership of the construction business." ¶ 55. Even executives outside Argo Construction kept "an eye on" the construction defect losses. *Id*. As corroborated by reports from CW3 and CW4, Defendant Rehnberg regularly stated in town hall meetings during the relevant period that construction defect "was something that was a concern" or a "challenge" ¶¶ 55, 61.

### D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

Beginning on June 11, 2018, each Defendant assured investors that Argo's construction business was flourishing and driving growth, despite known issues that required remediation. ¶¶ 96-118. For example, on February 11, 2019, Defendant Watson touted Argo's construction portfolio as one of "the portfolios of risk with the best loss ratios..." ¶ 99. Defendant Rehnberg, on November 7, 2019, told investors that Argo's "construction business, no longer within casualty and operating as a business on its own, is also driving growth in an industry that continues to flourish in a robust economy... Argo construction continues to exceed our expectations." ¶ 102. Defendant Bullock, during an earnings call on May 8, 2020, told investors that Argo's construction business unit contributed to the Company's "strongest growth." ¶ 104. Defendant Kirk, on November 3, 2021, similarly stated that "[t]he growth in the period was driven by our grow and invest businesses that include Argo Pro, Casualty, Construction, Environmental, Inland Marine and Surety." ¶ 117. For years, Defendants repeated these assurances to investors, without disclosing material facts regarding known issues with the construction defect business that contradicted their public statements. ¶¶ 96-118.

Analysts picked up on Defendants' positive statements regarding Argo Construction. ¶ 84. A few days after an "Investor Update" held on March 12, 2021, Boenning & Scattergood

specifically highlighted Argo's construction business as an area of focus. *Id*. On May 4, 2021, Boenning & Scattergood reported that, "GPW growth in the U.S. was driven by strategic focus businesses, including Argo Pro, Casualty, Construction, Environmental, Inland Marine and Surety." *Id*. On May 11, 2021, Boenning & Scattergood reported that, "ARGO is focusing on six business units in the U.S.: Argo Pro, Casualty, Construction, Environmental, Inland Marine, and Surety. These businesses represented 60% of the company's U.S. premium in the first quarter of 2021 and grew by more than 15%. Each experienced positive rate increases and generated combined ratios under 90% with minimal catastrophe losses." *Id*.

### E.   THE TRUTH IS REVEALED

The years of undisciplined underwriting and over-exposure within the construction line of business finally caught up to Argo. On February 8, 2022, Argo revealed that its fourth quarter results from 2021 ("4Q21") would be negatively impacted by $130 to $140 million worth of adverse prior year reserve development and non-operating charges. ¶ 119. This news stunned analysts. ¶ 120. That same day, Compass Point released a report with the headline: "Stunning Adverse Development & Other Charges; Downgrading to Neutral, Reducing Price Target to $47.50." *Id*. Compass Point stated that "[Argo] had held an insightful investor/analyst day and presented the promise of a future of steady earnings, lower volatility of earnings, and improving growth over time. This is what makes the current actions so surprising, especially after a year that had been going so well." *Id*. The next trading day, February 9, 2020, Argo's stock price dropped $7.11, to a price of $44.76 per share. ¶ 122. On February 10, 2022, the stock price dropped to $42.82 per share, for a two-day drop of $9.05 per share, or 17.5%. *Id*.

On February 22, 2022, Argo issued another press release wherein it reported that the net adverse prior year reserve development for 4Q21 was $132.3 million. ¶ 123. That same day,

Compass Point lamented that Argo's "earnings release has little in the way of explanation for the construction defect adverse loss development, nor does it give any certainty that the issue has been put to bed." ¶ 124. On February 23, 2022, during an earnings conference call, Defendant Rehnberg stated that around $77 million of the adverse prior year development came from construction defect claims within Argo's U.S. operations. ¶ 125. Rehnberg then stated:

> A large portion of the reserve increase for a construction defect was associated with businesses that have either been discontinued, including contract binding in October of 2021, or have been significantly remediated. The remediated portion was previously underwritten by our casualty business. We established Argo Construction from the standalone business unit in June of 2018 to focus on the construction market with a greater depth of talent and knowledge. Most of the claims associated with contract binding and casualty were written outside of the core construction business. Over 95% of the construction defect prior year, adverse development in 2021, fourth quarter applied to 2017 and prior years.

> We started taking underwriting action on construction defects at the end of 2017, including strengthening underwriting guidelines and placing significant restrictions on certain states and exposures. Much of the adverse reserve development was a result of analyses performed in the fourth quarter, which included, among other things, new and/or updated information received relating to construction defect claims.

*Id.* During the earnings call, Greg Peters, an analyst with Raymond James called this shocking reserve charge a "black hole." ¶ 126. Peters then asked Defendant Rehnberg what had happened and how investors could gain confidence. *Id.* In response, Defendant Rehnberg stated:

> And we started some underwriting actions in the end of 2017 when a task force was convened on CD [construction defect], which had previously been underwritten in our liability area, and which includes construction and in our contract lending line of business. So we broke out construction as a separate business and started underwriting more specifically on this business and changed the underwriting guidelines around what had happened. So the book we have today is not as exposed. It's got different -- underwriting terms and conditions, different approaches to it. So while I understand there's a concern about it, we have been working on the underwriting side of this for the past five years. And we mentioned in the recent years, it has been performing according to expectations.

This earnings call was the first time that Defendants had ever mentioned anything about the Construction Defect Task Force to investors. This was furthermore the first time Defendants had ever disclosed claims written outside of Argo's core business, "underwriting actions" taken at the end of 2017, changes in underwriting guidelines, changes in the exposure of the construction "book", and restrictions put on certain states and exposures in 2017.

Analysts were again shocked by the newly described details of the charge. On February 23, 2022, Compass Point again stated that "ARGO Appeared to be on the Right Track, and Stuns with Major Adverse Development, Other Charges." ¶ 128. On February 24, 2022, William Blair also noted that Argo's adverse development was unexpected. ¶ 129. The report stated that "significant underwriting challenges were evident in the core U.S. book in the quarter. This was historically the stable and better-performing part of the company" and further, that "[w]hile the U.S. book has historically been a bright spot, the company took significant adverse development charges in the quarter and is exiting several books." *Id.*

On August 8, 2022, Argo announced that it had entered into a Loss Portfolio Transfer ("LPT") agreement where the transferee agreed to cover $746 million of Argo's reserves, and an additional $275 million of cover in excess of $821 million, up to a policy limit of $1.1 billion. ¶ 130. Argo retained a loss corridor of $75 million up to $821 million. *Id.* Argo then announced that it anticipated an after-tax charge of approximately $100 million in connection with the transaction that would affect the third quarter of 2022. *Id.* Analysts described this transaction as "another body blow for ARGO shareholders" and worried about the "additional uncertainties associated with the $75 million loss corridor retention which could act as overhang on the outlook for the next 12-24 months." ¶¶ 132-33. Argo's common stock subsequently declined $9.12 per share. ¶ 134. Argo's stock lost more than 55% of its value in less than six months in 2022. *Id.*

## III.    STANDARD OF REVIEW

To survive a 12(b)(6) motion, a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint alleging securities fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure ("Rule") 9(b). *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 81 (S.D.N.Y. 2022). To meet this standard, "a party must state with particularity the circumstances constituting fraud or mistake." *Id.* However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

Although Rule 9(b) imposes a higher pleading standard for Plaintiffs, "we must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). On a motion to dismiss, the court must "accept all factual allegations in the complaint as true and must consider the complaint in its entirety." *Id.* "We 'draw all reasonable inferences in favor of the plaintiff' and 'dismissal is appropriate only where appellants can prove no set of facts consistent with the complaint that would entitle them to relief." *Id.* (quoting *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014)).

## IV.    ARGUMENT

To state a claim for securities fraud under Sections 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934, a plaintiff must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Plaintiffs' Complaint satisfies each of these requirements.

## A.    PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT

Plaintiffs have alleged that Defendants' repeated statements concerning the profitability, growth and financial results of Argo Construction were misstatements primarily by virtue of Defendants' failure to disclose material facts. A statement becomes misleading "by virtue of its omissions viewed in context of the statement as a whole." *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 387 (2d Cir. 2021). Even without an existing independent duty to disclose certain information, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250 (disclosure required "when necessary 'to make ... statements made, in light of the circumstances under which they were made, not misleading.'") (citation omitted).

Having chosen to speak about Argo's construction business, Defendants had a duty to be "both accurate and complete," giving all material facts necessary to permit investors to evaluate any risks associated with that newly-formed unit. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("the lack of an independent duty is not ... a defense to ... liability because upon choosing to speak, one must speak truthfully about material issues."); s*ee also Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (holding that the company need not "disclose all the facts that pertain to a subject (many of which would be immaterial), but instead [must] not ... omit material facts whose omission, in the light of what was stated, would be misleading.").[2]

---

[2] Plaintiffs do not allege "scheme liability" as Defendants assert. Def. Br. 26.

14

### 1. Defendants' Omissions of Material Fact About Argo's Construction Business Rendered Their Statements Misleading

Plaintiffs describe with particularity each of Defendants' statements that were made materially misleading by virtue of their omissions of material facts. ¶¶ 96-118.[3] For years, Defendants lauded Argo's construction business. *Id.* However, while touting the "success[]" and "growth" of this business, and its "outstanding" underwriting practices, Defendants knew that Argo's construction defect claims underwritten from 2011 to 2017 were deficient in material ways. ¶¶ 96-97, 99, 101, 102, 104, 109-12, 114-17. Specifically, Defendants knew that Argo's legacy construction business' underwriting policies were inadequate, its book was too exposed, and policies had been written outside of Argo's "core construction business" in prior years. ¶ 96. Defendants knew that these deficiencies would inevitably force the Company to increase reserves and to record an adverse charge. *Id.* As a result, any statement that heralded the strength, profitability and underwriting standards of Argo's construction business but omitted to disclose known issues within that unit is a materially misleading statement. *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (holding that statements that characterized "the company's underwriting standards as 'rigorous' and 'conservative'" but "failed to disclose a lowering of such standard," were material omissions).

Defendants incorrectly urge that some of the challenged statements are not actionable because they are "[a]ccurate [s]tatements of [f]inancial [p]erformance." Def. Br. at 22. However, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. WherehouseEntm't*, 900 F.2d

---

[3] Defendants contend that Plaintiffs use boilerplate language in explaining why each statement is false or misleading. Def. Br. at 23. However, Plaintiffs' use of the same underlying facts to demonstrate falsity and scienter does not render the paragraphs boilerplate.

576, 579 (2d Cir. 1990). "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* Statements about Argo Construction's performance were false because Defendants omitted material facts, failed to record a necessary and inevitable charge that would have altered Argo's financial performance, and misled investors as to the health of the Company's construction business. In the case Defendants cite to for support, *Africa v. Jianpu Tech. Inc.*, plaintiffs allege that the defendants' Loan Segment's revenues were misleading because they failed to disclose "improper collection tactics." No. 21-CV-1419 (JMF), 2022 WL 4537973, at *7 (S.D.N.Y. Sept. 28, 2022). Plaintiffs here are not challenging the literal accuracy of Argo's reported financial performance but instead the misleading impression that Argo gave about its construction business.

Further, Defendants' attempt to classify the alleged misleading statements as "[g]eneral [c]orporate [o]ptimism and [p]uffery" fails. Def. Br. at 24. The Second Circuit defines puffery as "optimistic statements that are so vague, broad, and non-specific that no reasonable investor could possibly consider them significant in making investment decisions." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018). However, on a motion to dismiss, a defendant must "persuade[] the Court that the purported puffery was so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at *12; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Defendants have not done so.

Defendants challenge as puffery Argo's statements that: (1) "we are a leader in multiple specialty lines, such as New York Construction"; (2) Argo Construction is a "new and successful specialty underwriting practice"; (3) Argo Construction has "outstanding underwriting and claims expertise"; and (4) that its "specialized underwriters understand that rates, pricing and coverages

needed to meet contractors' insurance requirements." Def. Br. at 25. However, courts in this district have found similar statements actionable. For example, the court in *In re Ambac* stated that:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations ... By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

693 F. Supp. 2d at 271 (finding that underwriting standards are "critical to investors"); *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 386 (S.D.N.Y. 2012) (finding statements that described defendants' loan portfolio as "fantastic," "great," "robust," "strong," and "really high quality," actionable). Defendants' statements that Argo's construction business was a "leader" and "successful" and that its underwriting was "outstanding" and "specialized," ¶¶ 97, 111, 113, were not puffery but rather, "purported descriptions of the health of the business." *In re Signet Jewelers*, 2018 WL 6167889, at *11.

Moreover, the context of these statements made them especially material to investors. Plaintiffs have alleged that: (1) investors were particularly focused on the health of Argo's U.S. segment as the Company had dubbed this segment its "crown jewel." ¶¶ 2, 3; (2) investors cared about the health of Argo's E&S business, which included Argo's construction business, since Argo held itself out to be a leader in this area. Argo furthermore attempted to set itself apart through its willingness to underwrite risks that the standard insurance market was unwilling to underwrite. ¶ 4; and (3) Defendants consistently made favorable statements about Argo's underwriting to investors. ¶¶ 78, 81, 87, 89, 91, 93, 95, 97, 113-14. *See In re Signet Jewelers*, 2018 WL 6167889,

at *11 (finding that "when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.'") (citation omitted).

Even further, statements that misrepresent existing facts will not be considered mere puffery. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). For example, Defendant Rehnberg's March 12, 2021 statement that "we are a leader in multiple specialty lines, such as New York Construction," cannot be considered mere puffery because while touting Argo Construction's leadership to investors, Rehnberg was calling construction defect claims a "concern" and "challenge" in internal town hall meetings. ¶¶ 111, 118. As demonstrated *infra* Part IV.B, each Defendant knew that Argo's construction business had been suffering from material deficiencies that needed to be immediately addressed at the end of 2017. Therefore, their statements are not puffery. *See Novak*, 216 F.3d at 315 (statements that defendants' inventory was "in good shape" and "under control" were not puffery because "they allegedly knew that the contrary was true.").

### 2. Defendants' Statements About Reserves Are Actionable Statements of Opinion

While the Second Circuit has found that statements of reserves constitute opinions, these statements are still actionable under certain circumstances. In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, the Supreme Court held that a statement of opinion is actionable where it "omits material facts about the [speaker's] inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself…" 575 U.S. 175, 176 (2015). "[A] reasonable investor, upon hearing a statement of opinion from an issuer, 'expects

18

not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 189).

Plaintiffs challenge two misleading statements that explicitly reference Argo's reserves. The same statement, made on two separate occasions, is "[n]et favorable prior-year reserve development for the second quarter of 2020 was $0.6 million and primarily related to favorable development in specialty lines related to our surety and construction businesses, partially offset by unfavorable development in liability and special property lines." ¶¶ 106, 116. These two statements are the only statements that Defendants challenge as opinions.[4] Def. Br. at 13. Defendants assert that these statements are not actionable opinions for several incorrect reasons. Def. Br. at 13-16. First, Defendants claim that Plaintiffs have not alleged any "particularized facts" evidencing Defendants' knowledge of falsity concerning their opinions. Def. Br. at 13. However, as noted *supra* Part III, knowledge may be averred generally. *See City of Sterling Heights Police & Fire Ret. Sys.*, 587 F. Supp. 3d at 81. Plaintiffs have alleged that Defendants' knowledge of falsity is evidenced by the admission that long-known issues within the construction unit necessitated the creation of the Construction Defect Task Force, and corroborating statements from CWs. ¶¶ 135-146. Defendants "omitted to disclose the known problems that the [] segment was simultaneously

---

[4] Defendants also argue that the alleged statements concerning underwriting are statements of opinions. Def. Br. at 16 n.6. Yet Defendants have failed to offer any explanation as to why such statements are opinions; rather, they seem to imply that a statement containing the word "underwriting" *ipso facto* renders it an opinion statement. That is not so. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017) (statements about underwriting did not constitute opinions); *In re Signet Jewelers*, 2018 WL 6167889, at *11-12 (the Court found that it was "not persuaded that Defendants' qualitative statements" about "consistent underwriting" even "qualify as statements of opinions."). Even if these statements could be considered statements of opinions, Plaintiffs have sufficiently alleged that the omitted facts conflict with what a "reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 176.

experiencing." ¶ 118. As a result, Defendants' statements became "misleading to a reasonable investor." *See In re Signet Jewelers*, 2018 WL 6167889, at *13 (holding that the defendants' reserves statements were actionable because "[d]efendants knew that its reserves did not account for losses that it was likely to incur and that its reserve figures provided a misleading picture of [defendants'] … portfolio and the company's underwriting practices.").

Defendants' characterization of this pleading as "fraud by hindsight" fails for the same reasons. On February 23, 2022, in response to a question from an analyst about the adverse reserve development, Defendant Rehnberg admitted that Argo had been trying to address Argo's weak underwriting guidelines, over-exposures, and other material issues pervading the Company's construction business for at least five years. ¶ 137. Rehnberg explained:

> And we started some underwriting actions in the end of 2017 when a task force was convened on CD [construction defect], which had previously been underwritten in our liability area, and which includes construction and in our contract lending line of business. So we broke out construction as a separate business and started underwriting more specifically on this business and changed the underwriting guidelines around what had happened. So the book we have today is not as exposed. It's got different -- underwriting terms and conditions, different approaches to it. So while I understand there's a concern about it, we have been working on the underwriting side of this for the past five years. And we mentioned in the recent years, it has been performing according to expectations. ¶ 127.

This admission undercuts Defendants' attempt at a "fraud by hindsight" argument. Plaintiffs do not infer that Defendants should have known facts sooner. Rehnberg acknowledges that Defendants knew, at least as of the start of the Class Period, that (1) Argo's construction portfolio had been too exposed for prior years; (2) the underwriting guidelines utilized in its construction line had been too lax; (3) construction defect claims from 2011 to 2017 had been improperly written, and (4) the Company would have to increase reserves for past years. ¶ 10. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) ("it is not 'fraud by hindsight'

when statements related to a loan's existing quality and risks were false and misleading when made.").[5]

### 3.    Defendants' Risk Disclosures Do Not Shield Them from Liability

Argo's risk disclosures do not insulate Defendants from liability. Def. Br. at 21. In relying on Argo's risk disclosures, and without ever explicitly saying so, Defendants invoke a truth-on-the-market defense. As an initial matter, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167. Moreover, Defendants' risk disclosure defense fails for two reasons. First, Argo's risk disclosures were inadequate. Second, Defendants' knowledge of falsity nullifies any risk disclosures made.

First, in order for a risk disclosure to be considered adequate, it "must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d at 167 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1116 (9th Cir.1989)). For instance, in Argo's 10-K for the fiscal year ended December 31, 2019, the Company stated that, "… the estimated net reserve could change by $140 million, in either direction." Argo, Annual Report (Form 10-K) (Feb. 28, 2020) at 76. A general disclosure that Argo's reserve development *could* either be adverse or favorable is hardly a sufficient warning to investors. *See Freudenberg*, 712 F. Supp. 2d at 193-94 (Defendants' statements that loan losses "'*could be* affected by market risks and were subject

---

[5] Defendants citations to support their fraud by hindsight theory are distinguishable from the case at hand. Def. Br. at 14. In the cited cases, defendants adjusted their reserves based on *new information* they acquired. *See Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020); *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10 CIV. 440 LAK HBP, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012), *adopted,* 10-Civ.-440 (Mar. 16, 2012) at ECF No. 65 (Kaplan, J.) Here, at the time that Argo issued its Form 10-K for fiscal year ended December 31, 2019, Defendants were already aware of information that necessitated increasing reserves. ¶¶ 135-46.

to change' does not insulate them from liability for their specific misstatements and omissions."). Even further, these risk disclosures were made against the backdrop of Argo's consistent statements regarding its disciplined underwriting and long-term favorable reserve development. ¶¶ 78, 81, 86-97, 113-14. These consistent favorable statements undermined the adequacy of any risk disclosures. *See Freudenberg*, 712 F. Supp. 2d at 194; *Lapin v. Goldman Sachs Group*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (defendants' disclaimers were "counteracted" by their misleading statements); *In re Credit Suisse–AOL Sec. Litig.,* 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006) (defendants' continued optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time.").

Second, risk disclosures do not protect statements made with actual knowledge of falsity. *See Freudenberg*, 712 F. Supp. 2d at 193. "Defendants cannot be immunized for knowingly false statements even if they include some warnings: As the Honorable Milton Pollack explained, the law provides 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *Id.* at 193-94 (quoting *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). While Argo's 10-Ks "warned" investors that the Company *could* experience adverse reserve development or that it *could* experience favorable reserve development, Def. Br. at 21, Defendants failed to warn investors about the "black hole" of a reserve charge that they were actively underreporting. ¶ 126; *Freudenberg*, 712 F. Supp. 2d at 193-94.

### B.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The

scienter inquiry "does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage" *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007)). Scienter cannot be assessed in a vacuum. *See Tellabs*, 551 U.S. at 323. Rather, "[t]he inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310. A strong inference of scienter "need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Id.* at 324 (citations omitted).

A plaintiff can allege scienter by showing either, "1) a 'motive or opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Blanford*, 794 F.3d at 306 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)).

Here, Plaintiffs have adequately pled facts that, taken together, create a strong inference of scienter. ¶¶ 135-187. First, the creation of the Construction Defect Task Force in 2017 and corroborating CW statements evidence Defendants' actual knowledge of the falsity of their statements during the Class Period. ¶¶ 135-146. Second, substantial incentive compensation plans

and Defendants' stock sales during the Class Period demonstrate Defendants' motive and opportunity to mislead investors. ¶¶ 147-187.

### 1.      Defendants Had Actual Knowledge that Their Statements about Argo's Construction Business Were False

Defendants knew that Argo's construction business was not performing as they had led investors to believe. Defendants' knowledge is evidenced by their creation of a Construction Defect Task Force, which was tasked with fixing these issues. ¶ 137. From 2017, the Construction Defect Task Force worked on "strengthen[ing]" Argo's construction business and removing "exposures." ¶ 137. Implicit in Defendants decision to strengthen Argo's underwriting standards and remove exposures is the acknowledgement that Defendants knew the standards were previously weak and that the Company's books were over-exposed. Defendants also knew that weak underwriting standards and over-exposed books meant that Argo was not adequately reserving for losses. This would force the Company to report adverse reserve development. Notably, Defendants did not disclose the existence of the Construction Defect Task Force or its task of strengthening underwriting guidelines for *five* years. ¶ 127. Investors only learned about the Task Force's existence on February 23, 2022, around the time that Argo revealed that its 4Q21 results would be impacted by adverse reserve development of $130 to $140 million. ¶¶ 119, 125-27. Further, at no point did Defendants explain what allegedly "new and/or updated information received relating to construction defect Claims" had suddenly necessitated a charge of this magnitude. ¶ 125.

In an attempt to downplay the creation of the Construction Defect Task Force, Defendants argue that Argo's strengthening of its underwriting guidelines was not an admission that the previous guidelines were deficient. Def. Br. at 31. However, the case they cite to for support is

distinguishable. In *KBC Asset Mgmt. NV v. MetLife, Inc.*, Appellee, an insurance company, launched an internal pilot program in order to discover *whether or not* its pension risk transfer practice was undercounting living annuitants. No. 21-291-CV, 2022 WL 480213, at *2 (2d Cir. Feb. 17, 2022). Here, Defendants did not create the Construction Defect Task Force to investigate potential deficiencies with construction defect claims. Rather, as belatedly admitted by Defendant Rehnberg, the Task Force was created to "strengthen" knowingly weak underwriting guidelines. And the business that was the focus of the Task Force was the very business that created the adverse reserve development.

Reports from CWs also demonstrate that Defendants had actual knowledge of the falsity of their statements. ¶¶ 135-146. Together, the CWs paint a picture of inadequate underwriting practices and a pervasive culture of reserve suppression affecting Argo's construction business. Defendants Watson, Rehnberg, Bullock and Kirk witnessed this first-hand at quarterly "product line review" meetings. ¶ 68. Two CWs independently reported that Defendant Rehnberg himself admitted that there were issues plaguing the construction defect business. ¶ 142. These facts, when viewed together with Plaintiffs' other scienter allegations, create a strong inference that Defendants knew that their statements about the health of Argo Construction were false and misleading. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) (finding confidential witness testimony "taken collectively" with other evidence supported scienter).

Plaintiffs describe with particularity the job positions and responsibilities of each CW in a manner that indicates that they had actual knowledge of the facts they reported, despite Defendants' assertions otherwise. Def. Br. at 17-18. Defendants argue that since the CWs did not have direct contact with Defendants, direct experience with construction defect reserves, and were lower-level employees, they could not possess the relevant knowledge. *Id.* However, Plaintiffs

adequately detail each CW's position in a manner that allows the Court to find their statements about Argo's construction business credible. *See Novak*, 216 F.3d at 314 (the facts alleged need only "support the probability that a person in the position occupied by the source would possess the information alleged"); *Moshell*, 481 F. Supp. 3d at 289 (finding that Plaintiffs sufficiently alleged that each CW, by virtue of their job position, was provided with "direct, contemporaneous information" about the fraudulent activity).

CW1 worked as a senior construction defect claims adjuster from August 2019 to December 2020. ¶ 37. CW2 worked in various roles at Argo, but most recently held the title "Underwriter 2 – Argo Construction" at Argo's construction business in New York from April 2021 to June 2022. ¶ 45. Prior to that, CW2 had worked as "Underwriter 1 – Argo Construction" from January 2019 through April 2021, and as an underwriting assistant from July 2017 to January 2019. *Id.* CW3 worked as a construction business development analyst from December 2020 to August 2021. ¶ 52. As a business development analyst, CW3 was responsible for analyzing the viability of new construction-based insurance products. ¶ 53. Finally, CW4 had various claims-related roles from June 2003 to March 2022. ¶ 57. Most recently, CW4 was the Assistant Vice President of Claims for Argo's environmental division and reported to the same senior level management as the employees working on construction defect claims. *Id.* By virtue of their positions in the Company, each of the CWs were knowledgeable about Argo Construction's underwriting and reserving processes. *See Blanford*, 794 F.3d at 307 (finding CW statements credible where the complaint specified each former employee's "position, length of employment, and job responsibilities.").

Additionally, Defendants' contention that the Complaint's CW statements do not corroborate one another, Def. Br. at 18, must fail. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d

774, 798 (S.D.N.Y. 2020) (crediting CW statements "when 'independent [adequately pled] factual allegations' corroborate a confidential source's statements.") (citation omitted). Notably, both CW3 and CW4 independently confirmed that the highest levels of management had expressed apprehension about construction defect claims in quarterly companywide town hall meetings. ¶ 138. CW3 stated that "construction defect was a concern for the leadership of the construction business," and that executives outside the construction business unit were "keeping an eye on" the construction defect losses. ¶ 55. Further, CW3 reported that Defendant Rehnberg himself called construction defect a "concern" and CW4 similarly reported that Defendant Rehnberg called construction defect a "challenge" at townhall meetings. ¶ 142.

Further establishing their credibility, the CWs independently described an environment of reserve suppression within Argo. The CWs offer objective facts to support their statements. CW4 specifically described a culture of "reserves suppression" at Argo where claims personnel were afraid to "put up reserves" and were incentivized to keep construction defect claims reserves to a minimum. ¶ 59. According to CW4, this culture of reserve suppression encompassed (1) meetings during which claims staff were regularly "humiliated" and "yelled at" and (2) management delaying the approval of reserve memos, i.e., "written memos from claims adjusters addressed to management requesting approval to reserve for claims of certain amounts." ¶ 63. CW4 reported that Argo's Vice President of Claims was scared to increase reserves. ¶ 59. *See In re Signet Jewelers*, 2018 WL 6167889 at \*13 (finding a former employee's allegations that "personnel contemplated raising reserves at 'bad debt' meetings, but senior executives … elected not to do so…" sufficient to support an inference of scienter); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 377 (E.D.N.Y. 2013) (finding that "Plaintiffs' numerous confidential witnesses [may] support a strong inference of a Company-wide culture that, at every level," employees were pressured to

falsify information "in order to reach certain [] thresholds and hence maximize profits.") (citation omitted).

CW1 also reported that adjusters needed approval to increase reserves up to a certain amount. ¶ 43. CW4 reported that Argo "would not commit the resources" to deal with the exorbitant number of construction defect claims that were just "floating around." ¶ 70. Each of these facts corroborates that Argo perpetrated a culture not just where claims were left untouched but also where personnel were actively afraid of and discouraged from increasing reserves. *See In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) ("supporting a finding of scienter is the collective picture painted by the confidential witnesses: a culture of unscrupulous lending practices and lax oversight that was so widespread as to be 'a matter of course.'").

Defendants attempt to minimize Argo's culture of reserve suppression. Def. Br. at 20. Not only does their argument fail, but also the cases they cite are readily distinguishable. In *In re Weight Watchers Int'l, Inc. Sec. Litig.*, a former corporate account manager stated that defendants' new software was a "complete disaster" because of glitches and technical problems. No. 14-CV-1997 (LAK), 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016). There, this Court found that the former employee's statement was a hyperbolic assertion and subjective characterization of technical glitches. *Id.* Moreover, the defendants had disclosed the execution issues the software was experiencing. *Id.* Here, in contrast, the CWs' assertions of a culture of reserve suppression are supported by their first-hand observations of Argo's executives consistently berating claims personnel over reserve increases at meetings in which Defendants were present. ¶ 68.[6] Further,

---

[6] The Complaint alleges that during construction product line meetings, which were attended by Defendants Watson, Rehnberg, Bullock, and Kirk, other executives "berated any claims staff who address" reserves, ¶ 68, contrary to Defendants' assertion that Plaintiffs failed to allege that any Defendant witnessed this behavior. Def. Br. at 33.

unlike in *Weight Watchers*, Argo never disclosed the underlying issue, with or without subjective characterization.

*Woolgar v. Kingstone Companies, Inc.* is distinguishable as well. 477 F. Supp. 3d 193 (S.D.N.Y. 2020). There, the Court found that a CW's statement that the defendants would fire you "[i]f you didn't do what they want" was an unsupported opinion which did not establish the defendants' knowledge of deficient underwriting practices. *Id.* at 222. Here, however, CW4's description of pervasive and intentional reserve suppression is supported by their observations of executives yelling at employees who wanted specifically to increase reserves and delaying the approval of reserve memos. ¶¶ 59, 62-64, 66-70.

Finally, Plaintiffs' allegations about construction defect claims concern the "core operations" of Argo. As a result, "[k]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (Kaplan, J.). Defendants argue that the "core operations" doctrine, taken alone, does not establish scienter. Def. Br. at 32. However, "the doctrine can provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017). Moreover, considering the importance that Argo placed on Argo Construction, it is inconceivable that Defendants, high-level executives, were unaware of the issues plaguing that line of business. *See Dobina*, 909 F. Supp. 2d at 251 (finding

that "in light of the importance of tax rates to the defendant's financials, that the proper determination of these rates constituted 'core operations…'").[7]

Defendants' assertion of non-culpable inferences also falls short. Def. Br. at 34-35. By Defendants' logic, the use of independent third-parties to review the Company's reserves evidences their belief that Argo's reserve estimates were accurate. Def. Br. at 16. As an initial matter, this defense raises issues of fact that are inappropriate for a motion to dismiss.[8] *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) ("[a]t this stage in the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements."); *In re Converium Holding AG Sec. Litig.*, No. 04 CIV 7897 DLC, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (refusing to "weigh the evidence that might be presented at trial" where Defendants attempt to rely on their use of outside consultants as evidence of their good faith belief of the accuracy of publicly reported numbers). Without any information about what the third-party actuaries reviewed, said, or did, Defendants' assertions of good faith are speculative and inappropriate.

Defendants further assert that there is no basis to conclude that the Individual Defendants would conceal the truth from investors since they knew the adverse reserve development would eventually catch up to them. Def. Br. at 35. That fraud ultimately might be uncovered has not prevented many defendants from violating the securities laws in the past. Plaintiffs' allegations of

---

[7] In *Dobina*, this Court found that the nonculpable inference that defendants had made an error in their tax accounting treatment was more compelling than the inferences of fraudulent intent because plaintiffs failed to allege any "suspicious circumstances or of knowledge of facts that made the risk of error obvious…" 909 F. Supp. 2d at 252. Here, Plaintiffs have sufficiently alleged that Defendants had actual knowledge of the risk of adverse reserve development attributable to poor underwriting and over-exposure of past policies. ¶¶ 135-46.

[8] That Defendants received outside audit opinions is not a defense to securities fraud. *See In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, *8 (S.D.N.Y. Feb. 27, 2006). Even if a defendant has relied on an outside opinion, corporate officials have a "well defined obligation to ensure the accuracy of the information filed with the SEC." *Id.*

scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiffs' allegations of scienter are far more compelling than any nonfraudulent explanation offered by Defendants. *In re Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016) ("[w]hen the competing inferences rest in equipoise, the tie ... goes to the plaintiff.") (citation omitted).

### 2. Defendants' Incentive Compensation Plan and Insider Trading Demonstrate Motive and Opportunity

Argo's cash incentive compensation plan was structured in a manner that made payment contingent on the Company's performance metrics and targets. ¶¶ 150-57. As a result, Defendants were motivated to conceal information that would negatively impact Argo's performance. Allegations that Defendants "benefitted in a concrete and personal way from the purported fraud," support a finding of scienter. *Novak*, 216 F.3d at 311. By misrepresenting the strength of Argo's construction business and refusing to disclose known problems, Defendants helped artificially inflate Argo's stock. This, in turn, contributed to Defendants' incentive compensation awards.

Before resigning after an SEC and internal investigation into his failure to disclose corporate perks over the course of five years, Defendant Watson received an incentive bonus of $1,020,521, which accounted for 46% of his total compensation package for fiscal year 2018. ¶ 158. Watson received stock awards and other forms of compensation that totaled $8,162,328 in 2018. *Id*. Further, in connection with the SEC's investigation into undisclosed perks, it was revealed that Watson had received $10 million per year in stock and cash compensation over a five-year period. ¶ 159.

In 2018, Defendant Bullock received an incentive award of $511,875. ¶ 160. Further, the fair value of all long-term equity incentive awards to Bullock in 2018 was $814,716. *Id*. In 2019,

Bullock received stock awards valued at $419,997. ¶ 161. In 2020, Bullock's target annual incentive compensation was $700,000, or 116.7% of his base salary, of which he received $210,000. ¶ 162. Bullock's stock awards that year were valued at $599,991. *Id*. In 2021, upon leaving Argo, Bullock received separation payments of $758,333 in cash severance and a $700,000 "incentive payment." ¶ 163.

In 2018, Defendant Rehnberg received an incentive award of $688,500. ¶ 164. The fair value of all long-term equity incentive awards to Rehnberg in 2018 was $1,634,291. *Id*. In 2019, Rehnberg received an incentive bonus of $283,815 and stock awards valued at $999,951. ¶ 165. Defendant Rehnberg was paid over $2.1 million in combination with his other compensation. *Id*. In 2020, Rehnberg received non-equity incentive compensation of $365,625 and stock awards valued at $2,499,980. ¶ 166. In 2021, Rehnberg's annual target incentive was $1,218,750, or 125% of his base salary, of which he earned $1,007,906. ¶ 167. Rehnberg's target award value for long-term incentive awards was $2 million, of which he received $1,999,945. *Id*.

When Defendant Kirk joined Argo in 2021, his target annual incentive compensation was $630,087, of which he earned $521,082. ¶ 168. He also received stock awards valued at $1,407,177. *Id*.

Defendants' assertion that "Plaintiffs do not even attempt to tie the incentive awards to the alleged fraud itself," Def. Br. at 30, is baseless. The Complaint clearly explains that Defendants' compensation was linked to metrics such as operating income, BVPS (which the Company defines as a combination of underwriting income, total return on invested assets and capital management) and Return on Equity ("ROE"). ¶¶ 151, 156. As such, any reserve increase would offset premium receivables on Argo's balance sheet and affect reported financial benchmarks, which would in turn affect Defendants' compensation. ¶ 156. By under-reserving and misrepresenting the health of

Argo Construction, Defendants were also able to inflate Argo's stock price, achieve ROE and other targets that incorporate such price, and realize greater compensation benefits. *Id.*

Defendants' stock sale proceeds, in combination with their lucrative bonuses, further support an inference of scienter.[9] During the Class Period, Defendants Watson, Rehnberg, and Bullock sold more than 130,000 shares of Argo common stock for combined proceeds of $7.67 million. ¶ 173. "[M]otive is adequately pleaded where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007). Defendant Watson sold 42,876 shares of Argo common stock at prices as high as $68.95 over the course of just three months in 2018. ¶ 174. Defendant Rehnberg sold 54,139 shares of Argo common stock. ¶ 175. Defendant Bullock sold 33,153 shares of Argo common stock. ¶ 176. These shares were sold in years that Defendants knew, yet failed to disclose, that the newly-formed construction division was facing issues that necessitated material changes to remediate past mistakes. *See In re Refco*, 503 F. Supp. 2d at 646 ("[t]he Second Circuit has held that motive is adequately alleged where the defendants who made false statements inflating the value of shares 'sold *tens of thousands* of shares during the period that the allegedly defrauded customers were purchasing them.'") (emphasis added) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994).

---

[9] The Complaint provides calculations of each Defendant's total proceeds from stock sales due to the complicated transactions underlying the trades. Defendants' Forms 4, corresponding to the relevant trades, reflect exercises of stock appreciation rights, payments of exercise prices or tax liability using a portion of securities received from the Company, and open market sales, among other things. The nature of the trades, coupled with the changing terms of Argo's long-term incentive compensation structure, render it impossible to accurately calculate net profits to each Defendant at the pleading stage.

Moreover, stock sales that are unusual in timing or amount support a finding of scienter. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d. Cir. 1995). Defendants assert that because they did sell not sell their stock shortly before the corrective disclosures, their stock sales cannot support scienter. Def. Br. at 29. However, "[u]nusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020)). Notably, most of the Defendants' sales occurred shortly after Argo established Argo Construction. ¶¶ 97, 174-76. Argo established Argo Construction in an effort to take advantage of the $1 trillion construction industry. ¶ 81. As a result, Defendant Watson's statement that Argo's construction business continued "to prosper as a strong, growing and profitable portfolio exceeding $150 million in premium" and Defendant Rehnberg's statement that Argo Construction's underwriting was "successful" and "outstanding" became especially crucial to investors. ¶ 97. These favorable statements and Defendants' omissions about Argo's construction deficiencies helped Defendants artificially inflate the stock. In the weeks following this announcement, Defendants sold a combined 44,173 shares for $2,761,998.56 in proceeds. ¶¶ 174-76.

Contrary to Defendants' assertion, the fact that Defendant Kirk (who was CFO for less than one year during the Class Period) did not sell shares during the Class Period is not dispositive. Def. Br. at 27. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001) (holding that there is no "*per se*" rule about whether the number of insiders selling can support unusual trading. Rather, each case must be "decided on its own facts."). Moreover, the cases that Defendants use as support do not support their argument. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, the Court found that the sale of stock was not demonstrative of scienter because out of the five individual defendants named, only *one* company executive was alleged to

have sold their shares. 75 F.3d 801, 814 (2d Cir. 1996).[10] Here, out of the four Individual Defendants, *three* of them sold shares during the Class Period.[11]

### C.   PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

The Complaint adequately alleges that Defendants Watson and Rehnberg are controlling persons under Section 20(a).[12] ¶ 212. Defendants first dispute that Plaintiffs allege a primary violation. Def. Br. at 35. For the reasons explained above, Plaintiffs have properly pled a claim for violation of Section 10(b). Defendants further argue that Plaintiffs have failed to allege culpable participation. To the contrary, the Complaint alleges that both Watson and Rehnberg made many of the false statements at issue and also exercised significant control over Argo due to their senior positions as CEOs during the Class Period.  ¶¶ 25-26, 203, 212-14.  *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 150 (S.D.N.Y. 2021).

## V.   CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss. However, should the Court grant any or all of Defendants' Motion, Lead Plaintiffs respectfully request leave to replead their claims. *Abessinio v. Beer*, No. 06 CIV 2777 (LTS) (FM), 2008 WL 11515514, at *1 (S.D.N.Y. May 9, 2008) (leave to amend should be freely given).

---

[10] In *In re eSpeed, Inc. Sec. Litig.*, only *two* defendants sold their shares. 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006).

[11] Plaintiffs do not "lump all Individual Defendants together," as Defendants would have this Court believe. Def. Br. at 33-34. Instead, Plaintiffs have alleged facts sufficient to demonstrate that each Defendant acted with scienter. The Complaint alleges that Defendants Watson, Rehnberg, Kirk, and Bullock were each aware of facts undermining their statements about Argo's construction line. ¶ 68. Further, Defendant Watson's motivation to conceal the fraud was evidenced by his stock sales, incentive compensation plan, and undisclosed perquisites. ¶¶ 158-59, 174, 177-82. Defendant Rehnberg expressed that construction defect was a concern and his motivation to conceal the fraud was evidenced by his stock sales and his incentive compensation plan. ¶¶ 142, 164-67, 175. Defendants Bullock and Kirk are alleged to have known material adverse facts and to have sold shares or been paid significant inventive compensation. ¶¶ 160-63, 168-79, 176.

[12] Each Defendant is alleged to have made one or more false statements during the Class Period. ¶ 203.

Dated: July 13, 2023

/s/  Daniel L. Berger
Daniel L. Berger
Karin E. Fisch
Mica A. Cocco
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, Floor 29
New York, NY 10017
Tel: 646-722-8500
Email: dberger@gelaw.com
        kfisch@gelaw.com
        mcocco@gelaw.com

*Counsel for Lead Plaintiffs Police & Fire
Retirement System City of Detroit and
Oklahoma Law Enforcement Retirement
System and the proposed Class*