UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE POLICE & FIRE RETIREMENT SYSTEM CITY OF DETROIT, Individually and On Behalf of All Others Similarly Situated, | : | |
| Plaintiff, | : | 22-cv-08971 (LAK) |
| v. | : | **ECF Case** |
| ARGO GROUP INTERNATIONAL HOLDINGS, LTD., SCOTT KIRK, KEVIN J. REHNBERG, MARK E. WATSON, III, and JAY S. BULLOCK, | : | |
| Defendants. | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay B. Kasner
Alexander C. Drylewski
Tansy Woan
Sarah E. Adams
One Manhattan West
New York, NY 10001-8603
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
alexander.drylewski@skadden.com
tansy.woan@skadden.com
sarah.adams@skadden.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 2

I. Plaintiffs Fail to Plead Any False or Misleading Statements ........ 2

A. Plaintiffs' CW Allegations Fail to Support Their Claims ........ 4

B. Argo Repeatedly Disclosed the Very Risks That Materialized ........ 5

C. Two Independent Third Parties Reviewed Argo's Estimated Reserves ........ 6

D. Accurate Financial Statements and Corporate Optimism are Not Actionable ........ 7

II. Plaintiffs Fail to Plead a Strong Inference of Scienter ........ 8

A. No Cognizable Motive to Commit Fraud Alleged ........ 8

B. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness ........ 9

C. Non-culpable Inferences Are Far More Compelling ........ 10

CONCLUSION ........ 10

**TABLE OF AUTHORITIES**

Page(s)

*In re Ambac Financial Group, Inc. Securities Litigation*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................2, 8

*In re BISYS Securities Litigation*,
397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005)....................10

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................4

*City of Sterling Heights Police & Fire Retirement System v. Reckitt Benckiser Group PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................7, 8

*In re Converium Holding AG Securities Litigation*,
2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006) ....................7

*In re Credit Suisse-AOL Securities Litigation*,
465 F. Supp. 2d 34 (D. Mass. 2006) ....................6

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................6

*In re Gentiva Securities Litigation*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................4

*KBC Asset Management NV v. MetLife, Inc.*,
2022 WL 480213 (2d Cir. Feb. 17, 2022)....................3

*Laboy v. Board of Trustees of Building Service 32 BJ SRSP*,
2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d Cir. 2013) .........2

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
900 F.2d 576 (2d Cir. 1990)....................7

*In re New Oriental Education & Technology Group Securities Litigation*,
988 F. Supp. 2d 406 (S.D.N.Y. 2013)....................7

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................8

*In re PXRE Group, Ltd., Securities Litigation*,
600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Group Ltd.*,
357 F. App'x 393 (2d Cir. 2009) ....................4

*Schiro v. Cemex, S.A.B. de C.V.*,
438 F. Supp. 3d 194 (S.D.N.Y. 2020)....................3

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)....................10

*In re Signet Jewelers Ltd. Securities Litigation*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)....................2, 4, 5, 8

*In re UBS AG Securities Litigation*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014)....................4, 6

*In re Weight Watchers International, Inc. Securities Litigation*,
2016 WL 2757760 (S.D.N.Y. May 11, 2016) ....................5

*In re Winstar Communications*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)....................6

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)....................5

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(2)(A)....................2

Fed. R. Civ. P. 9(b) ....................2

The Opposition ("Opp.")[1] confirms that Plaintiffs' claims rest upon an impermissible theory of "fraud by hindsight." While Plaintiffs focus on the fact that Argo revised its loss reserves, they do not dispute that such reserves are matters of opinion subject to *Omnicare*'s strict standards, or that Argo repeatedly disclosed that its reserves were merely "estimates" subject to "significant uncertainties" that could lead to materially unfavorable developments, including that they "could change by $150.0 million, in either direction." Nor do Plaintiffs dispute that Argo's reserves, which were never restated, were reviewed by two independent third parties. Rather, the Opposition resorts to (1) mischaracterizing Argo's 4Q21 disclosures as "admissions" of deficient underwriting guidelines—an argument belied by those same disclosures, and (2) complaints of mismanagement made by CWs that Plaintiffs concede never interacted with any Individual Defendant.

Plaintiffs also continue to conflate ***Argo Construction***—a business unit created in 2018, which is the subject of many of the challenged statements (and for which no negative announcement was ever made)—with ***construction defect claims***, which were underwritten across several pre-existing lines of business prior to 2018. Left with nothing else, Plaintiffs rely on Argo's CD Task Force, created to re-evaluate underwriting guidelines, to summarily conclude that earlier guidelines must have been deficient and loss reserves inadequate. But well-established case law demonstrates the impropriety of such inferences, which fail to support a securities fraud claim.

Finally, Plaintiffs' theory of scienter remains incoherent. The Opposition fails to explain why if Defendants wanted to conceal deficient loss reserves, Argo would hire multiple independent third-parties to review those reserves. Nor does it explain why Defendants would engage in a multi-year conspiracy spanning multiple leadership changes with no discernable goal other than to delay

[1] Capitalized terms shall have the same meanings ascribed in the opening brief (ECF No. 31 "Mot."). All emphasis is added and citations are omitted unless otherwise noted.

the inevitable while some Defendants *increased* their personal holdings of Argo stock. Contrary to Plaintiffs' suggestion, the PSLRA empowers courts to weigh competing inferences of fraud and reject illogical theories. The Court should do the same here and dismiss this action with prejudice.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD ANY FALSE OR MISLEADING STATEMENTS

Plaintiffs do not address *Omnicare* until page 18 of their Opposition, at which point they concede (as they must) that reserves are statements of opinion subject to the strict standards of *Omnicare*. (Mot. 12-13.) Yet Plaintiffs fail to identify any non-conclusory allegations showing that (i) any Individual Defendant did not believe their statements about reserves, (ii) any supporting facts they offered were untrue, or (iii) any Defendant omitted material facts that rendered their challenged statements misleading. (*Id.* 13-14.)

First, Plaintiffs rely on a one-sentence reference to the CD Task Force, summarily labeling it an "admission" of "long-known issues with the construction unit."[2] (Opp. 19.) But this ignores the text of the disclosure itself, which states that the Task Force "started some underwriting actions in the end of 2017," including "to strengthen[] underwriting guidelines"—***not*** that the underwriting guidelines were ever "deficient." (Ex. C, 4Q21 Tr. at 6, 10; AC ¶¶ 10, 96).[3] "It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence." *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,

---

[2] Plaintiffs misleadingly assert that "knowledge may be averred generally" (Opp. at 19 (citing Fed. R. Civ. P. 9(b)), when the PSLRA—applicable here—requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

[3] Though Plaintiffs refer to statements purportedly made about Argo's "disciplined underwriting" (Opp. 17, 19 n.4, 22), the cited AC paragraphs reveal that only three involve challenged statements, and none involve underwriting guidelines. (*See supra* § I.B., D.) None of these statements are actionable. (*See id.*; Mot. 22-26.) Regardless, Plaintiffs' cases are inapposite because they involve allegations of defendants loosening or disregarding underwriting standards. (Opp. 17.) *See, e.g.*, *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 251-52 (S.D.N.Y. 2010); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *8 (S.D.N.Y. Nov. 26, 2018). Such allegations are absent here.

2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d Cir. 2013); Mot. 16 n.6.[4] Critically, the Opposition also concedes that there are no allegations that the Task Force ever concluded the underwriting guidelines were deficient or that reserves should have been increased based on then-known information. (Mot. 15.)

Second, Plaintiffs' assertion that "Defendants 'omitted to disclose the known problems'" with Argo Construction is inadequate. (Opp. 19-20.) Plaintiffs ignore the well-disclosed distinction between Argo Construction (launched in 2018) and construction defect claims underwritten prior to 2018 (the subject of the 4Q21 reserve adjustment). This is fatal to Plaintiffs' theory since the AC only challenges statements involving Argo Construction (Mot. 6; AC ¶¶ 97, 101-02, 104-05, 107, 110-11, 114-15, 117), but Plaintiffs do not plead any facts—particularized or otherwise—that call into question the health or performance of Argo Construction. In fact, the same 4Q21 earnings call from which Plaintiffs repeatedly (and selectively) quote reaffirmed that Argo Constriction "has been performing according to expectations." (Ex. C, 4Q21 Tr. at 10-11.)

Third, the Opposition glosses over Argo's disclosure that the increase in reserves was based on new information obtained from a "recently concluded" 4Q21 reserve review. (Mot. 9-11, 14-15.) Though Plaintiffs assert Defendants never explained what this new information was (Opp. 21 n.5, 24), Defendants described in detail across multiple disclosures that construction defect claims are "characterized by extreme time lags for both reporting and payment of claims," and that its 4Q21 analysis showed an increase in the difference between actual incurred losses and expected

---

[4] Plaintiffs' attempt to distinguish *KBC Asset Management NV v. MetLife, Inc.*, 2022 WL 480213 (2d Cir. Feb. 17, 2022), falls flat. (Opp. 24-25.) There, the court rejected plaintiffs' reliance on improvements to internal processes as evidence of defendants' knowledge of a problem for "fail[ing] to allege any facts strongly supporting this inference." *Id.* at *2 (*See* Mot. 31-32.) Plaintiffs here also fail to allege any facts supporting this inference, and instead mischaracterize the 4Q21 earnings call, which did *not* say the CD "Task Force was created to 'strengthen' knowingly weak underwriting guidelines." (Opp. 25.) *See Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198-99 (S.D.N.Y. 2020) (dismissing securities claims that "rel[y] primarily on mischaracterizations of [defendant's] own disclosures").

losses "in business units with significant exposure to claims alleging construction defect." (Mot. 10-11.)[5] Plaintiffs offer no particularized facts to undermine these explanations.

**A. Plaintiffs' CW Allegations Fail to Support Their Claims**

Plaintiffs' attempt to rehabilitate their CW allegations falls far short. (Opp. 25-29.) In fact, Plaintiffs do not dispute (and thus concede) that no CW had direct contact with any Individual Defendant. (Opp. 25; Mot. 17.) *See In re UBS AG Sec. Litig.,* 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, 752 F.3d 173 (2d Cir. 2014). Indeed, Plaintiffs' suggestion that "the CWs paint a picture of inadequate underwriting practices and a pervasive culture of reserve suppression" (Opp. 25) falls apart when one looks at what is actually pled in the AC.

First, no CW reported that Rehnberg "admitted" there were "issues plaguing the construction defect business." (Opp. 25.) Not only was there never a "construction defect business," but only one CW claims that Rehnberg stated that "construction defect . . . 'was a concern'" (AC ¶ 55), and even that allegation says nothing about what that concern was or what information Rehnberg had that supported such "concern." *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 539 (S.D.N.Y.), *aff'd sub nom.*, 357 F. App'x 393 (2d Cir. 2009). Plaintiffs similarly fail to allege particularized facts that any Individual Defendant had access to any specific, contrary information during the Class Period. As explained by Plaintiffs' own authority, this is fatal to their claims. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013) (CW allegations insufficient where a "potentially fatal" issue concerned whether defendants "knew or had access to" the allegedly fraudulent information and practices) (Opp. 27-28).

Second, Plaintiffs attempt to remedy their lack of specificity through vague and subjective

[5] This is precisely like the "new information" in *Chapman v. Mueller Water Products, Inc.*, where the company determined during a 2Q18 review that products had been failing at higher-than-expected rates. 466 F. Supp. 3d 382, 408 n.8 (S.D.N.Y. 2020). Plaintiffs' reliance on *Signet Jewelers* is inapposite. (Opp. 27.) Plaintiffs there alleged that the CW witnessed executives "contemplate[] raising reserves" but "elect[] not to do so." 2018 WL 6167889, at *13.

inuendo asserting that all four Individual Defendants witnessed a supposed "culture" of reserve suppression. (Opp. 25.) But this allegation comes only from CW4, who fails to specify any meeting that any Individual Defendant actually attended, and whose knowledge is based on the purported fact that CW4 "attended a couple of [these] meetings over the course of" nineteen years. (AC ¶¶ 57, 67.) But unlike the CW in *Signet Jewelers*, who attended bad debt meetings *with* the individual defendants, 2018 WL 6167889, at *13, no CW here claims to have done the same.

Third, Plaintiffs attempt to legitimize their "culture" allegations by asserting that "[t]he CWs offer objective facts to support their statements." (Opp. 27.) Notably, however, the only "objective facts" come from CW4's purported "observations" and *opinions* that "claims personnel were afraid to 'put up reserves.'" (*Id.* 27, 29; AC ¶ 59.) Claims about Argo's purported mismanagement of Argo's claims process (versus its *reserving* process) also fall short. (Opp. 28.)[6]

**B. Argo Repeatedly Disclosed the Very Risks That Materialized**

Plaintiffs also fail to rebut Argo's robust warnings that reserves were estimates that could be increased. (Mot. 7-9, 21.) This is not a "truth-on-the-market defense." (Opp. 21.) Rather, such disclosures rebut any suggestion that any purported omission was material. (Mot. at 21.) Though Plaintiffs dismiss Argo's disclosures as "inadequate" (Opp. 21), they ignore all but one of the many detailed disclosures cited throughout Defendants' Opening Brief (Mot. 7-9, 21-22). The sole disclosure they do address—that Argo's reserve development could be adjusted by $150 million in either direction—is not a "general disclosure." (Opp. 21.) It is specifically tailored to the particular liability line at issue and changed over time as Argo's estimates changed. (Ex. B, FY20

[6] Despite Plaintiffs' claim to the contrary, *In re Weight Watchers International, Inc. Securities Litigation*, 2016 WL 2757760, at *7 (S.D.N.Y. May 11, 2016), is directly on point. (Opp. 28.) Indeed, they fail to explain how "observations" during meetings are anything but "a characterization or opinion of the witness, not an objectively testable statement of fact." *Id.* The same is true of *Woolgar v. Kingstone Cos., Inc.*, which held that CW allegations describing "an environment of fear" were "plainly insufficient." 477 F. Supp. 3d 193, 222 (S.D.N.Y. 2020).

10-K at 75; Ex. L, FY19 10-K at 76; Ex. G, FY18 10-K at 72.) Indeed, Argo's filings are replete with detailed warnings emphasizing that "the calculation and setting of the reserves for losses . . . is an inherently uncertain process dependent on estimates." (Ex. G, FY18 10-K at 21.)

Moreover, Plaintiffs' suggestion that these disclosures "undermine[] the adequacy" of "Argo's consistent statements regarding its disciplined underwriting and long-term favorable reserve development" (Opp. 22) are belied by the AC itself. As Plaintiffs readily admit, they only challenge two statements concerning reserves and no statements concerning "disciplined underwriting." (*Id.* 19, 22.)[7] Critically, none of the challenged statements assured investors of the adequacy of its reserves. *See UBS AG*, 2012 WL 4471265, at *6. Rather, Argo repeatedly emphasized that it "conduct[s] reserve reviews of all ongoing businesses each quarter," and it was promptly after one such review that Argo increased its reserves. (Ex. K, 3Q19 Tr. at 8.)

**C. Two Independent Third Parties Reviewed Argo's Estimated Reserves**

Defendants' honest belief in the accuracy of Argo's reserve estimates are confirmed by the fact that Argo's reserves and financial statements were reviewed by both an independent actuary and outside auditor and were not restated. (Mot. 16.) The Opposition fails to show otherwise. Plaintiffs incorrectly suggest that these facts are inappropriate on a motion to dismiss (Opp. 30), ignoring that numerous courts have credited such arguments at this stage (Mot. 16). Plaintiffs also have no answer to why Argo would have hired multiple third parties to review its reserves during the Class Period if it was attempting to conceal fraud. (Opp. 30.)[8]

---

[7] Plaintiffs' cases, involving a failure to warn of probable harm, are readily distinguishable. (Opp. 21-22.) *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 176 & 193 (S.D.N.Y. 2010) (general statements that loan losses "could be affected by market risks and were subject to change" did not warn that E*TRADE changed its business model and began "purchasing extremely high risk" instruments); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 n.7 (D. Mass. 2006) (similar).

[8] Plaintiffs misstate *In re Winstar Communications*, 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006), where the court noted "good faith reliance on an accountant *is* a viable defense to scienter." (Opp. 30.) Plaintiffs' other cases do not

### D. Accurate Financial Statements and Corporate Optimism are Not Actionable

Plaintiffs' remaining claims concerning Argo's accurately reported statements about Argo Construction's financial performance and general statements of corporate optimism, neither of which reference construction defect reserves or underwriting guidelines, are similarly deficient. As an initial matter, Plaintiffs attempt to defend, in a footnote, their use of boilerplate language copied throughout the AC. (Opp. 15 n.3.) It is not that "the same underlying facts" "demonstrate falsity and scienter" (*id.*), but that Plaintiffs repeat "nearly verbatim" "the same formulaic response as to why the statements are false" (Mot. at 23 (citing cases)) where the statements range from metrics accurately stating Argo's performance to statements that Argo has "[c]ompetitive advantages" and a "specialty underwriting practice" (*e.g.*, AC ¶¶ 97, 102, 110-12).

Regardless, Plaintiffs concede they "are not challenging the literal accuracy of Argo's [] financial performance." (Opp. 16.) Instead, they assert that "[s]tatements about Argo Construction's performance were false" because, in part, Defendants "misled investors as to the health of the Company's construction business." (*Id.*) But Argo never announced that the reserve adjustment stemmed from purported issues with Argo Construction. Rather, Argo announced that construction defect claims underwritten in other business lines prior to 2018 (*before* the creation of Argo Construction) drove the increase. (Ex. M, Feb. 8, 2022 8-K at 1).[9] *See City of Sterling Heights*, 587 F. Supp. 3d at 88 (dismissing "quantitative statements about past performance" because the "figures themselves are not alleged to have been inaccurate").

---

suggest otherwise. *See In re Converium Holding AG Sec. Litig.*, 2006 WL 3804619, at *2, *14 (S.D.N.Y. Dec. 28, 2006) (disputing ***which version of*** a consultant's report controlled); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 427 (S.D.N.Y. 2013) ("magnitude" and "obviousness" of fraud provided stronger inference).

[9] *McMahan & Co. v. WherehouseEntertainment*, 900 F.2d 576, 581 (2d Cir. 1990), is inapposite. (Opp. 15-16.) There, the court found an issue of fact on whether debenture holders' right to tender was illusory because it was presented as a valuable right and provided a special feature of protection, but in fact did not provide such rights or protections.

Finally, Plaintiffs challenge generic statements that Argo is "a leader in multiple specialty lines," and that Argo Construction is a "new and successful specialty underwriting practice," and has "outstanding underwriting and claims expertise," but Plaintiffs' own authority explains why these are non-actionable. (Opp. 17-18; Mot. 25.) *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89, 92 (S.D.N.Y. 2022) ("'very talented' employees," "unique . . . leadership model," "strong culture and discipline" deemed puffery).[10] Unlike in *Signet Jewelers*, where the challenged statements concerned "the strength and management of Signet's credit portfolio," 2018 WL 6167889, at *12, none of the statements here tout the financial health of Argo or Argo Construction nor claim that reserves (or underwriting guidelines) were "adequate" or "strong." (Opp. 17.) And, unlike in *Ambac Financial Group*, 693 F. Supp. 2d at 250, where a small failure in Ambac's portfolio could "wipe out Ambac's excess capital," Plaintiffs here have not alleged construction defect claims posed any similar concern.[11]

## II. PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

### A. No Cognizable Motive to Commit Fraud Alleged

Plaintiffs' reliance on alleged stock sales and personal compensation fail to demonstrate a cognizable motive. (Mot. 27-30; Opp. 31-35.) First, Plaintiffs do not refute that a "decisive [factor] in assessing" stock sales allegations is comparing how many shares were sold versus the total number that could have been sold. (Mot. 28.) Nor do they dispute that Watson's sales were only 6.7% of his total holdings, or that Rehnberg and Bullock's holdings *increased* during the Class Period. (*Id.*) Where Plaintiffs do engage, their response is unavailing. While they argue that the fact that Kirk never sold shares is not "dispositive" (Opp. 34), they fail to rebut that courts will

---

[10] Plaintiffs fail to dispute—and thus concede—that Argo has "competitive advantages" is classic puffery. (Mot. 25.)

[11] This case is also unlike *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000), where the complaint identified "with particularity several documentary sources" supporting plaintiffs' allegation that serious inventory problems existed."

discredit stock sale allegations where not all defendants sell during the class period (Mot. 27).

Additionally, contrary to Plaintiffs' conclusory claim that the "[n]ature of [Defendants'] trades . . . render it impossible to accurately calculate net profits" (Opp. 33 n.9), parties routinely calculate net proceeds—as required by Second Circuit case law to infer anything about a seller's motive (Mot. 27-28). Even more critically, the Opposition confirms that neither the timing nor amount of shares sold here was unusual. Plaintiffs simply parrot the total number of shares that Watson, Rehnberg and Bullock purportedly sold and summarily claim that they "knew, yet failed to disclose, that the newly-formed construction division was facing issues." (Opp. 33.) But again, Plaintiffs plead no facts that Argo Construction was "facing issues," and ignore that Argo Construction was launched years before the purported fraud was revealed to the market. (*Supra* § I; Mot. 28-29.) Plaintiffs also do not dispute that all three individuals sold shares often right after public filings, further undermining any inference of scienter. (*Id.* 29.)

Second, Plaintiffs' incentive compensation allegations fail because they do not plead any non-conclusory fact to suggest that "any increase in reserves would necessarily offset premium receivables on Argo's balance sheet and thereby affect reported financial benchmarks" such as underwriting income. (AC ¶ 156.) Rather, a reserve deterioration would be accounted for as an expense on the income statement and a liability on the balance sheet, and thus would *not* directly impact premium income. (*See* Ex. F, FY21 10-K at 59, 75.) Regardless, courts routinely dismiss compensation allegations as insufficient. (Mot. 29-30.)

**B. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness**

Plaintiffs also fail to plead conscious misbehavior or recklessness. (*Id.* 30.)[12] First,

---

[12] Plaintiffs fail to respond to, and thus concede, that vague references to PowerPoint presentations, executive turnover, and a prior SEC investigation into Watson are insufficient to support a strong inference of scienter. (Mot. 31-33.)

Plaintiffs cite no authority for the baseless proposition that "[i]mplicit" in Defendants' strengthening of underwriting guidelines "is the acknowledgement that Defendants knew the standards were previously weak" (Opp. 24-25), and instead ignore Defendants' authorities holding otherwise (Mot. 31-32). Plaintiffs also have not alleged any non-conclusory facts supporting their assertion that "weak underwriting standards" translates to inadequate *reserves*. (Opp. 24.)[13]

Second, Plaintiffs' CW allegations do not support an inference that "Defendants knew that their statements about the health of Argo Construction were false and misleading." (Opp. 25; *supra* § I.A.) Plaintiffs' cases are thus wholly inapposite because Plaintiffs have not pled *any* fact demonstrating the CWs "had direct contact with" the Individual Defendants.

Finally, Plaintiffs' reliance on the "core operations doctrine" similarly fails—that Argo placed "importance" on Argo Construction is irrelevant given construction defect *claims* caused the reserve increase. (Opp. 29.) Plaintiffs also do not refute the doctrine does not apply because Argo Construction represented less than 10% of Argo's gross written premiums. (Mot. 32-33.)

### C. Non-culpable Inferences Are Far More Compelling

Plaintiffs' strained theory is far outweighed by non-culpable explanations. (*Id.* 34.) Plaintiffs cite no authority to refute Defendants' point that it would make no sense to suppress reserves knowing those amounts would eventually come due. (Opp. 30.) They also ignore *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), which emphasized that "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."[14]

## CONCLUSION

Accordingly, Defendants respectfully request that the AC be dismissed with prejudice.

---

[13] The size of a reserve charge—here, only 6.5% of Argo's total FY 2021 revenue (Ex. F, FY-21 10-K at 56)—does not on its own establish scienter. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (Kaplan, J.).

[14] Plaintiffs' failure to plead a primary violation or culpable participation dooms their Section 20(a) claim. (Mot. 35.)

Dated: New York, New York
August 14, 2023

/s/ *Jay B. Kasner*

Jay B. Kasner
Alexander C. Drylewski
Tansy Woan
Sarah E. Adams
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
alexander.drylewski@skadden.com
tansy.woan@skadden.com
sarah.adams@skadden.com

*Attorneys for Defendants*