UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE POLICE AND FIRE RETIREMENT SYSTEM
CITY OF DETROIT and OKLAHOMA LAW
ENFORCEMENT RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly Situated,

                              Plaintiffs,

            -against-                                                22-cv-8971 (LAK)


ARGO GROUP INTERNATIONAL HOLDINGS, LTD., et al.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/12/24

## MEMORANDUM OPINION

Appearances:

> Daniel L. Berger
> Karen E. Fisch
> Mica A. Cocco
> GRANT & EISENHOFER P.A.
> *Attorneys for Lead Plaintiffs*

> Jay B. Kasner
> Alexander C. Drylewski
> Tansy Woan
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
> *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

Lead Plaintiffs Police & Fire Retirement System City of Detroit ("Detroit P&F") and

Oklahoma Law Enforcement Retirement System ("OLERS") (together, "Lead Plaintiffs") bring this

federal securities class action against Argo Group International Holdings, Ltd. ("Argo") and its

2

former and current executives for alleged violations of various provisions of the Securities Exchange Act of 1934 ("Exchange Act").[1]  The heart of the case involves Lead Plaintiffs' allegations that defendants failed to disclose key risks concerning its underwriting of construction defect claims from 2011 to 2017, and that Argo shareholders suffered when the risks matured and came to light in August 2022 [2]  Defendants now move to dismiss the amended complaint ("AC") for failure to state a claim upon which relief may be granted.[3]  For the reasons set forth below, defendants' motion is granted.

## Facts[4]

*I.    The Parties*

Argo is an insurance underwriter specializing in "niche" products or businesses for which obtaining coverage is often difficult.[5]  Based in Bermuda, the company operates two primary reporting segments: a U.S. business and an international business, the former of which accounts for

---

[1]      Dkt 29 (Amended Complaint, "AC") ¶¶ 200–215.

[2]      *Id.* ¶¶ 1–17.

[3]      Dkt 30 (Def. Mot.).

[4]      The Court assumes familiarity with the underlying facts and the procedural history and thus provides the minimal background necessary to decide the motion.  For the purpose of this motion, the Court assumes the truth of AC's allegations and draws all inferences favorable to plaintiff to which the allegations reasonably are susceptible.

[5]      AC ¶ 2.

the majority of Argo's gross written premiums.[6]

The four individual defendants named in the AC are current or former officers of Argo. Defendant Mark E. Watson III served as Argo's chief executive officer ("CEO") from 2000 until November 5, 2019, at which point he retired from his position at the company.[7] Defendant Kevin J. Rehnberg then took over as interim CEO from Mr. Watson until he formally was appointed to the position on February 18, 2020, serving in that role until March 7, 2022.[8] Prior to working as the company's CEO, Mr. Rehnberg was president of Argo Group U.S. beginning in March 2013.[9] Defendant Scott Kirk is the current chief financial officer ("CFO") of Argo, a position he has held since March 16, 2021.[10] His predecessor, defendant Jay S. Bullock, served as Argo's CFO and executive vice president from May 5, 2008 until March 15, 2021.[11]

Lead Plaintiff Detroit P&F is a retirement system that administers retirement and death benefits to police officers and firefighters in Detroit, Michigan, managing $2.8 billion in assets as of June 30, 2022.[12] Lead Plaintiff OLERS is a pension fund that provides retirement benefits to

---

[6]      *Id.* ¶¶ 2–3.

[7]      *Id.* ¶ 25.

[8]      *Id.* ¶ 26.

[9]      *Id.*

[10]     *Id.* ¶ 28.

[11]     *Id.* ¶ 27.

[12]     *Id.* ¶ 22.

4

law enforcement workers and their families in Oklahoma, managing over $1 billion in assets.[13] Both Lead Plaintiffs acquired common stock in Argo between June 11, 2018 and August 9, 2022 (the "Class Period"), during which time the events in question are alleged to have occurred.[14]

## 2. Background

The focus of Lead Plaintiffs' allegations is what are called "construction defect claims." In essence, these are claims filed on policies insuring commercial and residential contractors that cover "physical loss or damage due to defective components of a building, design, materials, or workmanship that requires repair or replacement."[15] As an underwriter focused on this niche or specialty market, Argo has underwritten insurance for the construction business for many years out of its U.S. operations. Indeed, defendant Kevin Rehnberg characterized Argo's construction segment in March 2021 as "a growth, profit and digital leader for the organization."[16]

Before June 2018, Argo did not have a dedicated group underwriting its construction-specific policies. Instead, Argo's construction-related underwriting was spread across several different lines of business within its excess and surplus lines group, which focused on specialty U.S.-based risks that were difficult to underwrite in the traditional insurance market.[17] However,

---

[13]
    *Id.* ¶ 23.

[14]
    *Id.* ¶¶ 1, 22–23.

[15]
    *Id.* ¶ 79.

[16]
    *Id.* ¶ 111.

[17]
    *Id.* ¶¶ 4, 80.

beginning on June 11, 2018 — the first date of the defined Class Period — Argo broke out its construction business into Argo Construction, a stand-alone unit formed to underwrite construction-specific policies.[18]  The company touted this change as designed to target more effectively an industry that was "projected to be among the fastest growing business sectors in the United States."[19]

According to the AC, defendants repeatedly and misleadingly touted the strength of Argo's construction business between 2018 and 2022.  These statements, which Lead Plaintiffs allege were false or misleading, generally fall into three categories: (1) statements regarding Argo's reserves for construction defect claims, (2) statements reporting or remarking on Argo Construction's financial performance, and (3) general statements of corporate optimism.[20]  For example, in a Form 10-Q filed on August 6, 2021, the company represented that its "[n]et favorable prior-year reserve development for the second quarter of 2020" was "primarily related to favorable development in specialty lines related to our surety and construction businesses . . . ."[21]  On February 11, 2019, defendant Mark Watson similarly claimed that Argo's construction segment was one of "the portfolios of risk with the best loss ratios" at the company.[22]  And defendants on multiple occasions touted Argo Construction as "successful," a "leader," and a "highly efficient operation"

---

[18]     *Id.* ¶ 81.

[19]     *Id.*

[20]     *Id.* ¶¶ 96–118.

[21]     *Id.* ¶ 116.

[22]     *Id.* ¶ 99.

with "competitive advantages."[23]  All the while — according to allegations in the AC that plaintiffs claims are supported by confidential witness statements — defendants knew that Argo Construction was not as financially solid as it presented itself and as was manifested by actions company executives allegedly took to minimize claims and suppress reserves.[24]

On February 8, 2022, Argo announced in a press release that it anticipated having to increase its aggregate loss reserves by $130 to $140 million, primarily driven by underfunded reserves related to construction defect claims for the years 2017 and earlier.[25]  Two weeks later, the company confirmed a net adverse prior year reserve development for the fourth quarter of 2021 of $132.3 million, with roughly $77 million of that adverse prior year development coming from construction defect claims within Argo's U.S. operations.[26]  In a call with investors, then-CEO Kevin Rehnberg explained that "[o]ver 95% of the construction defect prior year, adverse development . . . applied to 2017 and prior years," a period when such policies were written "outside of [Argo's] core construction business."[27]  Mr. Rehnberg revealed that the company had created a task force at the end of 2017 to examine its construction underwriting guidelines, which had led to the decision

---

[23]
    *See, e.g.*, *id.* ¶¶ 97, 111–113.

[24]
    *See generally id.* ¶¶ 37–71.

[25]
    *Id.* ¶ 119.

[26]
    *Id.* ¶¶ 123, 125.

[27]
    *Id.* ¶ 125.

to break out Argo Construction as a separate unit in 2018.[28]  After conducting a review of Argo's reserves during fourth quarter 2021, its updated analyses reported a significant difference between actual and expected losses for those construction-related policies underwritten between 2011 and 2017, which became the primary driver for the company's announced reserve increase in February 2022.[29]

As a result of this series of announcements, Argo's common stock declined significantly.  On August 8, 2022, Argo announced that it had entered into a Loss Portfolio Transfer agreement with a wholly-owned subsidiary of Enstar Group Limited ("Enstar").[30]  The agreement transferred to Enstar the liability for a majority of Argo's U.S. casualty insurance reserves for accident years 2011 to 2019, with Enstar providing cover for $746 million of Argo's reserves and an additional $275 million of cover in excess of $821 million, up to a policy limit of $1.1 billion.[31] The company anticipated that the transaction would entail an after-tax charge of roughly $100 million.[32]  By August 10, 2022, Argo's common stock had declined further, having lost approximately 55 percent of its value in less than six months of 2022.[33]

---

[28]    Id. ¶¶ 125–27.

[29]    Id.; see also Dkt 32-6 (Woan Dec. Ex. F) at 63.

[30]    Id. ¶ 130.

[31]    Id. ¶¶ 130–31.

[32]    Id. ¶ 130.

[33]    Id. ¶ 134.

*3.    Procedural History*

Based on these substantive allegations, Lead Plaintiff Detroit P&F initiated this action against the current defendants as well as Thomas Bradley, Argo's current CEO.[34] The Court granted Detroit P&F and OLERS's motion for appointment as Lead Plaintiffs on January 18, 2023,[35] following which they filed the AC and dropped Mr. Bradley as a defendant.

The AC asserts two causes of action. It alleges that: (1) all remaining defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and (2) defendants Watson and Rehnberg are liable under Section 20(a) of the Exchange Act.[36] Both counts are grounded in the allegations that defendants made false or misleading statements concerning Argo Construction's defect reserves, financial performance, and corporate outlook, specifically as they related to construction defect claims that the company underwrote between 2011 and 2017.

Defendants seek to dismiss the AC for: (1) failing to plead any material false or misleading statement or omission, (2) failing to plead *scienter* under the applicable heightened pleading standard, (3) failing to plead the elements of scheme liability under Rule 10b-5, and (4) failing adequately to state a sufficient claim for control person liability under Section 20(a) of the Exchange Act.[37]

---

[34] Dkt 1.

[35] Dkt 22.

[36] AC ¶¶ 200–215.

[37] Dkt 31 (Def. Mem.) at 12–35.

## Discussion

### 1.    Legal Standard

To survive a Rule 12(b)(6) motion, a complaint must plead facts that "state a claim to relief that is plausible on its face."[38] In most cases, a claim is facially plausible if "the plaintiff pleads factual content that permit the reasonable inference that the defendant is liable for the misconduct alleged."[39] This requirement usually is satisfied by "a short and plain statement of the claim showing that the pleader is entitled to relief."[40] Complaints alleging securities fraud, however, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)[41] which "require[s] a securities fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[42] With regard to Rule 9(b), the Court of Appeals has cautioned that, "[a]lthough pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'"[43]

---

[38]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[39]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[40]    Fed. R. Civ. P. 8(a)(2).

[41]    *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

[42]    *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462–63 (2d Cir. 2019) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[43]    *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)).

In addition to the stricter standards of Rule 9(b), claims brought under Section 10(b) and Rule 10b-5 of the Exchange Act must satisfy also the requirements of the Private Litigation Securities Reform Act of 1995 ("PSLRA"). Complaints brought under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"[44] — that is, with "a mental state embracing intent to deceive, manipulate, or defraud,"[45] or "recklessness"[46] — in order sufficiently to plead the element of *scienter*.

As noted, a court in deciding a motion to dismiss "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor.[47] But it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."[48] "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"[49] And even "[w]here a document is not incorporated

---

[44] 15 U.S.C. § 78u–4(b)(2)(A).  Because "the PSLRA did not change the basic pleading standard for scienter in this circuit," this Court, consistent with the practice of other courts in this district and circuit, considers pre-PSLRA case law.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted).

[45] *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 177 (2d Cir. 2023) (internal quotation marks omitted).

[46] *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

[47] *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

[48] *Id.*

[49] *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in securities action, court may consider "legally

by reference, the court [nevertheless] may consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[50]

### 2.    Count One: Violations of Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act prohibits both sellers and buyers of securities from employing "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."[51] Rule 10b-5, issued pursuant to Section 10(b), makes it unlawful in connection with a purchase or sale of a security "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."[52]

To state a claim under Section 10(b), a complaint must allege that the defendant

---

[50]

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

The exhibits submitted in support of the motion to dismiss (Dkt 32, Exs. A–CC) all are appropriately considered on a motion to dismiss save Exhibits W through Z, which are SEC Form 4s apparently offered to prove the truth of the statements they contain. The Court excludes them from consideration on this motion and thus avoids converting the motion into one for summary judgment. *See, e.g., Courtenay Communications, Inc. v. Hall,* 334 F.3d 210, 213 (2d Cir. 2003); *Friedl v. New York,* 210 F.3d 79, 83 (2d Cir. 2000); *In re SKAT Tax Refund Scheme Litig.,* No. 18-CV-05053, 2020 WL 7496272, at *3 (S.D.N.Y. Dec. 21, 2020).

[51]

15 U.S.C. § 78j(b).

[52]

17 C.F.R. § 240.10b-5.

"(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."[53]  "The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct."[54]  Under the PSLRA, the complaint must state facts relating to *scienter* "with particularity" such that they "giv[e] rise to a strong inference" that defendants possessed the requisite state of mind.[55]

Defendants contend that Lead Plaintiffs fail to plead the first and second elements of a claim brought under Section 10(b) — that is, that defendants made any material misstatement of fact or that they possessed the necessary intent to deceive or defraud the investing public.  Lead Plaintiffs vigorously contest each argument.

### A.    *Material False or Misleading Statements*

The AC lists eighteen statements or sets of statements that are alleged to have been materially false or misleading by omission.[56]  As explained above, these statements generally can be

---

[53]    *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (adding the implicit elements of reliance and proximate cause, neither of which are contested in this matter).

[54]    *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (quoting *First Jersey Sec.*, 101 F.3d at 1467).

[55]    15 U.S.C. § 78u–4(b)(2)(A).  Because "the PSLRA did not change the basic pleading standard for scienter in this circuit," this Court, consistent with the practice of other courts in this district and circuit, considers pre-PSLRA case law. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted).

[56]    AC ¶¶ 96-118.

grouped in three categories: (1) statements regarding Argo's reserves for its construction defect claims, (2) statements reporting or remarking on Argo Construction's financial performance, and (3) general statements of corporate optimism.[57] Lead Plaintiffs contend that: (1) statements on Argo's reserves constituted actionable opinions, (2) statements on financial performance and corporate optimism were materially misleading by virtue of defendants' omissions of facts related to its 2011–2017 construction defect claims; and (3) statements of corporate optimism were material to investors and did not constitute mere "puffery."[58] Each argument is addressed in turn.

### 1.    Statements on Argo's Reserves

The AC includes only two statements that actually refer to Argo's reserves, with both discussing the company's reserves for second quarter 2020. The statements read: "[n]et favorable prior-year reserve development for the second quarter of 2020 was $0.6 million and primarily related to favorable development in specialty lines related to our surety and construction businesses, partially offset by unfavorable development in liability and special property lines."[59] Regardless, the fact and reporting of Argo's reserve levels implicitly underpins many of the other challenged statements concerning the financial performance and outlook of the company.[60]

---

[57]    *Id.*

[58]    Dkt 33 (Opp. Mem.) at 15–21.

[59]    AC ¶¶ 106, 116.

[60]    As explained elsewhere, reserves and changes therein affect income statements and balance sheets. *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 55-57 (S.D.N.Y. 2015).  Nevertheless, Lead Plaintiffs deny any

14

At the outset, the Court recognizes that statements by a corporation about its reserves are statements of opinion rather than fact. Such determinations are "inherently subjective" rather than "matter[s] of objective fact" because they "depend[] on a variety of predictable and unpredictable circumstances" and thus "reflect management's opinion or judgment."[61] Plaintiffs themselves do not contest this.[62] The reason this distinction is important is because "it is substantially more difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that such a statement [of opinion] is false than it is to allege adequately (or prove) that a statement of pure fact is false."[63] Indeed, the Second Circuit historically has "recognized sparingly few circumstances in which a statement of opinion would be actionable" under Section 10(b), rather than a statement of fact that could be proven true or false.[64]

In 2015, however, the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund* ("*Omnicare*") expanded the circumstances in which opinion statements may form the basis of a lawsuit.[65] Under *Omnicare*, statements of opinion

---

[61] challenge to "the literal accuracy of Argo's reported financial performance." Opp. Mem. at 16.

*Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *see also City of Westland*, 129 F. Supp. 3d at 68–69 ("While [reserve] estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief, not of fact.") (internal citations and quotation marks omitted).

[62] *See* Opp. Mem. at 18.

[63] *City of Westland*, 129 F. Supp. 3d at 68–69.

[64] *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020).

[65] 575 U.S. 175 (2015).

may be actionable in three circumstances: (1) if "the speaker did not hold the belief [the speaker] professed," (2) if the opinion "embedded statements of fact," or (3) if the opinion omits facts that "ma[d]e [the] statement of opinion . . . misleading to an ordinary investor."[66]  None of these three exceptions applies to Argo's statements regarding its reserves.

      The core of Lead Plaintiffs' argument concerns defendants' creation of the 2017 task force that was intended to examine Argo's construction underwriting guidelines.  They allege that the existence of this task force was mentioned to investors for the first time during the February 2022 earnings call in which company executives explained the decision to increase reserves by $132.3 million, and that it otherwise was omitted from defendants' previous statements.[67]  They characterize its creation as an "admission that [there were] long-known issues within [Argo's] construction unit," specifically that "weak underwriting guidelines, over-exposures, and other material issues [had been] pervading the Company's construction business for at least five years."[68]  From this premise, Lead Plaintiffs contend in essence that defendants did not hold the beliefs about Argo's reserves that they professed and that they failed to disclose known problems about the company's construction segment, thus making their statements concerning Argo's reserves  misleading.[69]

---

[66]
    *Id.* at 185–88.

[67]
    Opp. Mem. at 11–12, 19–20.

[68]
    *Id.* at 19–20.

[69]
    *Id.*; *see also* AC ¶ 118.  Lead Plaintiffs do not appear to allege, either in their motion or in the AC, that there were untrue "embedded statements of fact" in Defendants' alleged statements such as to make them actionable opinions.  *Omnicare*, 575 U.S. at 185.

Despite Lead Plaintiffs' efforts, it is a far stretch to characterize the creation of the 2017 task force as an "admission" by defendants that they knew that Argo's construction defect reserves were inadequate years before they increased them. To begin, the 2017 task force actually was not formed to analyze the sufficiency of the company's existing construction defect *reserves*. Rather, the intent, Lead Plaintiffs allege in the AC, was to strengthen Argo's construction underwriting *guidelines* and restrictions prospectively.[70]  Moreover, nothing about the 2017 task force or its description by defendants suggested that "Argo's construction portfolio had been *too* exposed for prior years" or that its underwriting guidelines "had been *too* lax," as Lead Plaintiffs attempt to portray.[71]  Rather, Lead Plaintiffs jump to that conclusion from statements outlining the mere fact that underwriting guidelines and exposures were reviewed and improved after 2017, nothing more.[72]

With this understanding, Lead Plaintiffs' argument rests on a logical fallacy: the fact that defendants acted to tighten underwriting guidelines and exposures going forward does not show that their reserves for past underwritten policies were inadequate, let alone that they knew or believed they were. In essence, the fact that underwriting guidelines and exposures changed in 2017 means appropriate reserves for claims on future policies might be different, but does not suggest that the reserves for previously underwritten policies were, or were thought to be, inadequate given those earlier guidelines. Indeed, the AC alleges *no* facts showing or even suggesting that Argo's 2017 task

---

[70]    *See* AC ¶¶ 125–27; *see also* Def. Mem. at 15.

[71]    Opp. Mem. at 20 (emphasis added).

[72]    *See* AC ¶¶ 125–27.

force concluded that construction defect reserves for its 2011 to 2017 policies should have been increased at that time or even that it reviewed such an issue. Accordingly, Lead Plaintiffs twist the disclosure of the 2017 task force to represent something that it is not — an admission of knowledge that certain reserves were inadequate in 2017 — when in reality it is not alleged to have analyzed anything of the sort and merely recommended a change in the way Argo would conduct its construction underwriting business going forward.

Nor do Lead Plaintiffs' confidential witness allegations save their complaint. Most obviously, the majority of the confidential witnesses — and many of the grievances they raise — have nothing to do with the adequacy of Argo's construction defect reserves from 2011 to 2017. For example, a significant portion of the allegations concern claims of chronic understaffing and alleged abusive behavior by management in the company's claims management division,[73] which admittedly are concerning in their own right but lend no proof of knowledge of inadequate reserves. Moreover, confidential witnesses 2, 3, and 4 had no actual connection to or engagement with the company's 2011 to 2017 reserves, with those employees working in underwriting (from 2017-2022), business development, and claims management for the environmental division, respectively.[74] And the AC fails to allege that *any* of the confidential witnesses had direct contact with the named individual defendants, severely undermining their ability to assess or speak to the knowledge those defendants possessed about company reserves.

---

[73]    *See, e.g., id.* ¶¶ 33, 37, 41, 44, 62, 64, 69–70.

[74]    *Id.* ¶¶ 45, 52, 57.

The issues with confidential witness statements do not end there. Allegations that actually speak to the adequacy of reserves — such as defendants allegedly cultivating a culture of "reserve suppression" or remarking that construction defect claims were "something that was a concern"[75] — are too vague and unspecific to justify an inference that defendants knew that their construction defect reserves in particular were inadequate.[76] Such assertions are characteristic more of the witnesses' subjective perceptions of corporate culture rather than verifiable fact, which undermines their value as "particularized allegations from which it could be inferred that such a culture was anything more than the CWs' own individual, subjective opinions."[77] Moreover, even to the extent defendants allegedly were attempting to minimize reserves, such allegations are not inconsistent with a belief that existing reserves were sufficient. Rather, they reflect the reality of minimizing costs and generating profits in the insurance industry. And these vague, confidential witness allegations about Argo's reserves culture not only are uncorroborated, but they actually are *contradicted* by the separate financial assessments of both an independent actuary and outside auditor to the company.[78] Thus, even those minimal parts of the confidential witness allegations that

---

[75] *Id.* ¶¶ 55, 59, 61–63, 118.

[76] *See, e.g.*, *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 539 (S.D.N.Y.) ("alleged 'concerns' . . . of a general nature" insufficient to show defendants knew or were reckless in not knowing of insufficiency of loss estimates, even where concerns expressed that "reserve number [was] not large enough."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 Fed. App'x 393 (2d Cir. 2009).

[77] *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 222 (S.D.N.Y. 2020).

[78] *See* Dkt 32-3 (Woan Dec. Ex. C) at 7; Dkt 32-7 (Woan Dec. Ex. G) at F-2; Dkt 32-9 (Woan Dec. Ex. I) at 5; *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 570 (S.D.N.Y. 2004); *In re JP Morgan Chase Sec. Litig.*, No. 02-cv-1282, 2007 WL 950132, at *13 (S.D.N.Y. 2007); *In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *18

actually are relevant to the challenged statements carry little to no probative value given their speculative, subjective, and uncorroborated nature.[79]

Acknowledging these flaws in their central argument, Lead Plaintiffs' argument amounts to nothing more than an allegation that defendants *should* have known — either through the tangentially-related work of the 2017 task force or the rumblings of disgruntled lower-level employees — that their construction defect reserves were inadequate for years 2011 through 2017 and that they therefore should have increased those reserves earlier. But courts repeatedly have rejected such arguments as "underestimation in hindsight . . . rel[ying] on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not possibly have believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate."[80] The mere fact that defendants later revised reserves that it previously had deemed adequate "provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time."[81] And this is particularly true where, as here, there is an "equally compelling

---

[79] (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

For good measure, the Court could go on. Many of the confidential witness allegations also do not specify when the alleged events occurred or cover an indefinite time period. *See Woolgar*, 477 F. Supp. 3d at 221; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (indefinite time period of allegations "renders the task of matching CW allegations to contrary public statements all but impossible"). Moreover, only one of the confidential witnesses was employed at Argo during the time period during which the construction defect reserves at issue were set.

[80] *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013).

[81] *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004); *see also NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10-cv-440, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) (citing *In re CIT Grp.*).

conclusion" that defendants "appropriately made the adjustments [to reserves] based on new information [they] acquired"[82] — the relevant evidence here being the review of *actual reserves* (rather than underwriting guidelines) that Argo conducted during fourth quarter 2021.

This overwhelming body of precedent recognizes the "extremely conjectural" nature of estimating loss reserves, particularly the type of incorporated but not reported reserves that are relevant in this matter.[83] Such reserves are "set aside to cover losses for which claims have not been reported but must be estimated," and require "underwrit[ing] casualty risks with long discovery or reporting delays."[84] As such, "it is 'difficult to calculate and monitor the accuracy of loss reserves established by insurance companies,'"[85] and such reserves frequently "need adjustment as time passes and their accuracy can be tested in retrospect."[86] The fact that defendants declared their reserves to be adequate up until conducting a review which led to their increase in February 2022, then, does not support the backward-looking allegation that they knew or should have known of their inadequacy after convening a task force for a *different purpose* in 2017.

Nor was it misleading for defendants to omit the fact of the 2017 task force from their statements to investors. The Supreme Court has emphasized that meeting the standard for omissions

---

[82]
        *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020).

[83]
        *Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 63, 65 (2d Cir. 1993).

[84]
        *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991); *see also City of Westland*, 129 F. Supp. 3d at 56–57.

[85]
        *City of Westland*, 129 F. Supp. 3d at 57 (cleaned up) (quoting *Stephens*, 6 F.3d at 65).

[86]
        *Stephens*, 6 F.3d at 65; *see also City of Westland*, 129 F. Supp. 3d at 57.

"is no small task for an investor" and that a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."[87] Here, the fact that a 2017 task force reviewed and altered Argo's construction underwriting guidelines is not even a fact that "cut[s] the other way" — as argued above, forward-looking underwriting guidelines and adequate reserves for past policies are *not* flip sides of the same coin.  In any event, in statements and publications actually discussing reserves, defendants repeatedly disclosed the inherent risks involved in their estimation, as well as the potential for their future increase.[88] For example, the company explicitly noted that "existing reserves may be insufficient or redundant," that its "[r]eserves do not represent an exact calculation of liability," and that such a calculation was "an inherently uncertain process dependent on estimates" and many inputs that "are not directly quantifiable."[89] In fact, Argo specifically warned in its 2020 10-K filing that its "estimated net reserve could change by $150.0 million, in either direction,"[90] a range greater than the subsequent change that was ultimately made. Investors are understood to comprehend statements in their full context, "including hedges, disclaimers, and apparently conflicting information."[91]  Given these disclosures and the minimal

---

[87]
     *Omnicare*, 575 U.S. at 189, 194; *see also Chapman*, 466 F. Supp. 3d at 404.

[88]
     The Court agreed with defendants that their marshaling of these risk disclosures does not constitute a "truth-on-the-market defense," as Lead Plaintiffs characterize, Opp. Mem. at 21, but rather rebuts the materiality of any omission regarding the 2017 task force or its revisions. *See* Def. Mem. at 21; Dkt 34 (Def. Reply) at 5.

[89]
     Woan Dec. Ex. G at 21.

[90]
     Dkt 32-2 (Woan Dec. Ex. B) at 75.

[91]
     *Omnicare*, 575 U.S. at 190; *see also* Chapman, 466 F. Supp. 3d at 404 (warnings and disclosures offset suggestions that omissions were material).

relevance of the 2017 task force, it was not a misleading or material omission for defendants to omit such information in any of their reporting or statements on Argo's reserves.

Accordingly, neither the reported fact of defendants' construction defect reserves nor their statements remarking on them constituted actionable opinion statements under *Omnicare*.

### 2. Statements Regarding Argo Construction's Financial Performance

Beyond statements directly implicating Argo's reserves, the AC challenges numerous statements concerning the financial performance, strength, and growth of Argo Construction. While these remarks are too numerous to list in their entirety, a few are representative of Lead Plaintiffs' core allegations, including:

- Defendant Mark Watson's statement that Argo's "construction business continues to prosper as a strong, growing and profitable portfolio exceeding $150 million in premium."[92]

- Watson's statement that Argo's construction business constituted one of the company's "portfolios of risk with the best loss ratios . . ."[93]

- Defendant Kevin Rehnberg's comment to investors that Argo Construction was "driving growth in an industry that continues to flourish in a robust economy. Between rate increases and strong organic business growth, Argo construction continues to exceed our expectations."[94]

---

[92]  AC ¶ 97.

[93]  *Id.* ¶ 99.

[94]  *Id.* ¶ 102.

- Rehnberg's remarks that Argo Construction had "been growing over the past decade into what has been a growth, profit, and digital leader for the organization."[95]

First, and most importantly, the AC fails to satisfy the heightened pleading standards of the PSLRA and Rule 9(b). The PSLRA requires Lead Plaintiffs to "specify . . . the reason or reasons why [a] statement is misleading,"[96] and Rule 9(b) similarly requires them to "'explain why [a] statement[] [is] fraudulent.'"[97] In explaining the false or misleading nature of a given statement, "[t]he Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false — 'they must demonstrate with specificity why that is so.'"[98] In doing so, plaintiffs cannot "leav[e] the District Court to search [] long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false."[99] Nor may plaintiffs plead "a boilerplate paragraph after each alleged misstatement,"[100]

---

95
    *Id.* ¶ 111. *See also id.* ¶¶ 100, 104–05, 107, 109–10, 114–15, 117.

96
    15 U.S.C.A. § 78u-4(b)(1)(B).

97
    *Gamm*, 944 F.3d at 462–63 (quoting *Mills*, 12 F.3d at 1175).

98
    *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)), *aff'd*, 604 Fed. App'x 62 (2d Cir. 2015).

99
    *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. App'x 32, 38 (2d Cir. 2012).

100
    *Nandkumar v. AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023).

relying on "the same formulaic response as to why the statements are false" and "repeat[ing] this formula nearly verbatim for each of the . . . statements they challenge."[101]

Yet this is exactly what Lead Plaintiffs have done. In the section of the AC listing the more than eighteen allegedly false or misleading statements,[102] Lead Plaintiffs leave the Court with "long quotations" to review.[103] Although they occasionally "use[] bold and italics formatting to identify the statements they argue are false or misleading," they do so inconsistently, forcing the Court to guess whether "the entirety of those statements" — or "only portions" — are alleged to be actionable.[104] Moreover, Lead Plaintiffs fail to provide statement-specific reasons why each quoted passage allegedly is false or misleading, instead listing numerous separate quotations one after the other before supplying a generic explanation at the end that is meant to apply to all preceding remarks in that subsection. And the explanation they do provide consists in large portion of the same "boilerplate paragraph" copied and pasted "nearly verbatim" after each subsection:

> "At the time these statements were made, Defendants knew, but failed to disclose, the following facts about Argo's construction business: (1) Argo's construction unit had deficient underwriting guidelines; (2) its construction book of business was over "exposed" for the years 2011-2017; (3) many of the legacy claims underwritten in Argo's construction portfolio between 2011 and 2017 "were written outside of the core construction business"; and (4) by virtue of these problems, the Company would have to increase its reserves in order to adequately cover claims that had been underwritten from 2011-2017 and therefore incur significant adverse reserve

---

[101]     *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, No. 21-cv-4390, 2023 WL 3569068, at *9 (S.D.N.Y. May 19, 2023).

[102]     *See* AC ¶¶ 96–118.

[103]     *Bahash*, 506 Fed. App'x at 38.

[104]     *Array Techs., Inc.*, 2023 WL 3569068, at *8 n.9.

development. Defendants' knowledge of the falsity of the statements above is further demonstrated by the fact that CW4 reported that Defendants Rehnberg and Bullock attended quarterly construction product line review meetings wherein Cornwell presented PowerPoint slides featuring data from Argo's CAPS information system which tracked and managed claims and featured estimated losses. Further, during those same meetings (which were attended by Rehnberg and Bullock), Wade, Laudermilch, and Cornwell commonly "yelled at" staff if they referred to putting up significant reserves. By failing to disclose the issues within Argo Construction and instead touting Argo Construction's growth, Defendants Watson and Rehnberg misled investors about the true nature of Argo Construction."[105]

This lack of specificity fails to inform the Court and defendants of what particular statements or words misled investors, why *those specific statements* allegedly misled them, and the context of their issuance. Lead Plaintiffs' contention that their "use of the same underlying facts . . . does not render the paragraphs boilerplate"[106] is as good as an admission that their formulaic responses are not specifically tailored to each challenged statement, and is not compelling in any event. The PSLRA and Rule 9(b) demand more from the AC. Without it, Lead Plaintiffs have failed to meet the heightened pleading standards governing this case.[107]

Even putting aside the AC's lack of specificity under Rule 9(b) — an independently sufficient reason to dismiss this matter — Lead Plaintiffs plead no facts in the AC demonstrating that statements made from 2018 to 2022 about Argo Construction's financial growth and performance actually were false. In fact, as noted earlier, they concede that they "are not challenging the literal

---

[105]

    AC ¶ 108; *see also id.* ¶¶ 103, 118.

[106]

    Opp. Mem. at 15 n.3.

[107]

    To be clear, this decision on the lack of particularity in the AC applies to *all* statements challenged by Lead Plaintiffs, not just those in this sub-category.

accuracy of Argo's reported financial performance."[108]    Instead, Lead Plaintiffs assert that such statements were materially misleading due to defendants' omission of material facts concerning underlying weaknesses in Argo's construction business.

This contention fails for all of the same reasons previously outlined.  Most notably, Lead Plaintiffs' argument relies on the incorrect premise that the existence of the 2017 task force and its purposes proves "[d]efendants knew that Argo's construction defect claims underwritten from 2011 to 2017 were deficient in material ways."[109]    Again, the fact that the company changed its forward-looking underwriting guidelines is not equivalent to the proposition that its existing construction defect *reserves* were inadequate, let alone that defendants thought so and thus should have disclosed as much at the time.  In addition, Argo's steps to improve its future underwriting and exposure were not an admission that its previous "underwriting policies were inadequate" or that "its book was too exposed."[110]    Courts are not in the business of penalizing companies for reviewing and updating their best practices, and while it did turn out in retrospect that construction defect reserves were too low for a specific set of policies, hindsight bias cannot form the basis of a Section 10(b) claim.

Apart from logical fallacies, Lead Plaintiffs have proffered no compelling reason why defendants should have included information regarding the 2017 task force and its purposes alongside any statements they made about Argo's construction business — that is, why the omission

---

[108]     Opp. Mem. at 16.

[109]     *Id.* at 15.

[110]     *Id.*

of such material rendered the company's statements misleading. The challenged statements generally concern Argo Construction, the group that was created as a separate unit in 2018 and, as Lead Plaintiffs' admit *was* performing as defendants stated. To require defendants to incorporate sweeping disclosures about all facets of their business (past and present) every time they make statements about one specific unit would tend to suppress *any* statements or disclosures by companies, and would swamp those that did speak in litigation. That is not the law, nor should it be. Accordingly, the AC has failed to plead that statements concerning Argo construction's performance constitute materially misleading omissions under Section 10(b).

### 3.    Statements of Corporate Optimism

Finally, the AC challenges numerous statements of general corporate optimism, including representations that Argo is "a leader in multiple specialty lines, such as New York Construction," that Argo Construction is a "new and successful specialty underwriting practice" with "competitive advantages" and a "highly efficient operation," and that the company has "outstanding underwriting and claims expertise."[111] Claims based upon these statements fail for the same reasons stated in the previous section — namely, that Lead Plaintiffs have failed to meet the pleading standards of the PSLRA and Rule 9(b) and their allegations that the statements contain materially misleading omissions rests on a logical fallacy concerning what defendants knew in 2017.

---

[111]    AC ¶¶ 97, 111–113.

28

In any case, these statements constituted "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."[112]  While Lead Plaintiffs attempt to analogize defendants' remarks to meaningful characterizations of management practices, such as "conservative" lending or "adequate" collateralization,[113] representations that Argo's business is "competitive," "efficient," and "new and successful" are more akin to the "broad" statements that "are too general to cause a reasonable investor to rely upon them."[114]  Thus, these statements of general corporate optimism can be dismissed from the AC for the additional reason that they are inactionable "puffery."

### B.  Scienter

In securities fraud cases, *scienter* "means intent to deceive, manipulate, or defraud, . . . or at least knowing misconduct."[115]  Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,"[116] which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to

---

[112]

Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 811 (2d Cir. 1996); *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir. 2009) (quoting *Lasker*).

[113]

Opp. Mem. at 16–17 (quoting *In re Ambac Fin. Grp., Inc. Sec. Litig.,* 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010)).

[114]

*JP Morgan Chase Co.,* 553 F.3d at 206; *see also* Def. Mem. at 24–26 (collecting cases).

[115]

*First Jersey Sec.,* 101 F.3d at 1467.

[116]

15 U.S.C. § 78u–4(b)(2)(A).

commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness."[117] Any "inference of scienter must be more than merely plausible or

reasonable — it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent."[118]

### 1.    *Motive and Opportunity to Commit Fraud*

In order to plead motive and opportunity, Lead Plaintiffs are required to show that

defendants "benefitted in some concrete and personal way from the purported fraud."[119] General

motives "possessed by virtually all corporate insiders"[120] do not meet this heightened standard,

including desires to maintain "the appearance of corporate profitability"[121] and desires to sustain high

stock prices to increase executive compensation or prolong holding office.[122]

Regarding the latter, Lead Plaintiffs' allegations that defendants' incentive

compensation packages constituted a sufficient motive and opportunity are baseless. "If scienter

---

117

        *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

118

        *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

119

        *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000).

120

        *Id.* at 307.

121

        *Id.* at 308 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 814.

122

        *See Acito*, 47 F.3d at 54; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"[123] "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."[124] Lead Plaintiffs fail to provide any connection between defendants' compensation structures and the allegedly fraudulent activity beyond conclusory assertions of motive.

      Beyond generic compensation, the AC asserts that three of the individual defendants — Mark Watson, Kevin Rehnberg, and Jay Bullock — sold Argo common stock during the Class Period for profits of $7.67 million which, it contends, suffice to make out a claim of fraudulent intent.[125] "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."[126]

      Here, all four factors point against fraudulent intent by any of the three individual defendants. First, comparable cases from the Second Circuit have held that amounts comparable to the profits made by Watson, Rehnberg, and Bullock did not give rise to a strong inference of

---

[123]     *JP Morgan Chase Co.*, 553 F.3d at 201 (quoting *Acito*, 47 F.3d at 54).

[124]     *Acito*, 47 F.3d at 54 (cleaned up) (quoting *Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1107 (D. Conn. 1991)).

[125]     AC ¶¶ 171-76.

[126]     *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

31

fraudulent intent.[127] This is made particularly more compelling given that, of the three defendants, Watson's total holdings in Argo stock only decreased by 6.7 percent with his sales, and both Rehnberg's and Bullock's holdings actually *increased* during the class period by 36.8 percent and 8 percent, respectively.[128] Further, the AC notably lacks allegations of fraudulent stock sales against both defendant Scott Kirk and current Argo CEO Thomas Bradley, who was CEO during part of the Class Period as well. The fact that other insiders did not sell Argo stock during the Class Period further cuts against Lead Plaintiffs' claims of fraudulent intent with Watson's, Rehnberg's and Bullock's sales.[129] Accordingly, Lead Plaintiffs fail to plead that the named defendants had both motive and opportunity to commit the fraudulent activities alleged.

### 2.    Evidence of Conscious Misbehavior or Recklessness

Alleging conscious misbehavior is relatively uncomplicated, "since it encompasses

---

[127]
    *San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 813–14 (sale of stock by executive resulting in over $2 million in profit did not give rise to a strong inference of fraudulent intent); *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (sale of stock by executive resulting in $1.6 million in profit did not give rise to a strong inference of fraudulent intent).

[128]
    *See* Dkts 32-24, 32-25, 32-26 (Woan Dec. Exs. X, Y, Z); *see also In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382–83 (E.D.N.Y. 2003) (no inference where defendants sold less than 20 percent of holdings); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (sales of 22.5 percent and 4.9 percent of executives' respective holdings did not provide strong inference of fraud); *Acito*, 47 F.3d at 54 (sales of 11 percent of holdings did not provide strong inference of fraud); *Glaser*, 772 F. Supp. 2d at 592 (no inference where holdings actually increased during time period).

[129]
    *See San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 814; *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006).

deliberate illegal behavior."[130]  Recklessness, however, is more difficult to define.  At times, the

Second Circuit has described it as "[a]n egregious refusal to see the obvious"[131] or "a state of mind

approximating actual intent, and not merely a heightened form of negligence,"[132] though it perhaps

is best understood through "the actual facts of our securities fraud cases."[133]  In this regard, plaintiffs

sufficiently have pleaded *scienter* based on recklessness "when they have specifically alleged

defendants' knowledge of facts or access to information contradicting their public statements."[134]

 Given this definition, Lead Plaintiffs' allegations of conscious misbehavior or

recklessness largely fail for the reasons stated above.  Again, defendants' alleged knowledge of the

misleading nature of their statements is said to come primarily from the creation of the 2017 task

force.[135]  Yet neither the fact of its existence nor defendants' knowledge of it does not give rise to

an inference that they knew also of the future need to increase construction defect reserves in 2022.

 Nor can the allegations of any of the confidential witnesses save Lead Plaintiffs'

complaints.  For one thing, none of the four confidential witnesses had direct contact with any

defendants, nor did three of the four even work in a department with insight into construction defect

---

[130]
 *Novak*, 216 F.3d at 308.

[131]
 *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y. 1989)).

[132]
 *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).

[133]
 *Novak*, 216 F.3d at 308.

[134]
 *Id.*

[135]
 *See* Opp. Mem. at 24–25.

reserves while employed at Argo.[136] Reports that defendants fostered a culture of reserve repression or were concerned about construction claims are too vague and unspecific sufficient to infer their knowledge specifically of inadequate construction defect reserves for years 2011 through 2017.[137] Even if they were, they are more emblematic of the witnesses' subjective opinions rather than defendants' particularized knowledge.[138] In addition, many of the confidential witness allegations actually do not suggest what Lead Plaintiffs contend they suggest. For example, assertions that defendants attended "quarterly town hall meetings" where "loss ratios" and "premiums written" were discussed and that they were "presented PowerPoint presentations" on estimated losses for claims say nothing about what those estimated losses actually *were* or what financial experts were projecting for the company's forecasts.[139] And to the extent defendants did resist posting reserves, all that necessarily reflects is the reality of minimizing costs and generating profits in the insurance industry, not knowledge that results were too low.

Finally, to any extent that Lead Plaintiffs' allegations did support any inference of *scienter*, such an inference would be outweighed significantly by inferences of non-culpable states of mind. Predicting loss reserves is an inherently inexact and speculative task, and the fact that defendants had an independent actuary and outside auditor reaffirm their projections undermines any inference of fraudulent intent. Moreover, the fact that none of the individual defendants significantly

---

[136]    AC ¶¶ 45, 52, 57.

[137]    *See, e.g., In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 539.

[138]    *See Woolgar*, 477 F. Supp. 3d at 222.

[139]    AC ¶¶ 49, 141.

34

capitalized on Argo's financial position during the Class Period — and indeed, two of them even increased their positions in the company, and a third sold no stock at all — suggests that they also did not expect to have to adjust downward the company's financial outlook.  Accordingly, Lead Plaintiffs fail to plead either conscious misbehavior or recklessness in the AC.

### C.    Scheme Liability

In addition to liability under Rule 10b-5(b) for making misleading statements, Rules 10b-5(a) and (c) authorize also "what courts have called scheme liability for those who . . . engage in deceitful conduct."[140]   Liability under these provisions "is triggered where the defendant 'performed an inherently deceptive act that was distinct from an alleged misstatement.'"[141]  Scheme liability is designed to "capture a wide range of conduct."[142]

Count One of the AC charges defendants, among other things, with scheme liability by asserting that they "carried out a . . . scheme and course of conduct" to "deceive the investing public."[143]  Nowhere else in the AC, however, do Lead Plaintiffs allege *facts* that show a scheme by defendants as distinct from their alleged misstatements and omissions.  Indeed, the rest of the

---

[140]   *S.E.C. v. Hwang*, 692 F. Supp. 3d 362, 378 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *S.E.C. v. Jean–Pierre*, No. 12-cv-8886, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)).

[141]   *S.E.C. v. Farnsworth*, 692 F. Supp. 3d 157, 189 (S.D.N.Y. 2023) (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022)).

[142]   *Lorenzo v. S.E.C.*, 587 U.S. 71, 79 (2019).

[143]   AC ¶ 201.

complaint does not mention the word "scheme" at all.

3.      *Count Two: Violations of Section 20(a) of the Exchange Act*

Count Two of the AC alleges that defendants Watson and Rehnberg violated Section 20(a) of the Exchange Act by using their positions of authority and control over Argo to cause the company to engage in the wrongful acts discussed above and by violating their "duty to disseminate accurate and truthful information."[144]  Here, the AC fails adequately to allege a primary violation of Section 10(b) and Rule 10b-5.  Count Two therefore fails to state a claim upon which relief can be granted.[145]

### Conclusion

For the foregoing reasons, defendants' motion to dismiss (Dkt 30) is GRANTED.

SO ORDERED.

Dated:        December 12, 2024

                                                                    _____
                                                                    Lewis A. Kaplan
                                                                    United States District Judge

---

[144]    AC ¶¶ 211–15.

[145]    *See Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004) (noting that a Section 20(a) claim—which is "necessarily predicated on a primary violation of securities law"—"must also be dismissed" where "the district court properly dismissed the primary securities claims against the . . . defendants").